## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

(1) DANIEL HANCHETT, as Personal )
 representative of the Estate of Shannon )
Hanchett, Deceased, )    Attorney Lien Claimed
  )    Jury Trial Demanded
       Plaintiff, )
  )
vs. )    CASE NO.: CV-24-87-SLP
  )
(1) SHERIFF OF CLEVELAND COUNTY, )
    IN HIS OFFICIAL CAPACITY, )
(2) TURN KEY HEALTH CLINICS, LLC, )
(3) DIANA MYLES-HENDERSON, LPC, )
(4) TARA DOTO, LPN, )
(5) NATASHA KARIUKI, LPN, )
  )
  )
       Defendants. )

## COMPLAINT

**COMES NOW**, the Plaintiff Daniel Hanchett ("Plaintiff"), as Personal

Representative of the Estate of Shannon Hanchett ("Ms. Hancett"), deceased, and for his

Complaint against the above-named Defendants, states and alleges as follows:

## PARTIES

1. Plaintiff Daniel Hanchett, as Personal Representative of the Estate of

Shannon Hanchett, deceased, is a citizen of the State of Oklahoma and Personal

Representative of Ms. Hanchett's Estate. Ms. Hanchett was Plaintiff's late wife.

2. Defendant Sheriff of Cleveland County, Oklahoma ("Sheriff") is the Sheriff

of Cleveland County, Oklahoma, residing in Cleveland County, Oklahoma and acting

under color of state law. The Sheriff is sued purely in his official capacity.  It is well-

established, as a matter of Tenth Circuit authority, that a § 1983 claim against a county sheriff in his official capacity "is the same as bringing a suit against the county." *Martinez v. Beggs,* 563 F.3d 1082, 1091 (10th Cir. 2009). *See also Porro v. Barnes,* 624 F.3d 1322, 1328 (10th Cir. 2010); *Bame v. Iron Cnty.,* 566 F. App'x 731, 737 (10th Cir. 2014). Thus, in suing the Sheriff in his official capacity, Plaintiff has brought suit against the County/Cleveland County Sheriff's Office ("CCSO").

3.     Defendant Turn Key Health Clinics, LLC ("Turn Key") is an Oklahoma limited liability company doing business in Cleveland County, Oklahoma. Turn Key is a private correctional health care company that contracts with counties, including Oklahoma County, to provide medical professional staffing, supervision and care in county jails. Turn Key was, at times relevant hereto, responsible, in part, for providing medical services, supervision and medication to Ms. Hanchett while she was in custody at the Jail. Turn Key was additionally responsible, in part, for creating, implementing and maintaining policies, practices and protocols that govern the provision of medical and mental health care to inmates at the Jail, and for training and supervising its employees. Turn Key was endowed by Cleveland County/CCSO with powers or functions governmental in nature, such that Turn Key became an agency or instrumentality of the State and subject to its constitutional limitations.

4.     Defendant Diana Myles-Henderson, L.P.C., ("Myles-Henderson") is a citizen of Oklahoma. Myles-Henderson was, at all times relevant hereto, acting under color of state law as an employee and/or agent of Turn Key/CCSO/Cleveland County. Myles-Henderson was, in part,  responsible for overseeing Ms. Hanchett's health and well-being,

and assuring that Ms. Hanchett's medical/mental health needs were met, during the time she was in the custody of the Jail/CCSO. Myles-Henderson is being sued in her individual capacity.

5.     Defendant Tara Doto, LPN ("Nurse Doto") is a citizen of Oklahoma. Nurse Doto was, at all times relevant hereto, acting under color of state law as an employee and/or agent of Turn Key/CCSO/Cleveland County. Nurse Doto was, in part, responsible for overseeing Ms. Hanchett's health and well-being, and assuring that Ms. Hanchett's medical/mental health needs were met, during the time she was in the custody of the Jail/Cleveland County. Nurse Doto is being sued in her individual capacity.

6.     Defendant Natasha Kariuki, LPN ("Nurse Kariuki") is a citizen of Oklahoma. Nurse Kariuki was, at all times relevant hereto, acting under color of state law as an employee and/or agent of Turn Key/CCSO/Cleveland County. Nurse Kariuki was, in part,  responsible for overseeing Ms. Hanchett's health and well-being, and assuring that Ms. Hanchett's medical/mental health needs were met, during the time she was in the custody of the Jail/Cleveland County. Nurse Kariuki is being sued in her individual capacity.

## **JURISDICTION AND VENUE**

7.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C § 1343 to secure protection of and to redress deprivations of rights secured by the Eighth and/or Fourteenth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of State law.

8.     This Court also has original jurisdiction under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Eighth and/or Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

9.     This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367, since claims form part of the same case or controversy arising under the United State Constitution and federal law.

10.     The acts complained of herein occurred in Cleveland County, Oklahoma. Jurisdiction and venue are thus proper under 28 U.S.C. §§ 116(a) and 1391(b).

## STATEMENT OF FACTS

### Facts Specific to Ms. Hanchett

11.     Paragraphs 1-10 are incorporated herein.

12.     Shannon Hanchett was the owner of Norman's Cookie Cottage, a well-known and beloved bakery in Norman, OK.

13.     Unfortunately, in 2022, Ms. Hanchett began to exhibit signs of mental illness consistent with bipolar disorder and/or schizophrenia.

14.     On the evening of November 26, 2022, Ms. Hanchett entered an AT&T store in Norman, OK exhibiting obvious signs of a serious mental health episode.

15.     Clearly confused, distressed, and suffering from delusions, Ms. Hanchett called 911 from the store, and a Norman Police Department ("NPD") Officer responded to the scene.

16.     The officer acknowledged that Ms. Hanchett appeared to be exhibiting behavior consistent with a mental health disorder.

17.     Despite this recognition, the officer ultimately arrested Ms. Hanchett for misdemeanor obstruction and transported her to the Cleveland County Jail ("Jail").

18.     Ms. Hanchett had no criminal history and this was her first time in a detention facility / jail.

19.     Upon information and belief, Ms. Hanchett's mental health status, which could conservatively be described as acute psychosis,  sharply deteriorated upon arrival at the Jail.

20.     Turn Key nurse Danille Hay, LPN[1], began the medical intake process with Ms. Hanchett but was unable to complete it due to Ms. Hanchett's ongoing and severe mental health crisis.

21.     Nurse Hay was able to chart, however, that Ms. Hanchett suffered from lupus and bipolar disorder.

---

[1]     LPNs have about a year of nursing education, often culminating in a certificate. The role of an LPN is, as the name suggests, practical. Typical duties for which an LPN is qualified are: record a patient's health history; administer medications (under the supervision of an RN or physician); perform wound care; measure and record vital signs; observe a patient's condition. "LPNs cannot diagnose any medical condition or prescribe any medication." *See* American College Health Association Guidelines February 2023, https://www.acha.org/documents/resources/guidelines/ACHA_Scope_of_Practice_for_Colleg e_Health_LPNs_Feb2023.pdf. LPNs are expected to report even minor changes in patient care to a registered nurse or other medical professional. *See also, Estate of Jensen by Jensen v. Clyde,* 989 F.3d 848, 852 (10th Cir. 2021) ("An LPN designation does not require an associate's or bachelor's degree … [LPNs are] prohibited from prescribing medications, conducting health assessments, and diagnosing medical conditions.").

22.     Nurse Hay also took Ms. Hanchett's vital signs. Her blood pressure (143/89) and pulse (120 BPM) were both elevated. Nurse Hay did not, however, take any steps to address these concerning vital signs.

23.     Nurse Hay also noted at 2:34 a.m. on November 27, 2022 that Ms. Hanchett was "uncooperative" and she was unable "to complete [intake] at this time."

24.     Upon information and belief, Ms. Hanchett was placed in a general population cell despite her obvious and acute psychosis that prevented her from even completing a medical intake form.

25.     Pursuant to OAC 310:670-5-8(7), because Ms. Hanchett was held for more than 48 hours, she was required to undergo a medical examination performed by licensed medical personnel, which means a medical doctor ("MD"), osteopathic physician ("DO"), physician's assistant ("PA"), registered nurse ("RN"), licensed practical nurse ("LPN"), emergency medical technician at the paramedic level, or clinical nurse specialist.

26.     Upon information and belief, for the following three days, Ms. Hanchett continued to deteriorate in the throes of an untreated mental health crisis. During this time, neither Jail staff nor Turn Key staff did anything to treat Ms. Hanchett's serious conditions. Indeed, there is no indication in the medical records that any **_Turn Key employee/agent assessed, evaluated, or treated Ms. Hanchett from the time she was booked until the evening of November 30._**

27.     On November 30, 2022, Ms. Hanchett was found lying on the floor of her cell completely naked and incoherent.

28.     At 6:32 p.m. on November 30, Turn Key employee Diana Myles-Henderson, Licensed Professional Counselor[2] ("LPC"), charted that: Ms. Hanchett was scheduled for a mental health evaluation and "witnessed nude [and] without inhibition in the middle of the floor." Further, Ms. Hanchett "presented to be a threat to herself and others due to her defiance…PT will be placed on status for her own protection as well as others at this time."

29.     It was also noted that Ms. Hanchett: 1) had poor insight and poor judgment; 2) was confused; 3) made poor eye contact; 4) had flat affect and indifferent mood; and 5) had suicidal ideation.

30.     By this point, at the latest, it was abundantly obvious that Ms. Hanchett was in this midst of a serious and complex psychotic episode which could not be safely or adequately assessed or treated at the Jail by Turn Key's unqualified and unsupervised staff.

31.     On Ms. Hanchett's chart under "Plan," Myles-Henderson simply wrote "referred to security." Despite acknowledging Ms. Hanchett's serious condition, Myles-Henderson failed to refer her to a physician, physician's assistant ("PA"), nurse practitioner ("NP"), or registered nurse ("RN").

32.     This was deliberate indifference to a serious medical and/or mental health need.

33.     Ms. Hanchett was placed on suicide watch on November 30, but she had still not even completed a medical intake. Nor had she been assessed, evaluated, or treated by

---

[2]     LPCs are not authorized or qualified to provide any medical or psychiatric evaluation, treatment, or assessment.

a physician, PA, RN, LPN, or NP. Ms. Hanchett had also not been started on any psychotropic medications despite the obvious need. Of course, Turn Key's staff at the Jail was not qualified, nor licensed, to prescribe Ms. Hanchett with any medication.

34.     On suicide watch, Ms. Hanchett was supposed to be checked by Jail staff every 15 minutes. Upon information and belief, however, Jail staff repeatedly failed to conduct the required 15-minute checks.

35.     Upon information and belief, between November 30 and December 3, 2022, Ms. Hanchett's mental health crisis continued completely unabated. She was not evaluated or treated by a physician, RN, LPN, NP, PA, or even LPC Myles-Henderson. Rather, she was left alone in her cell, where she lay naked, in a state of catatonia, scared, confused, and falling deeper into the throes of her mental illness.

36.     Upon information and belief, Jail staff routinely missed the required 15-minute checks of Ms. Hanchett.

37.     In the alternative, when Jail staff conducted some of the required checks, they observed her bizarre behavior and obviously serious conditions, and failed to report their observations to medical staff.

38.     On December 1, 2022 at 10:40 a.m., Turn Key Nurse Natasha Kariuki, LPN, charted that she observed Ms. Hanchett lying "on floor talking to herself."

39.     Nurse Kariuki, however, did not compete a medical intake for Ms. Hanchett, did not take her vital signs, and provided no assessment or treatment at all. Nurse Kariuki did not call a physician or higher level provider. Nurse Kariuki was deliberately indifferent to Ms. Hanchett's serious medical and mental health needs.

40.     On December 1, 2022 at 7:05 p.m., Nurse Hay noted that she observed Ms. Hanchett "pacing in cell talking to herself."

41.     Nurse Hay, however, did not compete a medical intake for Ms. Hanchett, did not take her vital signs, and provided no assessment or treatment at all. Nurse Hay did not call a physician or higher level provider. Nurse Hays was deliberately indifferent to Ms. Hanchett's serious medical and mental health needs.

42.     On December 2, 2022 at 6:00 p.m., Turn Key Nurse Tara Doto, LPN noted that she observed Ms. Hanchett "yelling at window[.]" Nurse Doto took no additional steps to assess or treat Ms. Hanchett, or refer her to a higher level medical or mental health provider. This is deliberate indifference to a serious medical and/or mental health need.

43.     On December 4, 2022 at approximately 11:00 a.m., LPC Myles-Henderson saw Ms. Hanchett again. She observed Ms. Hanchett in essentially the same position and mental health condition as she had been on November 30. That is, Ms. Hanchett was seen "nude without inhibition in the idle of the floor. PT presented to be a threat to herself and others due to her defiance…PT refused to interact with staff and this provider…PT is not responding verbally."

44.     On December 4, LPC Myles-Henderson noted that ***Ms. Hanchett's "current symptom severity" was "severe – marked impact on inmate's ability to function satisfactorily in the current outpatient setting."***

45.     Myles-Henderson also charted that Ms. Hanchett: 1) had a flat affect and indifferent mood; 2) was not alert; 3) was not oriented to person, place, time, and situation;

4) lacked appropriate hygiene; 5) had poor judgment and insight; and 6) exhibited "monotonous" speech.

46.     LPC Myles-Henderson additionally charted that there had been "no progress" after this mental health encounter. Under "overall progress," she charted "no change."

47.     In other words, Myles-Henderson acknowledged: 1) the severity of Ms. Hanchett's condition; and 2) that Ms. Hanchett had made ***no progress*** between her arrival at the Jail on November 26 and December 4.

48.     Myles-Henderson charted that her plan was to refer Ms. Hanchett to both "security" and to "medical staff for medication evaluation."

49.     Once again, it was obvious that Ms. Hanchett was in this midst of a serious and complex psychotic episode which could not be safely or adequately assessed or treated at the Jail by Turn Key's unqualified and unsupervised staff. Myles-Henderson's failure to secure urgent or emergent evaluation and treatment by a prescribing provider constitutes deliberate indifference.

50.     On December 4, 2022 at 8:05 p.m., Nurse Doto observed Ms. Hanchett "laying on floor talking to self." Nurse Doto took no additional steps to assess or treat Ms. Hanchett or refer her to a higher level medical or mental health provider.

51.     LPC Myles-Henderson saw Ms. Hanchett again on December 5, 2022.

52.     She noted that Ms. Hanchett "WAS SEEN ON SUICIDE WATCH. PT PRESENTED AVOIDANT, ***PSYCHOTIC*** AND INDIFFERENT. PT WAS NOT RESPONSIVE TODAY BUT WAS ***LYING NUDE ON THE FLOOR.***"

53.     Yet again, with deliberate indifference, Myles-Henderson failed to provide or secure necessary and qualified care for Ms. Hanchett.

54.     At 8:48 p.m. on December 5, Nurse Doto observed Ms. Hanchett, "laying on floor eating an apple." Nurse Doto took no additional steps to assess or treat Ms. Hanchett, take her vital signs, or refer her to a higher level medical or mental health provider. This was yet another example of deliberate indifference.

55.     Upon information and belief, Jail detention staff had still been failing to regularly conduct the required 15-minute checks on Ms. Hanchett.

56.     Upon information and belief, when Jail detention staff did complete their required checks, they observed that Ms. Hanchett had not been adequately eating or drinking for days, but Jail detention staff failed to report these dangerous symptoms to a physician or other medical provider.

57.     At 9:39 p.m. on December 5, on one of the occasions on which Jail staff did check on Ms. Hanchett, detention officers requested that Nurse Doto take Ms. Hanchett's vital signs, as she was in an obvious medical and mental health crisis.

58.     Due to Ms. Hanchett's untreated and obvious psychosis, she was unable to even comply with the basic request to have her vitals taken by Nurse Doto. Upon information and belief, she was incoherent, delusional, hallucinating, and rapidly approaching a state of catatonia.

59.     Instead, of informing a more highly trained medical provider of Ms. Hanchett's condition, Nurse Doto simply filled out a "waiver of treatment/evaluation form" for Ms. Hanchett, writing that "PT refused to let me take vitals." Ms. Hanchett was

unable to sign the waiver due to her condition, so Nurse Doto wrote "refused" on the "patient signature" line.

60.     This was yet another obvious and dire sign that Ms. Hanchett could not be safely or adequately assessed or treated in a correctional setting. Nurse Doto was deliberately indifferent.

61.     On December 6, 2022 at 7:05 a.m., Turn Key Nurse Jewel Johnson, LPN, charted that she observed Ms. Hanchett ***"laying on back moving around [and] talking to herself. Not responding to verbal stimuli when asked if she is okay." Nurse Johnson took no vitals and provided no further assessment or any treatment.***

62.     On December 6 at approximately 11:30 a.m., Ms. Hanchett was finally seen by a medical provider other than Myles-Henderson or Turn Key LPNs.

63.     Turn Key psychiatrist, Jawaun Lewis, MD, provided the following assessment: Ms. Hanchett was "actively ***responding to internal stimuli*** and unable to provide clear history"; she was not oriented to person, place, time and situation; she was irrational, confused, and delusional; she had poor judgment and insight; her symptoms were ***"currently causing significant distress or impaired functioning"***; and her symptoms were ***"severe − marked impact on inmate's ability to function satisfactorily in the current outpatient setting."***

64.     Dr. Lewis knew that the staff at the Jail was incapable of providing the level of care Ms. Hanchett needed. Nonetheless, he left her at the Jail in disregard for the obvious and excessive risks to her health and safety.

65.     At 7:08 p.m. on December 6, Nurse Hay observed Ms. Hanchett "laying on cell floor, responding to internal stimuli." Nurse Hay took no additional steps to assess or treat Ms. Hanchett, or refer her to a higher level medical or mental health provider.

66.     A short time later, upon information and belief, Nurse Kariuki took Ms. Hanchett to a holding cell – which contained other inmates – to attempt to complete a medical intake.

67.     At approximately 7:19 p.m., it was reported that Ms. Hanchett was assaulted by another inmate.

68.     Nurse Kariuki charted: "PATIENT WAS WALKING AROUND IN THE HOLDING CELL. … PATIENT REFUSED MEDICAL ATTENTION."

69.     Nurse Kariuki also noted, "PATIENT STILL NEEDS A MEDICAL INTAKE. SHE DID NOT WANT TO ANSWER MY QUESTIONS TODAY. SHE IS ALREADY SCHEDULED TO HAVE HER INTAKE COMPLETED AT ANOTHER TIME."

70.     At approximately 7:24 p.m. on December 6, Nurse Kariuki noted that Ms. Hanchett "should stay housed in processing until she has been cooperative during the intake process," ignoring the obvious fact that Ms. Hanchett was experiencing an ongoing and escalating mental health crisis that was completely uncontrolled.

71.     Of course, Ms. Hanchett was not deliberately being "uncooperative." Nor did she consciously "refuse" medical attention after she was assaulted. She was in the midst of an ongoing medical and mental health crisis that required emergent care. Yet, with negligence and deliberate indifference, Nurse Kariuki failed to provide any treatment or

assessment of Ms. Hanchett, take her vitals, or refer her to an outside medical provider or more highly trained medical professional.

72.   Upon information and belief, Ms. Hanchett was placed back in a suicide watch cell.

73.   At approximately 9:30 a.m. on December 7, 2022, Nurse Kariuki was called to perform a "welfare check" on Ms. Hanchett.

74.   Nurse Kariuki noted that Ms. Hanchett was ***"laying on the ground covered in a green smock…Patient was talking to herself, she stated, 'they are going to kill me.' …*** Patient needing assistance sitting up for assessment. A full medical intake has not been able to be completed due to the patient's medical health status. ***She is unable to answer questions."***

75.   Nurse Kariuki took Ms. Hanchett's vital signs, ***which had not been taken since November 27***. Ms. Hanchett's blood pressure was 88/52, which is alarmingly low, especially compared to her blood pressure upon intake, which was 143/89. Nurse Kariuki did nothing to treat Ms. Hanchett's blood pressure and did not report it to a higher-level provider. This constitutes negligence and deliberate indifference.

76.   Upon information and belief, Ms. Hanchett had not been eating or drinking for several days. Indeed, Nurse Kariuki wrote that, "Per [Turn Key Nurse Practitioner] Becky Pata, give Gatorade BID x 5 days. She will also need to be monitored drinking water…"

77.     At approximately 12:09 p.m. on December 7, Turn Key Nurse Amanda Smith, LPN charted that Ms. Hanchett was cleared to move to medical housing "and to have clothes."

78.     Ms. Hanchett had not yet received a full medical intake, was in the midst of a serious mental health crisis, her blood pressure had plummeted to dangerously low levels, and had not been eating or drinking, *yet she was <u>still</u> not scheduled to be medically assessed by a physician, PA, or NP and was provided absolutely no medical treatment.* The Turn Key and CCSO staff were completely and utterly failing to provide basic care for Ms. Hanchett.

79.     On December 7, 2022 at approximately 4:34 p.m., LPC Myles-Hendrson saw Ms. Hanchett again.

80.     Myles-Henderson noted that Ms. Hanchett **"HAD NOT BEEN EATING [OR] TAKING MEDICAITON."** She further charted that Ms. Hanchett lacked appropriate hygiene, had "poor orientation," had "auditory [and] visual" hallucinations, had not been eating, and had poor insight.

81.     ***Under "psychotropic medication", Myles-Henderson checked the box for "none reported."***

82.     It was abundantly clear that Ms. Hanchett was suffering from a condition that could not be, and was not being, adequately treated in a correctional setting. With negligence and deliberate indifference, Myles-Henderson failed to call for an ambulance or otherwise ensure that Ms. Hanchett was urgently evaluated by a physician, PA, NP, or even an RN.

83.     Shortly after midnight on December 8, 2022, Nurse Doto discovered Ms. Hanchett "sitting crisscross up against the toilet, not responding to name." Nurse Doto called for additional female rovers because Ms. Hanchett was found completely naked, as she had been for several days prior.

84.     Upon information and belief, Jail detention staff had not been conducting their required 15-minute checks of Ms. Hanchett, and Ms. Hanchett had been left alone and unsupervised in her cell for hours before she was found unresponsive.

85.     Nurse Doto called 911 and attempted CPR, but it was too late. Ms. Hanchett had no pulse and was not breathing. Resuscitation efforts were futile, and a Norman Fire Department official declared Ms. Hanchett deceased.

86.     Nurse Doto noted that she informed Nurse Amanda Smith, who was the charge nurse[3], about Ms. Hanchett's condition at approximately 12:45 a.m.

87.     The Medical Examiner's office determined that Ms. Hanchett died of heart failure. Other significant conditions contributing to her death were psychosis with auditory and visual hallucinations and severe dehydration.

88.     On information and belief, Ms. Hanchett's death was would not have occurred in the absence of her prolonged catatonia and severe dehydration.

89.     Ms. Hanchett was just 38 years old when she died.

■  **The Jail's and Turn Key's Policy and Custom of Inadequate Medical Care**

---

[3]      Charge nurses oversee the operations of their specific medical unit. By permitting an LPN to act as charge nurse, Turn Key/CCSO left the Jail's medical unit to be supervised by a nurse who was unqualified for – and incapable of fulfilling – the duties to which she was assigned.

90.     Paragraphs 1-89 are incorporated herein.

91.     It is believed that Defendant Turn Key is the largest private medical care provider to county jails in the state.  Turn Key used its political connections to obtain contracts in a number of counties, including Cleveland County, Oklahoma County, Creek County, Tulsa County, Muskogee County, Garfield County, Ottawa County, Pottawatomie County, and Creek County.

92.     Turn Key has demonstrated, over a period of years, that its medical delivery system and "plan" is dangerously deficient. At least by the time of Ms. Hanchett's death, the County/CCSO knew, or should have known, that Turn Key's grossly deficient system and "plan" posed excessive risks to the health and safety of inmates, like Ms. Hanchett, who suffer from serious and complex medical conditions.

93.     To achieve net profits, Turn Key implemented policies, procedures, customs, or practices to reduce the cost of providing medical and mental health care service in a manner that would maintain or increase its profit margin.

94.     Under the Contract in effect while Ms. Hanchett was housed at the Jail, Turn Key was responsible to pay the costs of all pharmaceuticals at the Jail up to just $40,000 per year (both prescription and over-the-counter). If the annual pharmaceutical costs exceeded this limit, CCSO/Cleveland County was responsible for the excess costs.

95.     Similarly, Turn Key was responsible to pay the costs for all off-site medical services and hospitalizations up to just $50,000 per year, and CCSO/Cleveland County was responsible for any excess costs of inmate hospitalizations and off-site medical care.

96.     The Contract provided that Turn Key will arrange and bear the cost of hospitalization of inmates who – in the opinion of the Turn Key treating physician or medical director, require hospitalization – up to the agreed-upon limit.

97.     These contractual provisions create a dual financial incentive to under-prescribe and under-administer medications and to keep inmates, even inmates with serious medical needs, at the Jail and to avoid off-site medical costs.

98.     These financial incentives create risks to the health and safety of inmates like Ms. Hanchett who have complex and serious medical and mental health needs, such as bipolar disorder, schizophrenia, catatonia, dehydration, malnutrition, hyperthyroidism, and heart disease.

99.     Turn Key provides inadequate guidance, training and supervision to its medical staff regarding the appropriate standards of care with respect to inmates with complex or serious medical and/or mental health needs.

100.    Specifically, Turn Key has an established practice of failing to adequately assess and treat -- and ignoring and disregarding -- obvious or known symptoms of emergent and life-threatening conditions.

101.    These failures stem from the chronic unavailability of an on-site physician, financial incentives to avoid the costs of inmate prescription medications and off-site treatment and a failure to train and supervise medical staff in the assessment and care of inmates with complex or serious medical needs, such as bipolar disorder, schizophrenia, catatonia, dehydration, malnutrition, hyperthyroidism, and heart disease.

102.    Decisions related to the assessment and treatment of Ms. Hanchett were largely made by LPNs and LPCs who failed to refer Ms. Hanchett to a physician or offsite medical provider for a medical assessment.

103.    Indeed, Ms. Hanchett was never medically assessed by a physician, PA, NP, or even RN. And in fact, her medical intake was never completed in the two weeks she was at the Jail.

104.    Ms. Hanchett was also not provided with any medications to address her obviously serious medical conditions save for being prescribed one psychotropic medication less than 48 hours before her death. By that point, however, her deterioration was such that she was incapable of voluntarily accepting medication.

105.    Additionally, Turn Key has an established practice of failing to adequately assess inmates with complex and serious medical and mental health needs, including a failure to regularly take vital signs.

106.    Even on the rare occasions Turn Key staff takes vital signs from inmates with complex and serious medical and mental health needs, like Ms. Hanchett, Turn Key has an established practice of failing to train medical and mental health staff on what constitutes alarming vital signs; when to report alarming vital signs to a physician; and failing to send inmates with complex and serious medical and mental health needs to an outside medical facility for an adequate assessment and treatment.

107.    Turn Key's inadequate or non-existent policies and customs were a moving force behind the constitutional violations and injuries alleged herein.

108.    Turn Key's corporate policies, practices, and customs, as described *supra*, have resulted in deaths or negative medical outcomes in numerous cases, in addition to Ms. Hanchett.

109.    In November 2014, while detained at the Cleveland County Jail, Robert Allen Autry developed a sinus infection. Both he and his mother informed Turn Key medical staff that a traumatic brain injury he suffered as a teenager made him particularly susceptible to sinus infections causing life threatening brain injections. Mr. Autry and his mother repeatedly asked medical staff to provide antibiotics, but none were provided.

110.    Approximately two weeks after she initially contacted medical staff about her son's condition and need for care, Turn Key staff called Mr. Autry's mother asking her to provide written consent for Mr. Autry to receive emergency surgery.

111.    He had been found unconscious in his cell and had been transported to the hospital. Later the same day, Mr. Autry was diagnosed with "a serious bacterial infection in his brain as a result of an untreated sinus infection." Mr. Autry underwent emergency brain surgery and subsequently a serious of other operations and procedures to place a feeding tube, insert a tracheal tube, and replace a cranial monitoring probe.

112.    Eventually, the treating physician determined Mr. Autry "was totally incapacitated from a brain injury resulting from a brain abscess and subdural empyema" and "would likely never return to an independent state."

113.    In June 2016, a nurse who worked for Turn Key at the Garfield County Jail allegedly did nothing to intervene while a hallucinating man was kept in a restraint chair for more than 48 hours. That man, Anthony Huff, ultimately died restrained in the chair.

114.    On September 24, 2017, a 25-year-old man named Caleb Lee died in the Tulsa County Jail after Turn Key medical staff, in deliberate indifference to Mr. Lee's serious medical needs, provided nearly nonexistent treatment to Mr. Lee over a period of 16 days. Mr. Lee was not seen by a physician in the final six (6) days of his life at the Tulsa County Jail (and only once by a psychologist during his entire stay at the jail), despite the fact that other Turn Key staff noted that he was suffering from: tachycardia, visible tremors, psychosis, symptoms of delirium, stage 2 hypertension, paranoia, and hallucinations. Turn Key staff failed to transfer Mr. Lee to an outside medical provider despite these obviously serious symptoms that worsened by the day until Mr. Lee's death on September 24, 2017.

115.    An El Reno man died in 2016 after being found naked, unconscious and covered in his own waste in a cell at the Canadian County Detention Center, while ostensibly under the care of Turn Key medical staff. The Office of the Chief Medical Examiner found the man had experienced a seizure in the days before his death.

116.    Another man, Michael Edwin Smith, encountered deliberate indifference to his serious medical needs at the Muskogee County Jail in the summer of 2016.  Mr. Smith became permanently paralyzed when the jail staff failed to provide him medical treatment after he repeatedly complained of severe pain in his back and chest, as well as numbness and tingling. Smith claims that cancer spread to his spine, causing a dangerous spinal compression, a condition that can cause permanent paralysis if left untreated.  Smith asserts that he told the Turn Key-employed physician at the jail that he was paralyzed, but the physician laughed at Smith and told him he was faking. For a week before he was able to bond out of the jail, Smith was kept in an isolation cell on his back, paralyzed, unable to

walk, bathe himself or use the bathroom on his own. He was forced to lay in his own urine and feces because staff told Smith he was faking paralysis and refused to help him.

117.   In November of 2016, Turn Key staff disregarded, for days, the complaints and medical history of James Douglas Buchanan while he was an inmate in the Muskogee County Jail. As noted by Clinton Baird, M.D., a spinal surgeon:

> [Mr. Buchanan] is a 54-year-old gentleman who had a very complicated history… [H]e was involved in being struck by a car while riding bicycle several weeks ago. … ***He ended up finding himself in jail and it was during this time in jail that he had very significant clinical deterioration in his neurologic status. [I]t is obvious that he likely developed the beginnings of cervical epidural abscess infection*** in result of his critical illness [and] hospitalization, but then ***while in jail, he deteriorated significantly and his*** <u>***clinical***</u> <u>***deterioration***</u> <u>***went***</u> <u>***unrecognized***</u> <u>***and***</u> <u>***untreated***</u> ***until he was nearly completely quadriplegic.***

118.   On September 24, 2017, a 25-year-old man named Caleb Lee died in the Tulsa County Jail after Turn Key medical staff, in deliberate indifference to Mr. Lee's serious medical needs, provided nearly nonexistent treatment to Mr. Lee over a period of 16 days. Mr. Lee was not seen by a physician in the final six (6) days of his life at the Tulsa County Jail (and only once by a psychologist during his entire stay at the jail), despite the fact that other Turn Key staff noted that he was suffering from: tachycardia, visible tremors, psychosis, symptoms of delirium, stage 2 hypertension, paranoia, and hallucinations. Turn Key staff failed to transfer Mr. Lee to an outside medical provider despite these obviously serious symptoms that worsened by the day until Mr. Lee's death on September 24, 2017.

119.   Like Ms. Hanchett, Mr. Lee was largely assessed and treated by LPNs during his nearly three-week incarceration at the Jail before his death.

22

120.    Indeed, a physician never once saw Mr. Lee for a week before his death, despite the fact that his symptoms and conditions, including hypertension, bipolar disorder, and hallucinations, continued to deteriorate.

121.    In January 2018, Marconia Kessee died of drug toxicity in the Cleveland County Jail after Turn Key wholly failed to take any actions – including performing a medical intake evaluation – in response to profuse sweating, inability to walk, incoherent speech, and seizure-like convulsions of Mr. Kessee and instead put him in a cell where he died within hours. Cleveland County Jail detention staff were aware of the same symptoms and performed wholly inadequate, less than one second long sight checks of Mr. Kessee throughout the last hours of his life. Turn Key staff did not even perform a single sight check of Mr. Kessee during the time he lay dying, until he was found completely unresponsive.

122.    On September 6, 2019, Dunniven Phelps was booked in to the Tulsa County Jail.

123.    During the book-in process, on September 6 at approximately 7:35 p.m., Turn Key employee/agent Richard Dutra filled out an Intake Screening form. Pertinently, the Intake Screening form indicates that Mr. Phelps was being treated for hypertension (high blood pressure) at the time and had been prescribed medication by his physician to treat the condition. During the intake screening process, Mr. Dutra further documented that Mr. Phelps was diabetic and had previously been diagnosed with mental health conditions.

124.   During the medical intake process, Mr. Phelps complained that he had a severe headache, neck pain, and burry vision, which are common symptoms of a stroke.

125.   Despite the fact that Mr. Phelps told Mr. Dutra about his current symptoms and history of hypertension, Mr. Dutra recommended that Mr. Phelps be placed in general population and that he did not need a referral for a continuity of care plan.

126.   Throughout the night of September 6, 2019, Mr. Phelps' symptoms significantly worsened, as he was obviously suffering from a stroke.

127.   By the morning of September 7, Mr. Phelps was experiencing severe weakness on the entire left side of his body, leaving him barely able to walk, as his left leg was almost completely numb.

128.   At approximately 9:37 a.m. on September 7, Turn Key Nurse Patty Buchanan "assessed" Mr. Phelps, who told her that he could hardly feel or move the left side of his body and his other symptoms, such as dizziness and blurred vision, were worsening. Nurse Buchanan recorded Mr. Phelps' blood pressure as 163/103, which the American Heart Association classifies as Stage 2 hypertension.

129.   Nurse Buchanan failed to inform a physician or even an RN or Nurse Practitioner about Mr. Phelps' alarming symptoms and worsening condition, in deliberate indifference to his serious medical needs.

130.   Further, while Nurse Buchanan allegedly counseled Mr. Phelps on the importance of taking his medications, there is no evidence that she, or anyone else at TCSO/Turn Key, ***ever gave Mr. Phelps any medications during his time at the Jail.***

131.     On one occasion, when Mr. Phelps could not get off of the ground because he could not use his left leg or left arm, a DO threatened to "Taze" Mr. Phelps if he didn't get off the ground.

132.     Mercifully, an inmate who was an amputee let Mr. Phelps use his wheelchair so that he could try to get an actual medical assessment and treatment at the medical unit of the Jail.

133.     At approximately 2:19 p.m. on September 7, a DO finally agreed to wheel Mr. Phelps to the medical unit, where he was seen by Nurse Gann.

134.     Shockingly, Nurse Gann thought Mr. Phelps was faking his emergent condition. Jail surveillance video shows Mr. Phelps lying on the ground in the medical unit, unable to walk, stand, or effectively use his arms, while Nurse Gann drops a piece of paper onto his face, presumably because she thought Mr. Phelps would move out of the way if he was capable of moving. Nurse Gann and other Turn Key personnel left Mr. Phelps lying on the floor, helpless and in immeasurable pain.

135.     At 4:05 p.m. on September 7, Mr. Phelps was finally seen by Elizabeth Martin, Advanced Practical Registered Nurse ("APRN").

136.     APRN Martin noted that Plaintiff had a ***"3 day history of evolving stroke like symptoms."*** She also noted that Plaintiff's "speech [was] slurred" and that he had "left side facial droop" and weakness on his left side. By this time, Plaintiff's blood pressure was 183/114, which is considered a ***hypertensive crisis that requires immediate consultation and assessment by a physician.***

137.    Mr. Phelps was finally sent to Hillcrest Medical Center at approximately 6:15 p.m. on September 7, 2019.

138.    Once at Hillcrest, Mr. Phelps was transferred to the Intensive Care Unit ("ICU") where physicians provided emergent, live-saving treatment.

139.    Unfortunately, the delay in treating Mr. Phelps, due to Turn Key and Jail staff's deliberate indifference, resulted in Mr. Phelps suffering permanent damage.

140.    Mr. Phelps is now permanently paralyzed on the entire left side of his body and will require significant medical treatment for the rest of his life.

141.    From June to October 2019, Bryan Davenport, an inmate at the Cleveland County Jail, was denied adequate medical care by Turn Key personnel. Mr. Davenport informed Turn Key staff that he had hypertension and HIV, yet he was not seen by a physician, physician's assistant, or nurse practitioner for nearly a month after his arrival at the jail. Davenport provided Turn Key staff with the names of his providers, his need for HIV medications, and the names of those medications. When a Turn Key nurse finally saw Davenport, she told him that she did not want to start treatment pertaining to his HIV and left him without vital medications for several months. Turn Key also refused to treat Davenport under their "chronic care" protocol, instead requiring him to submit multiple sick calls just to attempt to get his medications so that Turn Key and Cleveland County could charge Davenport $15/visit.

142.    In October-November 2020, an inmate at the Cleveland County Jail slowly died of his known congestive heart failure as Turn Key and its employees ignored the obvious and severe worsening of his condition, including extreme edema and swelling, fluid

leaking from his legs, urinary incontinence, and clear sings of infection. Turn Key staff failed to properly assess, evaluate, or treat the inmate and failed to refer him to a more highly trained provider or an outside medical provider.

143.   In July 2021, an inmate named Perish White died of COVID-19, which he contracted in the Creek County Jail.

144.   Mr. White began feeling ill on or about July 5, 2021, and reported his symptoms to Turn Key staff at the Creek County Jail.

145.   By July 8, 2021, at the latest, Mr. White began experiencing shortness of breath and coughing. On information and belief, Mr. White also stopped eating and was refusing meal trays. These drastic changes in Parish's condition, particularly in light of the ongoing COVID-19 pandemic, made it obvious, even to a layperson, that Perish needed emergent evaluation and treatment from a physician.

146.   ***From July 5 to July 16, 2021, Turn Key staff never once took Mr. White's vital signs,*** despite his repeated complaints that he was seriously ill, his obvious symptoms, and the fact that COVID-19 was raging through the Creek County Jail.

147.   On July 19, 2021, Mr. White was finally taken to OSU Medical Center in Tulsa for COVID-19 and respiratory failure. At the time, his oxygen saturation level was in the 70's. He was diagnosed with acute kidney failure. He was placed on life support, including a ventilator and dialysis.

148.   Mr. White died on July 30, 2022.

149.   April 13, 2021, Christa Sullivan died at the Oklahoma County Jail ("OCJ"), which also uses Turn Key as its jail medical provider.

150.     Ms. Sullivan had a history of severe mental illness, including depression, bipolar disorder, schizophrenia, and several previous suicide attempts.

151.     Ms. Sullivan was housed at the OCJ for nearly a year prior to her death. Throughout her time at OCJ, she exhibited extremely serious symptoms, including multiple instances of self-harm, suicidal ideation, a refusal to eat or drink, rapid weight loss, and catatonia.

152.     Approximately two months before Ms. Sullivan's death, numerous Turn Key providers, including nurses and two physicians, acknowledged Ms. Sullivan's emergent conditions and the fact that it was impossible for Ms. Sullivan to receive the life-saving care she needed in a jail setting.

153.     In fact, one Turn Key physician noted, with respect to Ms. Sullivan:

> ***DEPRESSED AFFECT, SEVERE ADULT FAILURE TO THRIVE. SEEMS AT HIGH RISK FOR POOR OUTCOME. I HAVE DISCUSSED HER CASE WITH PSYCHE, NURSING, AND WOUND CARE AND DO NOT SEE ANY LIKELY TO SUCCEED INTERVENTIONS IN THIS SETTING. SHE DOES NOT SEEM COMPETENT BY ANY BEHAVIORAL PARAMETER THAT I CAN SEE. WILL REDISCUSS OPTIONS WITH DR. CUKA AND DR. COOPER.***

154.     Yet, Turn Key providers allowed Ms. Sullivan to languish in her cell for months, cationic and barely eating, until her eventual death.

155.     After Ms. Sullivan's death, Kevin Wagner, a Captain at OCJ told an investigator, "[Ms. Sullivan] went from 148 when she got here to … ***she looks like a skeleton.***" Captain Wagner also told the investigator he helped get Ms. Sullivan to a local

hospital for a week at one point "because I felt that **medical (in the Jail) wasn't providing her care enough."**

156.   Another staff member told an investigator that Ms. Sullivan deteriorated **"to a bag of bones."**

157.   On June 12, 2021, Joseph Stewart was booked into the Cleveland County Jail.

158.   On June 13, 2021, Mr. Stewart advised a Jail detention officer and Turn Key Nurse Angela Albertson, LPN, that he needed to go to the hospital because his arm had been hurting since the day of his arrest and because he had an L1 (lumbar vertebrae) fracture that was hurting.

159.   Responsible Jail and Jail medical staff did nothing other than instruct Mr. Stewart to "not lay on his right side and rest arm."

160.   Two hours later, Mr. Stewart advised Turn Key Nurse Sarah Garcia, LVN, of his arm and back pain.

161.   In response, Mr. Stewart was moved to a bottom bunk. Nurse Garcia did not alert any other medical provider of Mr. Stewart's condition, complaints, or her decision making.

162.   On June 17, 2021, Nurse Albertson responded to a sick call placed by Mr. Stewart. Nurse Albertson noted that Mr. Stewart had increased pain and reduced range of motion in his left arm and a belief that it might be associated with his back.

163.   On June 19, 2021, Turn Key LPN Amanda Stehr observed Mr. Stewart "laying on the …floor" in distress with a pain rating of 10/10. She charted that Mr. Stewart

asked "multiple times" to be transported to the hospital, that he was experiencing the worst pain he had ever been in and he could not handle it."

164.   In response, Nurse Stehr called a Turn Key NP, ***whose only action was to prescribe an 800 mg ibuprofen, despite Mr. Stewart's obviously serious – and steadily worsening – symptoms and condition***.

165.   On June 21, 2021, Turn Key CRNP Becky Pata was informed that Mr. Stewart had fractured his L1 approximately three months previous, that he had experienced right shoulder pain since booking, and that he had a history of herniated discs.

166.   Pata observed Mr. Stewart limping and "obviously in a great deal of pain" before charting that she would "send to ER out of abundance of caution."

167.   After being transported to Norman Regional Hospital ("NRH"), Mr. Stewart's L1 compression fracture was confirmed.

168.   Mr. Stewart was returned to the Jail after his short visit to the NRH ER.

169.   On June 30, 2021, Mr. Stewart reported to Pata that he didn't feel well. He was taken back to NRH to be evaluated for pneumonia. Mr. Stewart reported symptoms including shortness of breath and unilateral leg swelling for the past month. After treating and discharging Mr. Stewart, NRH provided discharge instructions to the Jail and Turn Key that Mr. Stewart needed to return to the hospital in the event of "worsening symptoms or any symptoms of concern," "trouble breathing," or any "new symptoms or other concerns."

170.   On July 4, 2021, Mr. Stewart reported the following worsening or new conditions to Defendant Nurse Kariuki: 1) chest pain of 10/10; and 2) spitting up blood.

Nurse Kariuki observed that Mr. Stewart appeared to be in distress with "reddish-green mucous…in the toilet."

171.    In response to these alarming (and new) symptoms, Kariuki did nothing other than click a preformatted box suggesting that she instructed him to "increase fluids, medication use, follow-up sick call if no improvement."

172.    Upon information and belief, Nurse Kariuki failed to report these symptoms to a physician, NP, PA, or RN, despite being aware of NRH's discharge instructions.

173.    On July 5, 2021, Mr. Stewart reported to Nurse Albertson additional worsening or new conditions, including difficulty breathing and persistent coughing.

174.    In response to these new symptoms/worsening condition, Nurse Albertson did nothing other than instruct Mr. Stewart to "take good deep breaths so as not to get pneumonia."

175.    On July 7, 2021, Mr. Stewart reported to CRNP Pata that he now was coughing up blood streaked sputum and had heartburn.

176.    Pata, despite having knowledge of the NRH discharge instructions, did not contact a physician or the hospital and merely ordered omeprazole and prednisone for Mr. Stewart.

177.    On July 14, 2021, Mr. Stewart reported the following worsening or new conditions to Turn Key LPN Christina Meza: 1) "woke up with blood dripping down the side of my face"; 2) pale-looking appearance; 3) persistent coughing; and 4) "leaning forward to breathe with hands on knees."

178. Meza did nothing other than order Guaifenesin, a generic cough medicine. She did not report Mr. Stewart's condition to a physician or the hospital despite knowing of NRH's discharge instructions.

179. Within an hour of Mr. Stewart's complaint to Meza, Turn Key and Jail staff allowed Mr. Stewart's release without disclosing the extent of his medical condition. Mr. Stewart was released to the custody of a deputy from Kingfisher county at approximately 7:59 p.m.

180. No one informed the Kingfisher deputy of Mr. Stewart's emergent condition or NRH's orders to bring Mr. Stewart back to the hospital if he had new or worsening symptoms.

181. Upon arrival at the Kingfisher Jail, approximately 60 miles from Norman, the medical staff at the Kingfisher Jail refused to admit Mr. Stewart based on his dire medical condition.

182. The transporting deputy then took Mr. Stewart to a local hospital before he was transferred to a hospital in Enid where he died the following day, July 15, 2021.

183. Mr. Stewart died due to acute bacterial endocarditis, acute respiratory failure, congestive heart failure, and hyponatremia.

184. On August 3, 2021, Gregory Neil Davis was arrested by Oklahoma City Police Department ("OCPD") Officers and transported to the OCJ.

185. Mr. Davis was charged with indecent exposure, and was observed by officers to be in the midst of an obvious mental health crisis.

186.    Upon arriving at the OCJ, Mr. Davis was not evaluated by Turn Key personnel, nor was he tested for COVID-19 or have his vital signs taken.

187.    Mr. Davis was finally seen by a Turn Key provider, Sanaria Okongor, LPC, on August 6, 2021. Ms. Okongo noted that Mr. Davis suffered from signs of psychosis, but she made no treatment recommendations or took any actions other than to recommend follow-up a few days later.

188.    Ms. Okongor saw Mr. Davis again on August 9, 2021 and again noted he appeared to be suffering from psychosis. Ms. Okongor again failed to make any treatment recommendations or take any actions, including taking vital signs or referring Mr. Davis to a higher-level provider.

189.    For at least the final few days of Mr. Davis's life – from August 9-12, 2021 – inmates in nearby cells heard Mr. Davis beating at his cell door, crying, and begging for medical help but no one came to assist him, provide him medical care, or refer him to a physician or outside medical provider.

190.    On the morning of August 12, 2021, at approximately 6:45 a.m., Mr. Davis was observed in his cell in need of emergency medical attention by Lt. Morris and Ronald Anderson, employees and/or agents of the Oklahoma County Criminal Justice Authority ("OCCJA").

191.    Upon information and belief, EMSA was not called until approximately 9:17 a.m. When EMSA arrived, paramedics transported Mr. Davis to a nearby hospital, where he was pronounced dead.

192.    Mr. Davis died of a perforated duodenal ulcer, a condition that does not normally result in death unless left untreated for a substantial period of time, often more than 24 hours.

193.    From August 3-12, 2021, the only Turn Key personnel who saw, evaluated, assessed, or "treated" Mr. Davis was an LPC, who saw Mr. Davis on two occasions.

194.    Mr. Davis was never seen by a Turn Key physician nor was he referred to an outside medical provider other than the day of his death, when it was far too late.

195.    In August 2021, Larry Price, an intellectually disabled, 55-year-old inmate at the Sebastian County (Arkansas) Adult Detention Center, starved to death after responsible jail and Turn Key personnel failed to properly treat his medical and mental health conditions, including schizophrenia, for a year.

196.    The six foot, two inch Mr. Price entered the jail weighing approximately 185 pounds. By the time he was found unresponsive in his cell 366 days later, he weighed 90 pounds according to EMS reports. He had also been ingesting his own urine and feces according to reports.

197.    The medical examiner's report noted that Mr. Price was COVID-19 positive when he died, but the official cause of death was listed as "acute dehydration and malnutrition."

198.    For over a year, Turn Key personnel watched as Mr. Price deteriorated both physically and mentally, doing nothing to assess, evaluate, or treat his conditions. Nor did Turn Key personnel refer Mr. Price to an outside medical provider.

199.    On December 24, 2021, Dean Stith, a 55-year-old Black man, was booked into the Tulsa County Jail after being arrested for the non-violent misdemeanor of false reporting of a crime.

200.    Mr. Stith suffered from numerous pre-existing medical and mental health conditions, including hypertension, bipolar disorder and/or schizophrenia, and serious dementia, which was obvious even to a layperson. Indeed, upon information and belief, the charges Mr. Stith faced - false reporting of a crime – were the result of symptoms of his dementia.

201.    During the book-in process, on December 25, 2021 at approximately 12:14 a.m., Turn Key employee/agent James Flora, LPN filled out an Intake Screening form. Pertinently, the Intake Screening form indicates that Mr. Stith: was being treated for hypertension; had an unstable gait; had open sores and wounds on both of his hands; was disheveled, disorderly, and insensible.

202.    Mr. Stith's condition continued to deteriorate throughout his stay at the Jail.

203.    On January 5, 2022, at approximately 4:29 p.m., Turn Key Nurse Practitioner Megan Rasor saw Mr. Stith for the purported purpose of "[hypertension] and wounds to BLE." NP Rasor charted that Mr. Stith was unable to recall his medication regimen and was "A&O [alert and oriented] to person and place only. Patient ***has 2+ pitting edema to BLE with multiple open areas…***[4] Patient to wear compression hose but is noncompliant."

---

[4]     Pitting edema is when a swollen part of your body has a dimple (or pit) after you press it for a few seconds. It can be a sign of a serious health issue, such as a blood clot, congestive heart

204.    On January 7, 2022, Mr. Stith's blood pressure was measured at 101/68, his pulse was 60, which is in the low range. Inexplicably, his oxygen saturation was not taken.

205.    Also on January 7, Judy Wagga, a Turn Key Psychiatric Nurse Practitioner, saw Mr. Stith and noted that he "appeared to be responding to internal stimuli." This was a sign that Mr. Stith was suffering from acute psychosis, an emergent situation.

206.    On January 8, 2022, Mr. Stith's pulse rose to 98 and his blood pressure rose to 124/97. Yet, despite these fluctuations, Mr. Stith was not put on any blood pressure medicine or given additional treatment.

207.    On January 9, 2022, Alicia Irvin, Turn Key psychologist, noted Mr. Stith's dementia and wrote that he had slurred speech, a new alarming symptom, and was not responding appropriately to questions. Dr. Irvin described Mr. Stith as having a "Major Neurocognitive Disorder." But Mr. Stith was not sent to an outside medical provider nor referred to a physician.

208.    Mr. Stith's pulse had also plummeted to 56, which is considered bradycardia. Bradycardia can be a serious problem if heart can't pump enough oxygen-rich blood to the body. Symptoms of bradycardia include confusion, such as the confusion repeatedly displayed by Mr. Stith.

209.    By this point it was abundantly clear that Mr. Stith was suffering from a condition that could not be adequately treated in a correctional setting. With negligence

---

failure, kidney disease, liver disease or *lung disease*. Nurse Lewis' note indicates that Mr. Stith had pitting edema in both legs.

and deliberate indifference, Dr. Irvin, who is not a physician, failed to call for an ambulance or otherwise ensure that Stith was urgently evaluated by a physician.

210.   At approximately 2:46 p.m. on January 9, Turn Key Nurse Sarah Lewis, LPN, observed Mr. Stith **"drooling, tangential thought, not responding appropriately to questions, diminished skin turgor,[5] 2+ pitting edema to BLEs, and full body weakness."** Nurse Lewis also noted that Mr. Stith was **unable to urinate**.

211.   Particularly when coupled with his worsening condition over a period of days, Nurse Lewis' note clearly reflects that Mr. Stith was in a dire condition and in obvious need of emergent care that could not be provided in a correctional setting. Nonetheless, with negligence and deliberate indifference, Nurse Lewis failed to call for an ambulance or even contact a physician.

212.   On January 10, 2022, at approximately 4:05 a.m., Mr. Stith was found wedged between his bunk and the wall in his cell. TCSO Detention Officer Davis notified Turn Key Nurses Nikki Copeland and Sarah Schumacher, who found that Mr. Stith was "cool to the touch and arms contracted to chest."

213.   EMSA was called and paramedics arrived at approximately 4:39 a.m., finding Mr. Stith unresponsive. The EMSA paramedics documented that Jail **"health care staff are poor historians** and are unsure of timeline."

---

[5]   A decrease in skin turgor is a late sign of dehydration.

214.    The paramedics noted that Mr. Stith was displaying decorticate posturing, which is a pose in which someone has rigid, extended legs, arms bent toward the center of their body, pointed and turned in toes, curled wrists, and balled hands. Decorticate posturing is caused by abnormal brain conditions such as a stroke, concussion, traumatic brain injury, brain bleed, brain tumor, or infection. Mr. Stith was transferred to St. John Medical Center where he presented in cardiac arrest.

215.    Providers at St. John were unable to resuscitate Mr. Stith, who passed away shortly after his arrival.

216.    The Office of the Chief Medical Examiner of Oklahoma determined that Mr. Stith died due to: 1) acute bronchopneumonia[6] due to complications of COVID-19; and 2) hypertensive atherosclerotic cardiovascular disease.

217.    On December 20, 2022, less than two weeks after Ms. Hanchett died, another inmate at the Cleveland County Jail, Kathryn Milano, passed away.

218.    In February 2023, Joe Allen Sims, Jr., a mentally ill inmate who was supposed to be under "critical watch," died by suicide at the Cleveland County Jail.

219.    Mr. Sims was discovered by Jail staff 77 minutes after he hanged himself, despite the fact that he was supposed to be closely monitored due to his mental state.

220.    Upon information and belief, Ms. Milano had an extensive history of medical and mental health issues that were poorly controlled while she was housed at the Jail, consistent with the Jail's and Turn Key's policies and practices as discussed, *supra*.

---

[6]     Symptoms of bronchopneumonia include muscle aches, confusion or delirium.

221.   In each of these instances, there was an utter lack of physician supervision over the clinical care provided to the inmates.  And each of these inmates, with obvious, serious and emergent medical and mental health conditions, was kept at the jail when they clearly should have been transported to a hospital or other off-site provider capable of assessing and treating the conditions.

222.   By its design, the Turn Key medical system was destined to fail.

223.   At all pertinent times, Dr. William Cooper, D.O., was the "Medical Director" for Turn Key.  In an effort to cut costs, Turn Key and Dr. Cooper spread the few physicians and mid-level providers they employ far too thin, making it impossible for them to medically supervise, let alone provide appropriate on-site medical care, at any of the county jails under contract with Turn Key.

224.   In essence, Turn Key employs a small number of mid-level providers, such as physician's assistants or nurse practitioners, and physicians who travel all over the State (and sometimes to other states, such as Arkansas and Kansas) to the dozens of jails staffed by Turn Key for short blocks of time each week.  This constitutes plainly insufficient medical staffing, particularly for a larger institution like the Cleveland County Jail.

225.   With no physician reasonably available to medically supervise the care provided to the inmates, undertrained personnel were left to practice outside the scope of their training and licensure.

226.   In other words, Turn Key had a policy, practice or custom of inadequately staffing county jails, including the Cleveland County Jail, with undertrained and underqualified medical personnel who are ill-equipped to evaluate, assess, supervise,

monitor or treat inmates, like Ms. Hanchett, with complex and serious medical and mental health needs, including heart disease, bipolar disorder, schizophrenia, catatonia, dehydration, and malnutrition.

227.   With wholly inadequate physician oversight of the clinical care, the non-physician staff was improperly, and dangerously, expected to act in the role of a physician, with the understanding that off-site care was to be avoided.

228.   This system, designed to minimize costs at the expense of inmate care, obviously placed inmates with complex, serious and life-threatening medical and mental health conditions, like Ms. Hanchett, at substantial risk of harm.

229.   This system, which Turn Key implemented company-wide, was substantially certain to, and did, result in constitutional deprivations.

230.   CCSO and the County were on notice that the medical care and supervision provided by Turn Key and the detention staff was wholly inadequate and placed inmates like Ms. Hanchett at excessive risk of harm.  However, CCSO and the County failed to alleviate the known and obvious risks in deliberate indifference to the rights of inmates like Ms. Hanchett.

231.   Moreover, Dr. Cooper, Turn Key's Medical Director, has maintained a policy, at the corporate level, of intentionally omitting information about inmates' negative health outcomes from written documentation, and has ordered Turn Key personnel to keep such bad news out of written communications.

232.   This policy, in and of itself, constitutes deliberate indifference to the health and safety of Turn Key's patients.

233.   Turn Key has maintained a custom of inadequate medical care and staffing at a corporate level which poses excessive risks to the health and safety of inmates like Ms. Hanchett.

234.   There is an affirmative link between the aforementioned unconstitutional acts and/or omissions Turn Key staff, including of Nurse Doto, Nurse Kariuki, and LPC Myles-Henderson, and policies, practices and/or customs which Turn Key promulgated, created, implemented and/or possessed responsibility for.

235.   Ms. Hanchett displayed alarming symptoms for the entirety of the two weeks she was housed at the Jail, including bipolar disorder, schizophrenia, catatonia, dehydration, malnutrition, and heart disease. In deliberate indifference to these serious medical needs, neither Nurse Doto, Nurse Kariuki, LPC Myles-Henderson, nor any other Turn Key employee/agent adequately treated Ms. Hanchett's symptoms and conditions. When her health deteriorated to the point that she was completely incoherent, was not eating or drinking, and spent hours every day lying on the floor of her cell naked, she was kept at the Jail for an extended period of time, when it was obvious she needed a higher level of care. This was callous and reckless indifference. Indeed, the only time that Ms. Hanchett's vital signs were taken while she was at the Jail were the during the initial attempted book-in process and the day before she ultimately passed away.

236.   It was obvious that Ms. Hanchett's conditions could not be effectively treated in a correctional setting. Yet, despite the obvious and excessive risks to her health and safety, Nurse Doto, Nurse Kariuki, LPC Myles-Henderson, and the other Turn Key

employees/agents referenced above, refused to send her to the hospital or other facility with a higher level of care.

237.   To the extent that no single Turn Key employee/agent violated Ms. Hanchett's constitutional rights, Turn Key is still liable under a theory of a systemic failure of its policies and procedures as described herein. There were such gross deficiencies in the medical delivery system at the Jail that Ms. Hanchett was effectively denied constitutional medical care.

■   **Sheriff/CCSO/ County's Custom of Inadequate Medical Care**

238.   Counties may be held liable for the maintenance of an unconstitutional health care delivery system. In *Burke v. Regalado*, 935 F.3d 960 (10th Cir. 2019), the Tenth Circuit upheld a jury verdict against the Tulsa County Sheriff for his failure to supervise based on evidence that he maintained a policy or custom of insufficient medical resources and training, chronic delays in care and indifference toward medical needs at the Tulsa County Jail. *See Burke*, 935 F.3d at 999-1001.[7]

239.   As evidenced, *supra*, the Jail/CCSO/the County have maintained an unconstitutional health care delivery system.

---

[7] *See also v. Crowson v. Washington Cty. Utah*, 983 F.3d 1166, 1192 (10th Cir. 2020) (finding that a county may face liability based on "theory [of] systemic failure of medical policies and procedures"); *Burke v. Glanz*, No. 11-CV-720-JED-PJC, 2016 WL 3951364, at *23 (N.D. Okla. July 20, 2016) ("[B]ased on the record evidence construed in plaintiff's favor, a reasonable jury could find that, in the years prior to Mr. Williams's death in 2011, then-Sheriff Glanz was responsible for knowingly continuing the operation of a ***policy or established practice of providing constitutionally deficient medical care*** in deliberate indifference to the serious medical needs of Jail inmates like Mr. Williams.").

240.    Indeed, by simply retaining Turn Key as the medical provider at the Jail in light of the obviously substandard care that Turn Key has provided – and continues to provide – to inmates at the Cleveland County Jail and county jails all over Oklahoma, Arkansas, and Kansas, CCSO/the County are deliberately indifferent to inmates' serious medical needs.

241.    CCSO/the County are aware, or should be aware[8], of Turn Key's repeated failures to provide constitutionally adequate medical care for inmates, yet CCSO/the County have made the conscious decision to retain Turn Key as the Cleveland County Jail's medical provider.

242.    In addition, CCSO has utterly failed to train its detention staff in how to properly monitor, supervise, or care for inmates, like Ms. Hanchett, with complex or serious medical needs, with deliberate indifference to the health and safety of those inmates.

243.    An inspection conducted by the Oklahoma State Department of Health's Jail Inspection Division ("JID") in March 2023 revealed that jailers had missed numerous cite checks on inmates, including inmates who were supposed to be under critical watch, in December 2022 and January 2023. One of those inmates who jailers failed to adequately monitor was Ms. Hanchett. Logs revealed that detainees who were supposed to be closely

---

[8] The negative medical outcomes discussed, *supra,* at jails in which Turn Key is the medical provider, have garnered substantial media attention. Further, upon information and belief, when Turn Key submits a request for proposal ("RFP") to a county when it is vying to become the jail's medical provider, Turn Key discloses a list of the current and previous lawsuits against it in which inmates, or an inmate's estate, has alleged constitutionally inadequate medical care.

monitored were left alone and unsupervised for up to 45 minutes at a time on December 5 and 6, 2022.

244.    An inspection in May of 2022 revealed that detention officers missed dozens of 15-minute checks required for detainees under suicide watch at the Jail.

245.    In one case, the report shows that jailers missed 50 of 73 checks needed over 18 hours for a detainee deemed a suicide risk.

246.    The report also revealed that jailers missed dozens of other checks on inmates who were not on a heightened monitoring schedule.

247.    Yet, upon information and belief, CCSO/the County failed to ensure that the Jail was properly staffed, jailers were adequately trained, and that jailers conducted their required checks, especially on inmates, like Ms. Hanchett, who had serious medical/mental health needs and/or required close monitoring.

248.    In March 2023, the Board of County Commissioners of Cleveland County approved a plan to increase medical and mental health staff at the Jail following the deaths of Ms. Hanchett, Ms. Milano, and Mr. Sims.

249.    County Commissioner Rod Cleveland said that the move ***was not a response to the deaths of Hanchett, Milano, and Sims, but rather to the Jail's growing population***.

250.    In 2022, the Jail's average daily population was 541 detainees compared to 367 three years earlier, according to reports from Turn Key.

251.   Medical staff reported that there were twice as many sick calls and twice as many mental health needs in 2022 compared to 2019, but during that time period, the County took no steps to increase detention or medical staffing at the Jail.

252.   The County/BOCC/CCSO have had abundant opportunity to increase funding, supervision and training which would allow it to properly staff and address the systemic deficiencies, including severe deficiencies in its medical delivery system, that have plagued the Jail in recent years. Its failure to do so has resulted in injury to multiple detainees, including Ms. Hanchett. Its failure to take reasonable measures to alleviate known and substantial risks to inmates like Ms. Hanchett constitutes deliberate indifference at the municipal level.

## CAUSES OF ACTION

### VIOLATION OF THE EIGHTH AND/OR FOURTEETH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES (42 U.S.C. § 1983)

253.   Paragraphs 1-252 are incorporated herein by reference.

**A.   Individual Liability and Underlying Violation of Constitutional Rights**

- **Failure to Provide Adequate Medical Care**

254.   Ms. Hanchett had obvious, severe, and emergent medical and mental health needs made known to CCSO/the County and Turn Key, including Defendants Doto, Kariuki, and Myles-Henderson, prior to her death.

255.    Nonetheless, CCSO/the County and Turn Key, including Defendants Doto, Kariuki, and Myles-Henderson, disregarded the known and obvious risks to Ms. Hanchett's health and safety.

256.    As described *supra*, Ms. Hanchett had serious and emergent medical and mental health issues that were known and obvious to the Turn Key/CCSO employees/agents. It was obvious that Ms. Hanchett needed immediate and emergent evaluation and treatment from a physician, but such services were denied, delayed, and obstructed. Turn Key/CCSO employees/agents, including Defendants Doto, Kariuki, and Myles-Henderson, disregarded the known, obvious, and substantial risks to Ms. Hanchett's health and safety.

257.    In deliberate indifference to her serious medical needs, health, and safety, Defendants failed to provide Ms. Hanchett with, *inter alia*, timely or adequate medical or mental health treatment; proper monitoring and supervision; or reasonable access to outside medical providers who were qualified and capable of evaluating and treating her while she was placed under their care.

258.    In deliberate indifference to her health and safety, Jail detention staff repeatedly failed to conduct required 15-minute checks on Ms. Hanchett when they knew Ms. Hanchett was suffering from obviously serious medical and mental health conditions.

259.    As a direct proximate result of the unlawful conduct of Jail and Turn Key staff, including Defendants Doto, Kariuki, and Myles-Henderson, Ms. Hanchett suffered actual and severe physical injuries, physical pain and suffering, emotional and mental distress, loss of familial relationships and death.

### B. Municipal Liability (Against Turn Key)

260.    Paragraphs 1-259 are incorporated herein by reference.

261.    Turn Key is a "person" for purposes of 42 U.S.C. § 1983.

262.    At all times pertinent hereto, Turn Key was acting under color of State law.

263.    Turn Key has been endowed by Cleveland County with powers or functions governmental in nature, such that Turn Key became an instrumentality of the State and subject to its constitutional limitations.

264.    Turn Key is charged with implementing and assisting in developing the policies of CCSO with respect to the medical and mental health care of inmates at the Cleveland County Jail and has shared responsibility to adequately train and supervise its employees.

265.    In addition, Turn Key implements, maintains and imposes its own corporate policies, practices, protocols and customs at the Jail.

266.    There is an affirmative causal link between the aforementioned acts and/or omissions of Turn Key medical staff, as described above, in being deliberately indifferent to Ms. Hanchett's serious medical needs, health, and safety, and the above-described customs, policies, and/or practices carried out by Turn Key.

267.    To the extent that no single officer or professional violated Ms. Hanchett's constitutional rights, Turn Key is still liable under a theory of a systemic failure of policies and procedures as described herein. There were such gross deficiencies in medical procedures, staffing and facilities and procedures that Ms. Hanchett was effectively denied constitutional conditions of confinement.

268.    Turn Key knew or should have known, either through actual or constructive knowledge, or it was obvious, that these policies, practices and/or customs posed substantial risks to the health and safety of inmates like Ms. Hanchett.  Nevertheless, Turn Key failed to take reasonable steps to alleviate those risks, in deliberate indifference to inmates', including Ms. Hanchett's, serious medical needs.

269.    Turn Key tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein.

270.    Additionally, Turn Key has maintained a healthcare delivery system at a corporate level, including at the Cleveland County Jail, that has "such gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care." *Garcia v. Salt Lake County*, 768 F.2d 303, 308 (10th Cir. 1985).

271.    There is an affirmative causal link between the aforementioned customs, policies, and/or practices and Plaintiff's injuries and damages as alleged herein.

### C. Official Capacity Liability (Against Defendant Sheriff)

272.    Paragraphs 1-271 are incorporated herein by reference.

273.    The aforementioned acts and/or omissions of CCSO and/or Turn Key staff in being deliberately indifferent to Ms. Hanchett's health and safety and violating Ms. Hanchett's civil rights are causally connected with customs, practices, and policies which the Sheriff/County/CCSO promulgated, created, implemented and/or possessed responsibility for.

274.    Such policies, customs and/or practices are specifically set forth in paragraphs 90-252, *supra.*

275.    The Sheriff/County/CCSO, through its continued encouragement, ratification, approval and/or maintenance of the aforementioned policies, customs, and/or practices; in spite of their known and obvious inadequacies and dangers; has been deliberately indifferent to inmates', including Ms. Hanchett's, health and safety.

276.    The Sheriff/County/CCSO has maintained a healthcare delivery system at the Jail that has such "gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care." *Garcia v. Salt Lake County*, 768 F.2d 303, 308 (10th Cir. 1985).

277.    As a direct and proximate result of the aforementioned customs, policies, and/or practices, Ms. Hanchett suffered injuries and damages as alleged herein.

278.    As a direct and proximate result of Defendants' conduct, Plaintiff is entitled to pecuniary and compensatory damages.

## NEGLIGENCE
### (Against Turn Key)

279.    Paragraphs 1-278 are incorporated herein by reference.

280.    Turn Key is vicariously liable for the acts of its employees and/or agents under the doctrine of *respondeat superior*.

281.    Turn Key is not an "employee" of CCSO under the Oklahoma Governmental Tort Claims Act ("GTCA") and is not otherwise immune from liability under Oklahoma law.

282.    Turn Key, through its employees and/or agents at the Cleveland County Jail, including Defendants Doto, Kariuki, and Myles-Henderson, owed a duty to Ms.

Hanchett, and all other inmates incarcerated at the Cleveland County Jail, to tender medical treatment with reasonable care, taking caution not to cause additional harm during the course of medical and/or mental health care and treatment.

283.   As described herein, Turn Key, through its employees and/or agents, including Defendants Doto, Kariuki, and Myles-Henderson, breached its duty to Ms. Hanchett, by failing to provide competent and timely medical and mental health care and treatment as required by applicable standards of care, custom and law.

284.   Turn Key staff, including Defendants Doto, Kariuki, and Myles-Henderson, failed to provide adequate or timely evaluation and treatment, even as Ms. Hanchett's known medical and mental health conditions deteriorated. Agents and/or employees of Turn Key failed to reasonably or timely treat Ms. Hanchett's serious medical conditions, and prevented her timely transfer to a medical facility for emergent care.

285.   Turn Key's negligence is the direct and proximate cause of Ms. Hanchett's physical pain, severe emotional distress, mental anguish, death, loss of familial relationships, and the damages alleged herein.

286.   As a result of Turn Key's negligence, Plaintiff is entitled to damages.

## PRAYER FOR RELIEF

WHEREFORE, based on the foregoing, Plaintiff prays this Court grant him the relief sought, including but not limited to actual and compensatory in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, punitive damages for  Defendants Doto's, Myles-Henderson's, and Kariuki's  reckless

disregard of Ms. Hanchett's federally protected rights, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

/s/Daniel E. Smolen
Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
Bryon D. Helm, OBA #33003
SMOLEN & ROYTMAN
701 South Cincinnati Avenue
Tulsa, Oklahoma 74119
P: (918) 585-2667
F: (918) 585-2669

**_Attorneys for Plaintiff_**