## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) DANIEL HANCHETT, as Personal representative of the Estate of Shannon Hanchett, Deceased, | ) ) ) | |
| | ) | Attorney Lien Claimed |
| Plaintiff, | ) ) | Jury Trial Demanded |
| vs. | ) ) | CASE NO.: 24-CV-87-J |
| (1) SHERIFF OF CLEVELAND COUNTY, IN HIS OFFICIAL CAPACITY, (2) TURN KEY HEALTH CLINICS, LLC, (3) JAWAUN LEWIS (4) DIANA MYLES-HENDERSON, LPC, (5) TARA DOTO, LPN, (6) NATASHA KARIUKI, LPN, (7) JEWEL JOHNSON, LPN, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## AMENDED COMPLAINT

**COMES NOW**, the Plaintiff Daniel Hanchett ("Plaintiff"), as Personal Representative of the Estate of Shannon Hanchett ("Ms. Hanchett"), deceased, and for his Amended Complaint against the above-named Defendants, states and alleges as follows:

## PARTIES

1.    Plaintiff Daniel Hanchett, as Personal Representative of the Estate of Shannon Hanchett, deceased, is a citizen of the State of Oklahoma and Personal Representative of Ms. Hanchett's Estate. Ms. Hanchett was Plaintiff's late wife.

2.    Defendant Sheriff of Cleveland County, Oklahoma ("Sheriff") is the Sheriff of Cleveland County, Oklahoma, residing in Cleveland County, Oklahoma and acting

1

under color of state law. The Sheriff is sued purely in his official capacity. It is well-established, as a matter of Tenth Circuit authority, that a § 1983 claim against a county sheriff in his official capacity "is the same as bringing a suit against the county." *Martinez v. Beggs*, 563 F.3d 1082, 1091 (10th Cir. 2009). *See also Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010); *Bame v. Iron Cnty.*, 566 F. App'x 731, 737 (10th Cir. 2014). Thus, in suing the Sheriff in his official capacity, Plaintiff has brought suit against the County/Cleveland County Sheriff's Office ("CCSO").

3.    Defendant Turn Key Health Clinics, LLC ("Turn Key") is an Oklahoma limited liability company doing business in Cleveland County, Oklahoma. Turn Key is a private correctional health care company that contracts with counties, including Oklahoma County, to provide medical professional staffing, supervision and care in county jails. Turn Key was, at times relevant hereto, responsible, in part, for providing medical services, supervision and medication to Ms. Hanchett while she was in custody at the Jail. Turn Key was additionally responsible, in part, for creating, implementing and maintaining policies, practices and protocols that govern the provision of medical and mental health care to inmates at the Jail, and for training and supervising its employees. Turn Key was endowed by Cleveland County/CCSO with powers or functions governmental in nature, such that Turn Key became an agency or instrumentality of the State and subject to its constitutional limitations.

4.    Defendant Diana Myles-Henderson, L.P.C., ("Myles-Henderson") is a citizen of Oklahoma. Myles-Henderson was, at all times relevant hereto, acting under color of state law as an employee and/or agent of Turn Key/CCSO/Cleveland County. Myles-

2

Henderson was, in part, responsible for overseeing Ms. Hanchett's health and well-being, and assuring that Ms. Hanchett's medical/mental health needs were met, during the time she was in the custody of the Jail/CCSO. Myles-Henderson is being sued in her individual capacity.

5.      Defendant Tara Doto, LPN ("Nurse Doto") is a citizen of Oklahoma. Nurse Doto was, at all times relevant hereto, acting under color of state law as an employee and/or agent of Turn Key/CCSO/Cleveland County. Nurse Doto was, in part, responsible for overseeing Ms. Hanchett's health and well-being, and assuring that Ms. Hanchett's medical/mental health needs were met, during the time she was in the custody of the Jail/Cleveland County. Nurse Doto is being sued in her individual capacity.

6.      Defendant Natasha Kariuki, LPN ("Nurse Kariuki") is a citizen of Oklahoma. Nurse Kariuki was, at all times relevant hereto, acting under color of state law as an employee and/or agent of Turn Key/CCSO/Cleveland County. Nurse Kariuki was, in part, responsible for overseeing Ms. Hanchett's health and well-being, and assuring that Ms. Hanchett's medical/mental health needs were met, during the time she was in the custody of the Jail/Cleveland County. Nurse Kariuki is being sued in her individual capacity.

7.      Defendant Jewel Johnson, LPN, ("Johnson") is a citizen of Oklahoma. Johnson was, at all times relevant hereto, acting under color of state law as an employee and/or agent of Turn Key/CCSO/Cleveland County. Johnson was, in part, responsible for overseeing Ms. Hanchett's health and well-being, and assuring that Ms. Hanchett's

medical/mental health needs were met, during the time she was in the custody of the Jail/CCSO.  Johnson is being sued in her individual capacity.

## JURISDICTION AND VENUE

8.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C § 1343 to secure protection of and to redress deprivations of rights secured by the Eighth and/or Fourteenth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of State law.

9.      This Court also has original jurisdiction under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Eighth and/or Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

10.     This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367, since claims form part of the same case or controversy arising under the United State Constitution and federal law.

11.     The acts complained of herein occurred in Cleveland County, Oklahoma. Jurisdiction and venue are thus proper under 28 U.S.C. §§ 116(a) and 1391(b).

## STATEMENT OF FACTS

### Facts Specific to Ms. Hanchett

12.     All preceding paragraphs are incorporated herein by reference.

13.    Shannon Hanchett was a mother of two boys and a pillar of the local community.  She was the owner of Norman's Cookie Cottage, a well-known and popular bakery in Norman, OK.

14.    Ms. Hanchett had a bachelor's degree and a master's degree in Human Relations from the University of Oklahoma.  She began her career helping children at the Oklahoma Department of Mental Health Services, where she worked for almost a decade advocating for mental health care. Tragically, she would later find herself in the same position as the vulnerable people she had passionately tried to help.

15.    In October of 2022, Ms. Hanchett went to the hospital for severe headaches, but a CT scan found no abnormalities.  A few weeks later, she began to exhibit signs of mental illness consistent with bipolar disorder and/or schizophrenia. She had no prior history of illness.

16.    The following month, Ms. Hanchett began to hallucinate and became convinced that her husband of 17 years, Daniel, had tapped the cell phone he had recently bought for her.

17.    On the evening of November 26, 2022, Ms. Hanchett entered an AT&T Wireless store in Norman, hoping to buy a new cell phone.  While in the store, she exhibited obvious signs of psychosis.

18.    Clearly confused, distressed, and suffering from delusions, Ms. Hanchett asked a store employee to call 911, and a Norman Police Department ("NPD") Officer responded to the scene.

19.    The Officer acknowledged that Ms. Hanchett appeared to be exhibiting behavior consistent with a mental health disorder. Nevertheless, he arrested Ms. Hanchett for misdemeanor obstruction and transported her to the Cleveland County Jail ("Jail"). Video from the officer's body-worn camera shows that Ms. Hanchett is disoriented and terrified at the prospect of being arrested.

20.    Ms. Hanchett had no criminal history. This was her first time in a detention facility. She was a pretrial detainee.

21.    Jail surveillance video shows Ms. Hanchett's mental health status, which could conservatively be described as acute psychosis, continued to deteriorate after arriving at the Jail.

22.    Turn Key nurse Danille Hay, LPN,[1] began the medical intake process with Ms. Hanchett but later claimed she was unable to complete it due to Ms. Hanchett's ongoing and severe mental health crisis.

23.    Nurse Hay *was* able to chart, however, that Ms. Hanchett suffered from lupus and bipolar disorder.

---

[1]    LPNs have about a year of nursing education, often culminating in a certificate. The role of an LPN is, as the name suggests, practical. Typical duties for which an LPN is qualified are: record a patient's health history; administer medications (under the supervision of an RN or physician); perform wound care; measure and record vital signs; observe a patient's condition. "LPNs cannot diagnose any medical condition or prescribe any medication." *See* American College Health Association Guidelines February 2023, https://www.acha.org/documents/resources/guidelines/ACHA_Scope_of_Practice_for _College_Health_LPNs_Feb2023.pdf. LPNs are expected to report even minor changes in patient care to a registered nurse or other medical professional. *See also, Estate of Jensen by Jensen v. Clyde,* 989 F.3d 848, 852 (10th Cir. 2021) ("An LPN designation does not require an associate's or bachelor's degree … [LPNs are] prohibited from prescribing medications, conducting health assessments, and diagnosing medical conditions.").

24.     Nurse Hay also took Ms. Hanchett's vital signs. Her blood pressure (143/89) and pulse (120 BPM) were both elevated. Nurse Hay did not, however, take any steps to address these concerning vital signs.

25.     Nurse Hay later charted that Ms. Hanchett had been "uncooperative" during processing and that she'd been unable "to complete [intake] at this time."  However, in a written report, Officer David Owen notes that Ms. Hanchett "appears to cooperate with officers while being processed as a new inmate."

26.     After failing to complete the intake process, Jail staff locked Ms. Hanchett in processing cell B130 – a tiny, cockroach-infested cell that had no sink, no toilet and no bed. For the next 11 days, she was confined in these conditions and deprived of virtually all human contact. The lights were left on at all times, day and night, depriving her of any sleep.

27.     For periods of up to 5 days at a time, no one at the Jail even opened the door of Ms. Hanchett's cell. Denied access to a toilet, she was forced to urinate on the floor and then lie in her own waste.

28.     Despite the absence of a sink in her cell, no one at the Jail provided her with water or other hydration, day after day after day.

29.     Throughout this time, the Jail and Turn Key staff were fully aware of Ms. Hanchett's dreadful conditions of confinement and her escalating mental health crisis.

30.     Ms. Hanchett's cell was video monitored, allowing Jail staff to clearly see her extreme distress, her erratic behavior, and the rotting food, trash, and human waste on the floor of her cell.  Despite observing that Ms. Hanchett had not been adequately eating and

had been given nothing to drink for days, they failed to address these dangerous health risks or report them to a physician. This constitutes deliberate indifference, reckless neglect and inhumane mistreatment across the board. Indeed, as painstakingly summarized herein, Ms. Hanchett was shown *nothing but* indifference during her time at the Jail.

## <u>DAY 1</u>
## SATURDAY, NOVEMBER 26

31.    At 7:57 PM on Saturday, November 26, 2022, Jail staff locked Ms. Hanchett into a tiny, cockroach-infested cell called B130.  B130 is a processing cell, ostensibly meant to hold inmates for brief periods while they are being processed into the Jail.  Because this processing cell is not meant to hold inmates for more than a few hours, it has no bed – or any furnishings at all – no sink, and no toilet.  The tiny room consists of nothing more than bare walls and a bare floor with a drain in its center.  A light blares down from the ceiling. In the 11 days Ms. Hanchett spent in B130, the light remained on at all times. This made it virtually impossible for Ms. Hanchett to sleep, driving her deeper into madness.

32.    After locking Ms. Hanchett into this "processing cell" on Saturday night, Jail staff leave her there – without access to water, a sink, a toilet, or even a mat to lie on – for more than 3 days without letting her out.  Video from the cell's overhead camera shows that, from the moment Ms. Hanchett enters cell B130, she was suffering an obvious and severe psychotic episode.  She talked to herself virtually nonstop for more than 10 hours – sometimes staring directly into the camera, sometimes standing in the corner and talking to the wall.  She paced around the cell and at times appeared to dance.  Eventually she fixated on the intercom and spoke into it for hours.  She did not sleep.

**DAY 2**
**SUNDAY, NOVEMBER 27**

33.    At 1:34 AM, Ms. Hanchett was pointing with both hands at the drain on the floor of her cell, while talking to the video camera and shaking her head.

34.    At 4:52 AM – after an entire night of pacing, gesturing, and talking to the camera and the intercom – a Cleveland County Detention Officer ("DO") delivers a sack lunch through the bean hole.  After looking inside the sack, Ms. Hanchett tosses it onto the floor.  Although the Jail staff are fully aware that Ms. Hanchett has been in this processing cell – with no access to water – for 8 hours, they do not provide her with any water.

35.    In the throes of her psychosis, Ms. Hanchett does not eat.  She unwraps a sandwich and throws it on the floor.  She throws an apple against the wall.  She opens a packet of crackers and dumps them down the drain.  She takes the sandwich apart and throws the pieces at the drain.  All the while, she is speaking to the camera overhead.

36.    When a DO looks into Ms. Hanchett's cell at 6:35 AM, he sees her talking to herself, with her food all over the floor.  By this time, she has been talking to the camera for more than 10 hours.  Despite seeing that she is severely disturbed and not eating – and despite knowing that she has no access to a sink, toilet, or even a mat to lie on – the DO does nothing to help her. No water is provided. No physician is called.

37.    At 10:39 AM, a DO passes a box of food through the bean hole. Hanchett opens the box, looks at it, and dumps it onto the floor by the drain.  In the ensuing hours, multiple DOs look into Hanchett's cell and see that she hasn't eaten.  They see that there

is food all over the floor of her cell, including a meal piled up at the drain. Again, no one at the Jail does anything to help her.

38.     By 4:57 PM, Hanchett has been locked in a cell with no toilet for ***21 hours***. Left with no choice, Ms. Hanchett pulls her pants down and *urinates on the floor* of her cell, which is already covered with food and trash.  In her psychotic state, she strips naked, only to put her urine-soaked clothes back on a few minutes later.  She sits in the corner, with her legs in the urine.

39.     In the hours that follow, multiple DOs look into Hanchett's cell.  They see that she is in a tiny cell with no toilet, that she has not eaten, and that her floor is covered with food and urine.  Not one of them gives her water, takes her to the bathroom or shower, calls a physician or ensures that she is seen by a medical or mental health care provider capable of evaluating and treating her condition.

40.     At 6:23 PM, two DOs pass by her cell holding jugs of water, but *they do not give any* to Ms. Hanchett.  One returns a moment later, the jug still in his hands.  He looks into Ms. Hachett's cell.  Instead of giving her water, he closes the panel and walks away. After observing Ms. Hanchett in a state of undress, lying on a urine soaked floor, with food scattered across the cell, the DO did nothing to ensure that Ms. Hanchett was evaluated and treated by a qualified medical or mental health professional.  This is deliberate indifference.

**DAY 3**
**MONDAY, NOVEMBER 28**

41.     By Monday, Ms. Hanchett – who was already severely psychotic when she arrived at the jail – has had no meaningful sleep for days.  The lights in her cell have been on the entire time.  She has continued to throw her meals onto the floor, so the rotting food is piling up.  The door of her cell has not even been opened since Saturday.  She has *still* been given no water, no mat to sleep on, and no opportunity to bathe.  She has not seen a physician.

42.     Ms. Hanchett continues to speak on the intercom, but help does not arrive. She is forced to urinate on the floor again.  She urinates through her pants, then takes them off and goes naked from the waist down.  As DOs look into her cell, they see that she is half naked, that she has not been eating, and that the floor of her cell is covered in trash, rotting food, and human waste.  They do nothing to help her.

43.     Pursuant to OAC 310:670-5-8(7), because Ms. Hanchett has now been held for more than 48 hours, she was required to undergo a medical examination performed by licensed medical personnel – meaning a medical doctor ("MD"), osteopathic physician ("DO"), physician's assistant ("PA"), registered nurse ("RN"), licensed practical nurse ("LPN"), emergency medical technician at the paramedic level, or clinical nurse specialist. Jail staff make no effort to provide her medical or psychiatric attention.  Turn Key staff do not even attempt to examine her.  They do not check her vital signs.  They provide her no medication.

44.     Ms. Hanchett is severely psychotic, confined in squalid conditions, not eating, and given no access to water. Yet not one person on the Jail or Turn Key staff displays even the slightest concern for her well-being. This constitutes ongoing and continual deliberate

indifference to Ms. Hanchett's serious medical needs as well as her basic life necessities. Within days, Ms. Hanchett will die from severe dehydration, simply because of the staggering indifference of Jail and Turn Key staff.

**DAY 4**
**TUESDAY, NOVEMBER 29**

45.     Just past midnight, a DO opens the window panel on the door of Ms. Hanchett's cell and looks in.  He sees Ms. Hanchett lying on the bare floor of her filthy cell, naked from the waist down.  The DO is carrying a jug of water.  By this point, Ms. Hanchett has been locked in this tiny cell without any source of water for more than two days.  The DO knows Hanchett is in a temporary processing cell that has no sink.  Despite holding a jug of water, he does not give any to Hanchett.  He closes the panel and walks away.  Two hours later, the DO returns and shows Ms. Hanchett to one of his fellow detention officers. The officer opens the panel and immediately upon seeing Ms. Hanchett he raises hands and backs away, laughing.

46.     Jail staff occasionally put sack lunches through the bean hole in Hanchett's cell door.  She continues to throw the food on the floor. Jail and Turn Key staff are aware not only that her floor is covered with rotting food, but that she has not been eating.  LPN Kariuki later documents "PT HAD NOT BEEN EATING."   Likewise, in an incident report, Turn Key APRN Pata states "I was told by nursing that she had not been eating."

47.     After spending days in a tiny, brightly lit cell – without a toilet, water, or any meaningful sleep or sustenance – Ms. Hanchett's psychosis has obviously accelerated and

worsened.  Yet, with deliberate indifference,  Turn Key staff have provided her with no assistance or treatment whatsoever.

48.    At 10:58 AM, the hall camera shows the man in the cell next to Hanchett is drinking a bottle of water.  Yet no one has provided water to Hanchett at any time.

49.    By 5:57 PM, Ms. Hanchett has been locked in this processing cell, without access to a toilet, for ***82 hours***.  After several minutes of speaking at the intercom, she again urinates onto the cell floor.  She then spends the next several minutes urgently pressing the intercom button.  When a DO finally arrives and opens the panel, she sees that the floor of Hanchett's cell is covered in food, trash, and human waste.  She sees Hanchett in her soiled pants. Ms. Hanchett is in obvious distress. Still, the DO does nothing to assist her. This was deliberate indifference.

50.    Ms. Hanchett walks around in her own urine.  She picks up an apple off the filthy floor and begins to eat it.  After having paced the tiny cell for days, she finally lies down in her own urine.

51.    The next time a DO opens the panel, he sees Hanchett shaking her head and pointing at her urine on the floor.  The DO does nothing to help her.  He closes the panel and walks away. This was deliberate indifference.

52.    At 9:31 PM, Jail staff finally remove Hanchett from the "processing cell" that she has been trapped in for more than three days.  Once Hanchett is removed from the cell, a trustee enters and cleans the cell.  But they do not clean it for Ms. Hanchett.  They clean it so that they can put a different inmate into B130 while he is being processed.

**<u>DAY 5</u>**

13

## WEDNESDAY, NOVEMBER 30

53.    Ms. Hanchett has been suffering a severe and obvious psychotic episode for more than four (4) days. She has not been eating. Jail and Turn Key staff are fully aware of her extremely serious and emergent condition.  Despite the severity of her illness, *she has not been seen by a physician* even once. She has not been sent to a hospital. Turn Key staff have not provided her any treatment whatsoever.  They have not even taken her vital signs – the absolute minimum of medical care – since she entered the Jail four days ago. This constitutes extreme indifference that an affront to "contemporary standards of decency."

54.    Instead of transferring Ms. Hanchett to a psychiatric facility, Jail staff return Ms. Hanchett to "processing cell" B130 once the male inmate has been processed.  After marching her back into that cell, Jail staff order her to strip naked. Ms. Hanchett takes off her pants but either cannot or will not take off her shirt.  Jail staff grab Hanchett and take off her shirt.

55.    Ms. Hanchett is naked. The only object in her cell is a suicide blanket. Although Ms. Hanchett has been identified as a suicide risk, she has been provided no medical or mental health evaluation, treatment or care.

56.    Instead, after locking the door to cell B130, Jail staff do not open her cell door again until the following Monday – ***5 days later***.

## DAY 6
## THURSDAY, DECEMBER 1

57.    Since being returned to B130, Ms. Hanchett no longer spends most of her time pacing. Instead, she lies on the floor. Occasionally DOs deliver food, although

Hanchett generally does not eat it. When she receives a sack lunch through the bean hole, she dumps its contents and sticks her arm through the paper bag. As before, the food and trash clutter the floor, which grows filthier each day.

58.    Dangerously dehydrated, floridly psychotic, and completely untreated, Shannon Hanchett – mental health advocate, business owner, wife, and mother of two children – writhes around naked on the filthy floor of her video-monitored cell. As she does so, a bug crawls across the lens of the camera. These are shockingly undignified and inhumane conditions of confinement.

59.    Jail staff observe Ms. Hanchett in this condition – on continuous video monitoring of her cell, and by looking through the panel on her cell door – but they continue to do **nothing** to help her. Turn Key staff know, and it is patently obvious, that she is psychotic and desperately needs treatment, but they do **nothing** to help her.

60.    At 10:38 AM, Turn Key Nurse Kariuki opens the panel on Ms. Hanchett's cell. She sees Ms. Hanchett lying naked on her back on the bare concrete floor. Her face is next to the drain. She is making strange, agitated movements with her fingers, which she raises to her mouth. Nurse Kariuki observes this for approximately 1 second. Instead of aiding her in any way, she simply closes the panel and walks away. This is deliberate indifference.

## DAY 7
## FRIDAY, DECEMBER 2

61.    At 12:32 AM., any Jail or Turn Key staff member watching Ms. Hanchett's video-monitored cell would see a bug crawling across the camera lens as Hanchett rolls the

end of her soiled suicide blanket and stuffs it into the drain that she had previously swept her urine into. She pulls the blanket from the drain and rubs it across her face and lips repeatedly. On information and belief, Ms. Hanchett is attempting to soak up her urine from the drain, desperately seeking the hydration she has been continually deprived of.

62.    At 7:02 AM, a DO opens the panel on Hanchett's door and talks to her. The DO sees Ms. Hanchett sitting on her suicide blanket, facing the cell door, with her fingers in the drain at the center of the floor. When the DO returns, Hanchett's hand is still in the drain. She is touching her face and shaking. The DO does ***nothing*** to help her.

63.    Later that morning, while Hanchett is sitting naked against the cell door, a DO slides a box of food through the bean hole. Hanchett receives the box and immediately dumps its contents onto both the floor and her own body. She throws her food. She rubs the food against her face and all over her body.

64.    Jail staff and Turn Key staff open the panel periodically and see her in this condition. They do nothing to help her. No one even brings her water or takes her out to use the toilet or shower. No one calls 911 or a physician.

65.    That afternoon, Ms. Hanchett appears to be trying to get her hand into the drain on the floor. When a DO opens the panel, she is crouched, naked, at the door. She squats down to open the bean hole and talks to the DO through it. The DO sees the state she is in and the disorder of her cell and immediately closes the panel. Hanchett falls back to the ground.

66.    She lies on the floor, face down, and spends the next 22 minutes sticking her face into the drain. She does this repeatedly over the next several hours.

67.     The floor is covered with trash and rotting food, which has been piling up for days.  Lying on her back on the squalid floor – without access to a toilet for days on end – Hanchett urinates onto the floor again.  Instead of moving away from her waste, she lies in it. This is bizarre behavior plainly indicating that Ms. Hanchett was suffering from acute, and untreated, psychosis.

68.     A DO carrying water opens the panel of Ms. Hanchett's cell, observes her condition, but does nothing to help her.  Although she has been locked in this processing cell for days without any access to water – and the officer is holding water in his hands just outside her cell – *he walks away without giving her any.*

69.     Ms. Hanchett has now been locked in this processing cell for *an entire week*.  They will keep her there *another 5 days*.  On the last day, she will die from severe dehydration.

### DAY 8
### SATURDAY, DECEMBER 3

70.     A full day later, Ms. Hanchett still has been given nothing to drink.  A DO grabs a jug of water and approaches the cell next to Hanchett's.

71.     The DO then moves on to Ms. Hanchett's cell.  He opens the panel on her cell door.  Ms. Hanchett is collapsed on the floor, naked, in the corner near the door.  The officer puts his face up to the glass and sees Hanchett. After a week spent in severe psychosis, barely eating, and without access to water, *Ms. Hanchett is now so weak that she is unable to sit up on her own power.*  She is barely able to drag the suicide blanket over

herself to cover her naked body. This is a woman in obvious medical distress. Still, with deliberate indifference and reckless neglect, she is provided no assistance.

72.    At 11:59 PM, Turn Key Nurse Doto opens the panel on the door of Ms. Hanchett's cell. She sees Ms. Hanchett lying on the floor, surrounded by trash and human waste. When she sees Nurse Doto, Ms. Hanchett raises her head off the floor and speaks urgently to her, waving both hands. Nurse Doto does nothing to help Ms. Hanchett. She does not enter the cell. She does not take her vital signs. She does not call 911 or a physician. She watches Ms. Hanchett for a few seconds, then closes the panel and walks away. This was deliberate indifference.

73.    In four days, Shannon Hanchett will be dead.

**DAY 9**
**SUNDAY, DECEMBER 4**

74.    At 2:29 AM, Nurse Doto opens the panel on the door of Ms. Hanchett's cell. As before, she sees Ms. Hanchett lying on the floor, surrounded by trash and human waste. As before, she does nothing to help Ms. Hanchett. She closes the panel and walks away.

75.    At 2:44 AM, a DO walks past Ms. Hanchett's cell with a jug of water. He does not give her any. At that time, Ms. Hanchett is lying on the floor and sticking her face into the drain. Twenty (20) minutes later, Hanchett is holding an empty cup and showing it to the camera. She holds it to her mouth for hours. A DO opens the door panel and sees Hanchett lying on the floor, facing the cell door, and holding an empty cup. He does nothing to help her.

76.     Hours later, this happens again – three more times.  At 5:56 AM, a DO opens the panel and sees Ms. Hanchett lying on her back with an empty cup at her mouth.  He is holding a water bottle, yet he does not give any to Hanchett.

77.     At 6:00 AM, another DO approaches Hanchett's cell.  He is carrying a gallon of water.  He opens the panel on her door and sees her with the empty cup in her hands.  But he does not give any water to her.  Instead, he closes the panel and walks away.

78.     At 6:15 AM, another DO approaches the door to cell B130 and opens the panel.  She sees Hanchett holding her empty cup.  But she does not provide her with water.  She closes the panel and walks away.  The trash and rotting food continue to accumulate on the cell's floor.

79.     At 9:07 AM, Cpt. Darby Hammonds walks to Ms. Hanchett's cell with Turn Key employee Myles-Henderson, Licensed Professional Counselor[2] ("LPC"), and opens the panel.  They see Ms. Hanchett lying naked and motionless on a concrete floor that is strewn with trash, rotting food, and bodily waste.  When Cpt. Hammonds knocks on the window, Ms. Hanchett rolls over and waves to them.  She appears to urge LPC Myles-Henderson to come in.  But LPC Myles-Henderson does nothing to assist Ms. Hanchett.  She does not enter the cell.  She does not take Ms. Hanchett's vital signs.  She does not even try to speak to Ms. Hanchett.  Cpt. Hammonds closes the panel and they both walk away.

---

[2]     LPCs are not authorized or qualified to provide any medical or psychiatric evaluation, treatment, or assessment.

80.    LPC Myles-Henderson logs that she witnessed Ms. Hanchett "nude [and] without inhibition in the middle of the floor."  Although she has not spoken with Ms. Hanchett, she charts that Hanchett "presented to be a threat to herself and others due to her defiance..."  And despite the fact that Ms. Hanchett waved to LPC Myles-Henderson and motioned her to enter the cell, Myles-Henderson falsely claims that "patient refused to interact with staff and this provider."

81.    By December 4, Hanchett had been floridly psychotic for more than a week. Her physical health had deteriorated sharply. Her vital signs had not been taken, nor had her hydration been monitored. She had become so weak that she had difficulty even sitting up on her own power.  Nevertheless, Jail and Turn Key staff still had not referred her to psychiatric facility, had her examined by a healthcare professional qualified to diagnose and treat her or provided any care or treatment at all. This was extreme and unconscionable indifference.

**DAY 10**
**MONDAY, DECEMBER 5**

82.    Just past midnight, a DO opens the door to Hanchett's cell and enters it. **This is the first time her cell door has opened since Wednesday, November 30.** Although Ms. Hanchett had entered the Jail in good physical condition – and had spent the first several days in custody on her feet and pacing her cell – Jail staff find she is now unable to even stand on her own.

83.    A DO tries to give Hanchett clothes to put on.  Hanchett struggles to even sit up.  She is moving very slowly – it is clearly very difficult for her.  She manages to stand,

with difficulty, but she looks unsteady.  She is unable to dress herself, so she bends over so the DO can put her shirt on her.  When attempting to put on the pants, she has to grab the DO to keep herself from falling.  At 12:21 AM, **Ms. Hanchett collapses to the floor.** This was an emergent situation requiring immediate transfer to a hospital. That, however, did not happen.

84.    Although three DOs see Hanchett's condition and witness her collapse, none of them call for emergency medical help.  Instead, while Hanchett is lying limp on the floor, they take the opportunity to put pants on her.  It requires two DOs to lift her onto her feet. She is unable to walk on her own, so the DOs walk her out of the cell.  A total of four (4) Jail staff members watch this unfold.  **Not one of them calls for medical help for Ms. Hanchett.**

85.    Turn Key Nurse Doto smiles as she watches the DOs put Hanchett on the floor in the West Corner area, just down the hall from cell B130.  One **DO demonstrates for Nurse Doto how Hanchett collapsed just moments before.**  Nurse Doto walks over to cell B130, where Ms. Hanchett has spent the past five (5) straight days – without a toilet,  without a shower, and with human waste and rotting food piled on the floor. Reacting to the stench of the cell, Nurse Doto covers her nose with her sweater and glances inside.  Then she walks away.

86.    Although Ms. Hanchett is in the midst of an obvious medical emergency, Nurse Doto does nothing to help her.  After learning that Hanchett had just collapsed and could not stand without assistance, she does not even take Ms. Hanchett's vital signs.  She merely stands near where Ms. Hanchett is propped up on the floor.  After standing around

and chatting with the DOs for five minutes, she simply walks away. Nurse Doto knew, as it was patently obvious, that Ms. Hanchett, was in medical distress. Nurse Doto disregarded the known and excessive risks to Ms. Hanchett's health and safety. This was deliberate indifference.

87.    Too weak to move, Ms. Hanchett is left sitting on the floor for hours, with her back propped against the wall.   Multiple DOs walk around without paying any attention to her. Although she has recently collapsed, at times she is completely unattended.

88.    After nearly two hours, Ms. Hanchett slowly slumps onto the floor.  Because she has been left completely alone, no one sees her slide down.  Eventually, a DO walks into the West Corner area and sees Ms. Hanchett collapsed on the floor, her head on the concrete.  Instead of assisting her, he turns his back to her and walks off to chat with a co-worker. This was deliberate indifference.

89.    At 2:20 AM, a DO – the same officer who had seen Ms. Hanchett collapse when removing her from her cell – walks into the West Corner area and sees that Hanchett has collapsed onto the floor.  This officer, too, does nothing to assist her.  Like her co-worker, she simply turns her back on Ms. Hanchett and walks away.  Five minutes later, she re-enters the West Corner area and walks right past Hanchett on the floor.  Instead of helping Ms. Hanchett, with deliberate indifference, she goes behind the desk and does paperwork.

90.    At 2:29 AM, Jail staff pull Ms. Hanchett to her feet.  Rather than finally moving her to a cell with a sink, toilet, and mat, they march her back to processing cell

B130.  Although Nurse Doto had recoiled at the stench of that cell, Jail staff do not bathe Ms. Hanchett before returning her to it.

91.     Since Ms. Hanchett is too weak to stand, the DOs put her on the floor.  One DO stands over Hanchett and orders her to strip naked.  Ms. Hanchett struggles to take off her clothes.  She is too weak to take off her pants, even while lying on the ground.  Instead of calling an ambulance, the DO pulls off Hanchett's pants.  She drags Hanchett into a seated position and Hanchett manages to take off her shirt.  The DO then walks away and locks Hanchett into the processing cell.  This is yet another example of deliberate indifference.

92.     Ms. Hanchett lies naked on the bare concrete floor of her video-monitored cell.  It is 2:40 AM.  The lights are on, as always.  A bug scurries across the camera lens.

93.     At 7:48 AM, LPC Myles-Henderson wheels a medical cart down the hall outside Ms. Hanchett's cell.  Although Ms. Hanchett is psychotic and on suicide watch – and although she has collapsed multiple times earlier this morning – LPC Myles-Henderson does not even look into Ms. Hanchett's cell to check on her.  Instead, she pauses outside the cell and types on her laptop.  She charts that "Pt was seen on suicide watch.  Pt presented avoidant, psychotic, indifferent. PT was not responsive today but was lying nude on the floor."  She also charts that "with regard to medication, Patient is Non-Compliant." In fact, however, Ms. Hanchett has not been seen by a physician, and she has been neither prescribed nor given any medication at the Jail.

94.     Shannon Hanchett has now spent **nine (9) days** in a "temporary" processing cell with no sink, toilet, bed or mat.  The lights have blared down on her the

entire time. Her physical condition has deteriorated to the point that she cannot sit, stand or walk on her own power. She is in desperate need of emergent medical attention. None is given. Ms. Hanchett is now just over two days away from dying from severe dehydration.

95.      There is no shortage of water at the Cleveland County Jail.  But Jail staff will not allow Ms. Hanchett to have it.  At 6:08 PM, a DO walks past Ms. Hanchett's cell while carrying a jug of water.  Although she knows Ms. Hanchett has been locked in a cell with no sink for days, she does not give Hanchett any water. This is deliberate indifference.

96.      Turn Key staff know Ms. Hanchett is severely psychotic and completely untreated, but they likewise do nothing to help her. Although she is too weak to dress herself or stand under her own power, they do not even check her vital signs.  She has never seen a doctor. This is deliberate indifference.

97.      At 8:08 PM, a DO opens the panel on Ms. Hanchett's cell and Nurse Doto briefly peers in.  She sees Ms. Hanchett lying naked on the bare concrete floor, amidst trash and rotting food.  She knows Ms. Hanchett is too weak to stand and has collapsed earlier that day.  She knows Hanchett's cell has no sink in it.  Yet Nurse Doto provides no care to Ms. Hanchett.  Instead, she walks away to the nearby desk and chats with DOs there. There is a jug of water in front of her.  She does not provide any to Ms. Hachett.

98.      Although Nurse Doto has done nothing to help Ms. Hanchett despite her serious medical needs, she does take the time to complete a "Waiver of Treatment/Evaluation" Form.  In it, she claims that at 9:39 PM on December 5, Ms. Hanchett "refused to let me take vitals."  The document – which is supposed to be signed by the patient – states:

- ***"I certify that I am refusing to consent . . . at my own insistence and against the advice of the health care provider…"***

- "I have been informed of by a qualified healthcare professional of the risks attendant to my refusal."

- "During the clinical interview with included counseling and education, the qualified healthcare professional has given me the opportunity to ask questions and has answered my questions."

- ***"I assume full responsibility for any results caused by my decision and I hereby release the institution, its employees, officers, and the provider from all legal responsibility and liability."***

- "***I certify that I am of sound mind*** and have read, or had read to me, and fully understand the above information concerning my refusal to accept treatment/evaluation..."

99.     On the signature line, Nurse Doto writes "refused."

100.     Nurse Doto falsified this form.  Jail surveillance video shows Nurse Doto did not ask to take Ms. Hanchett's vitals, conduct a "clinical interview," or provide Ms. Hanchett "counseling and education."  Nor did Ms. Hanchett refuse Nurse Doto's help.

101.     At 10:34 PM, a DO walks by Hanchett's cell carrying a jug.  He gives water to an inmate in a different cell, but does not give any to Shannon Hanchett.

**DAY 10
TUESDAY, DECEMBER 6**

102.     At 6:02 AM, a DO opens the panel on Ms. Hanchett's cell.  He is carrying a jug of water.  Ms. Hanchett has been in a cell with no sink for ***ten (10) days***.  She is now 42 hours away from dying from dehydration.  The DO closes the panel and walks away without giving Hanchett any water.  This is deliberate indifference.

103.    At 7:05 AM, Turn Key Nurse Jewel Johnson notes that Hanchett is "talking to herself" and "not responding to verbal stimuli when asked if she is okay." Yet she takes no action to help Ms. Hanchett. This is deliberate indifference.

104.    At 11:27 AM, a Turn Key nurse rolls a cart with a laptop on it down the hall outside Ms. Hanchett's cell. A DO opens the door and the nurse enters Hanchett's cell. The nurse tries to get Hanchett to come to the door. Hanchett cannot even sit up on her own, let alone stand, but she tries to roll to the door. The ***DO attempts to lift her up, but she falls. She is slowly dying of dehydration.*** Again, this is an obviously emergent situation requiring immediate transfer to a hospital. Instead of calling for an ambulance, the nurse drags Ms. Hanchett's naked body over to the door.

105.    Hanchett's torso remains in her cell, while her legs extend into the hallway. The nurse then steps over Hanchett's naked body into the hall. A DO who was holding the door leaves, so the door is now being held open by Hanchett's body.

106.    The nurse puts a headset on Ms. Hanchett, who is lying naked on the concrete floor. Too weak to even sit up on her own, or dress herself, Hanchett then has a brief video call with Dr. Jawaun Lewis, a psychiatrist. ***<u>This is what passes as "medical care" at the Jail.</u>***

107.    After ten (10) days at the Jail, no member of Turn Key's staff had even taken Ms. Hanchett's vital signs since she first entered the facility. She has received no treatment at all, nor even an examination. The video call with Dr. Lewis, while lying naked on the floor, was her first -- and last -- "encounter" with a doctor at the Jail. During the call, Ms. Hanchett is in an obvious state of emergent distress, naked and weakened to the point that

she could not even sit up.  Instead of ordering that Ms. Hanchett be sent to the hospital, Dr. Lewis terminated the call after a few minutes.

108.    When the call is over, the nurse drags Ms. Hanchett's naked body back into the cell.  A total of four (4) Jail and Turn Key staff members participate in or witness this encounter.  *Not one takes any action to help Ms. Hanchett.*  Instead, after they have dumped her body in the cell and closed the door, the nurse and nearby DOs appear amused. This is depraved indifference.

109.    That evening, Nurse Kariuki fills out a "Restrictive Housing Clearance" form.  In it, she states that on December 6, Ms. Hanchett "refused medical attention" and that she was "noncompliant for intake." But Jail video surveillance does not show that Nurse Kariuki has seen Ms. Hanchett at any time on December 6 – or at any other time in the past five (5) days.  Although Ms. Hanchett arrived at the Jail ten (10) days ago experiencing a psychotic episode – and although her mental health has steadily declined in the interim – Nurse Kariuki states on this form that it is "unknown" whether Ms. Hanchett is a mental health patient.  She concludes the "Restrictive Housing Clearance" form by stating *"Pt should stay housed in processing until she has been cooperative during the intake process."*

110.    At 6:13 PM, a DO is seen carrying a jug of water down the hall, but he does not give any to Hanchett.  A half hour later, he shows Hanchett to another DO through the window in the cell door.  Neither officer does anything to help Ms. Hanchett.  This is deliberate indifference. She is now just over one day from her death.

## DAY 11
## WEDNESDAY, DECEMBER 7

111.    Shannon Hanchett spends her last day of life lying naked on the floor of a processing cell, amidst trash, rotting food, and her own bodily waste.  Hours from death, she remains too weak to even sit up on her own.

112.    Numerous Jail and Turn Key staff observe her condition and do nothing to help her as she slowly dies.  That morning, a DO opens the panel on Hanchett's door and shows her to his fellow officers.  He is holding a water bottle, but he does not give any to Hanchett, who is dying from dehydration.  When they are done viewing her, they close the panel and walk away.

113.    At 9:19 AM, Cpt. Hammonds opens Ms. Hanchett's cell door.  She is accompanied by two other Jail staff members.  When the door is opened, two of these staff members lift their shirts up to cover their noses.  One sprays air freshener into the hallway. Although the Jail staff cannot tolerate even a brief exposure to the smell of the cell, *Ms. Hanchett has been living in this stench for days on end.*

114.    The staff find Ms. Hanchett lying naked on the floor, rolling in the filth.  She does not even respond to the door opening.  A DO enters the cell and lifts Hanchett up to get her dressed, but she cannot even sit up – ***she collapses back onto the floor.***  The DO tries again, and Hanchett ***again collapses to the floor.***  Another DO enters the cell to assist.  It takes two people to get Ms. Hanchett's shirt on her.  Together, they stand Hanchett up and try to walk her out the door, but she ***cannot walk even with two people helping her.  She collapses and falls into the hallway.*** This is, yet again, an obviously emergent situation requiring immediate transfer to a hospital.

115.    Still, with Ms. Hanchett on death's door in front of them, the Jail staff do not call an ambulance.  Rather, Cpl. Shaw grabs the suicide blanket from her cell and places it over Hanchett's body.  Then Cpt. Hammonds grabs Hanchett by her arms and ***drags her limp, naked body on the concrete floor, down the entire length of the hall.***

116.    Cpt. Hammonds and Cpl. Shaw deposit Ms. Hanchett in cell B124 – another processing cell.  They stand around with the cell door open.  No one is concerned that she will flee or fight.  She is far too weak.

117.    Turn Key LPN Natasha Kariuki arrives at cell B124.  For the first time since Hanchett's admission to the Jail on November 27, Ms. Hanchett's vitals are taken.  At this point, Ms. Hanchett has been suffering from severe psychosis for nearly two weeks.  Her physical condition has markedly worsened to the point that she cannot walk, stand or even sit up on her own power. She has been in an obvious state of medical distress for well over a week.  Turn Key has provided her no treatment to her whatsoever.  Her blood pressure has dropped from 143/89 on November 26 to just 88/52.  She is faint and confused.  This is a crisis. She is just hours away from dying from extreme dehydration.  Yet LPN Kariuki advises that Hanchett ***"did not need to be transported to the hospital per the Physician's Assistant (PA) Becky Pata."  Becky Pata has never examined Ms. Hanchett.***

118.    Nurse Kariuki later documents that during this encounter, Ms. Hanchett stated "THEY ARE GOING TO KILL ME."  Tragically, Ms. Hanchett was right.

119.    With Hanchett now removed from cell B130 for good, a trustee performs a deep cleaning of the ghastly cell – sweeping, using a wetvac, and then mopping the floor.

It is clear that the stench from that fetid cell is permeating the entire area. Cpt. Hammonds lifts her shirt over her nose as she walks down the hall. She then sprays down the door of the cell – first on the outside, then the inside. As she walks down the hall, she sprays into the air to help mask the odor released from Hanchett's cell.

120.    Two hours later, Cpt. Hammonds and Major Carter approach the door of cell B124, along with another DO. When Major Carter opens the cell door, Ms. Hanchett's bare legs *flop out into the hall.* Major Carter steps over Hanchett's legs. She pulls her up into a seated position and puts her shirt on. Again, Ms. Hanchett cannot even sit up under her own power. When she tries, ***she folds over.*** Cpt. Hammonds and Major Carter recline her back and move her limp body around on the hallway floor so they can get her pants on.

121.    As they are doing this, Nurse Kariuki walks by. She sees this happening and does ***nothing.***

122.    Cpt. Hammonds and Major Carter try to pull Hanchett up by her arms so that they can get her into a wheelchair, but they fail. ***Hanchett collapses again.*** They do not call an ambulance. Instead, they again retrieve a suicide blanket from the cell, place Hanchett on top of it, and ***drag her body down the hall by her arms.*** This is extreme neglect and indifference.

123.    Eventually, Cpt. Hammonds and Major Carter lift Ms. Hanchett's limp body off the floor and into a wheelchair. She is too weak to even keep her feet in the footrests. So as Cpt. Hammonds wheels her down the hall, her heels drag on the concrete floor. Major Carter follows behind them, with an amused smile on her face.

124.   At 12:45 PM, three Jail staff members wheel Ms. Hanchett into the jail's medical unit.  She is unable to sit up in the wheelchair, so they tilt the wheelchair back so that she will not fall out of it.  **Nurse Kariuki and Nurse Jewel Johnson appear to share a joke and laugh as she passes by them.**  Even a nearby inmate joins in the laughter. This is utterly inhumane disregard.

125.   They wheel Ms. Hanchett to the shower in the medical unit, pull off her pants, and **dump her body** from the wheelchair onto the shower floor.  Turn Key Nurse Kariuki is sitting behind the desk – just a few feet from the shower – and watches this with an amused expression.  While Ms. Hanchett is lying on the shower floor, a DO approaches Nurse Kariuki and tells her a joke.  She laughs and pushes him away with a "you're so bad" gesture.

126.   **Nurse Kariuki puts her head down on the desk because she is bent over laughing.  Ms. Hanchett is dying of dehydration just a few feet away.**

127.   When the shower is complete, Cpt. Hammonds and Nurse Johnson try to stand Ms. Hanchett up and walk her out of the shower, but she cannot stand.  **She collapses to the floor once again.**  Instead of calling an ambulance, the Turn Key nurses continue to laugh. The deliberate indifference is continual and appalling.

128.   Cpt. Hammonds and Nurse Johnson give up on getting Ms. Hanchett dressed and decide to drag her naked body across the floor yet again.  *Nurse Kariuki is laughing so hard she is bouncing in her seat.*  As Cpt. Hammonds drags Ms. Hanchett's body into a medical cell, Nurse Johnson tosses a towel on top of her body.  Nurse Johnson then grabs Ms. Hanchett's ankles and helps drag her limp body across the floor and into the cell.  Two

DOs are also watching.  Neither takes any action to help Ms. Hanchett.  One covers his mouth because he appears to be laughing.

129.    After dumping Ms. Hanchett's body on the floor of the medical cell, ***Nurse Johnson performs a curtsey for Nurse Kariuki and the DOs watching from behind the desk.  All of them laugh.***  Ms. Hanchett is now just twelve hours away from her death.

130.    Nurse Doto reports to the Jail at 7:09 PM.  At no time during her shift that night does she provide Ms. Hanchett anything to drink.  She does, however, repeatedly sip on her own drinks during this time, and hands a DO a cold beverage, in full view of Hanchett's cell.  And after Ms. Hanchett's death, Nurse Doto submits to the Sheriff's Office a ***falsified***, handwritten statement claiming she had given Ms. Hanchett water twice that night.

131.    Contradicting her own statement to law enforcement that she had given Ms. Hanchett water on the night of her death, in another medical record ***Nurse Doto falsely claims Ms. Hanchett "refused fluids"*** at 9:17 PM that night.  Jail surveillance video shows she did not offer Ms. Hanchett water at that time or any other time that night.  Nor was Ms. Hanchett remotely competent to "refuse" water at this point – if she was even conscious at all.  She was just three hours from dying from dehydration.  She needed to be transported emergently to the hospital.  Yet instead of providing her any care at all, Nurse Doto falsely claims Ms. Hanchett simply chose not to drink water that was offered to her.  This was, once again, deliberate indifference.

132.    At 9:50 PM, the lights go out in the medical cells.  This is the first time Shannon Hanchett has experienced darkness in **11 days.**

### DAY 12
### THURSDAY, DECEMBER 8

133.    At 12:18 AM, DO McKenney approaches Ms. Hanchett's medical cell and looks in with his flashlight.  He kicks the door to try to get her attention, but she does not respond.

134.    He opens the door and stands in the doorway.  Although Ms. Hanchett is non-responsive on the floor, McKenney does not enter the cell.  Instead, he makes a call on his radio and then stands casually, leaning on the open door.

135.    Nurse Doto enters the medical unit.  She walks at a leisurely pace and does not come directly to Ms. Hanchett's cell.  When she finally enters the cell and turns on the light, she does not go to Hanchett. According to DO Brittany Garcia, at this time Ms. Hanchett's ***"feet were pale and blue."***  "Inmate Hanchett's eyes were red and her lips were purple."  Yet Nurse Doto moves without any sense of urgency.  She takes a moment to put her hair into a ponytail, then *cracks a joke to McKenney.*  They both laugh.  Ms. Hanchett is dead. Her body is on the ground at their feet. This is inexplicable and outrageous indifference.

136.    As Nurse Dotto and DO McKenney chat, two additional DOs enter the medical unit.  Nurse Doto smiles at them and leaves Hanchett's cell to retrieve something from the far side of the room.  She still has not even examined the unresponsive Hanchett.

137.    Finally, Nurse Doto enters Hanchett's cell.  A moment later she leaves the cell to retrieve an AED.  But Turn Key's AED is broken.  Nurse Doto leaves to find one that works.  ***This is the first and only "care" Ms. Hanchett has received at the Cleveland County Jail.  They waited until she was dead.***

138.    At 12:36 AM, members of the fire department arrive. They declare Ms. Hanchett deceased.  Her body is wrapped in a bag and wheeled out on a gurney.

139.    That afternoon, at 12:30 PM, Major Carter completes an "Inmate Bunk Reassignment Request Form."  The form approves a transfer of Ms. Hanchett from her processing cell into the medical unit.  Ms. Hanchett had arrived at the jail more than 11 days ago.  She had been housed in a "temporary" processing cell that entire time.  Not until *12 hours <u>after</u> her death* did the Jail staff approve her transfer to another cell.

140.    The Medical Examiner's office determined Ms. Hanchett died of heart failure. Other significant conditions contributing to her death were psychosis with auditory and visual hallucinations and severe dehydration.

141.    On information and belief, Ms. Hanchett's death was would not have occurred in the absence of her prolonged catatonia and severe dehydration.

142.    Ms. Hanchett was just 38 years old when she died.

■ **CCSO and Turn Key's Policy and Custom of Inadequate Medical Care**

143.    All preceding paragraphs are incorporated herein by reference.

144.    It is believed that Defendant Turn Key is the largest private medical care provider to county jails in the state.  Turn Key used its political connections to obtain contracts in a number of counties, including Cleveland County, Oklahoma County, Creek

County, Tulsa County, Muskogee County, Garfield County, Ottawa County, Pottawatomie County, and Creek County.

145.    Turn Key has demonstrated, over a period of years, that its medical delivery system and "plan" is dangerously deficient. At least by the time of Ms. Hanchett's death, the County/CCSO knew, or should have known, that Turn Key's grossly deficient system and "plan" posed excessive risks to the health and safety of inmates, like Ms. Hanchett, who suffer from serious and complex medical conditions.

146.    To achieve net profits, Turn Key implemented policies, procedures, customs, or practices to reduce the cost of providing medical and mental health care service in a manner that would maintain or increase its profit margin.

147.    Under the Contract in effect while Ms. Hanchett was housed at the Jail, Turn Key was responsible to pay the costs of all pharmaceuticals at the Jail up to just $40,000 per year (both prescription and over-the-counter). If the annual pharmaceutical costs exceeded this limit, CCSO/Cleveland County was responsible for the excess costs.

148.    Similarly, Turn Key was responsible to pay the costs for all off-site medical services and hospitalizations up to just $50,000 per year, and CCSO/Cleveland County was responsible for any excess costs of inmate hospitalizations and off-site medical care.

149.    The Contract provided that Turn Key will arrange and bear the cost of hospitalization of inmates who – in the opinion of the Turn Key treating physician or medical director, require hospitalization – up to the agreed-upon limit.

150.    These contractual provisions create a dual financial incentive to under-prescribe and under-administer medications and to keep inmates, even inmates with serious medical needs, at the Jail and to avoid off-site medical costs.

151.    These financial incentives create risks to the health and safety of inmates like Ms. Hanchett who have complex and serious medical and mental health needs, such as bipolar disorder, schizophrenia, catatonia, dehydration, malnutrition, hyperthyroidism, and heart disease.

152.    Turn Key provides inadequate guidance, training and supervision to its medical staff regarding the appropriate standards of care with respect to inmates with complex or serious medical and/or mental health needs.

153.    Specifically, Turn Key has an established practice of failing to adequately assess and treat -- and ignoring and disregarding -- obvious or known symptoms of emergent and life-threatening conditions.

154.    These failures stem from the chronic unavailability of an on-site physician, financial incentives to avoid the costs of inmate prescription medications and off-site treatment and a failure to train and supervise medical staff in the assessment and care of inmates with complex or serious medical needs, such as bipolar disorder, schizophrenia, catatonia, dehydration, malnutrition, hyperthyroidism, and heart disease.

155.    Decisions related to the assessment and treatment of Ms. Hanchett were largely made by LPNs and LPCs who failed to refer Ms. Hanchett to a physician or offsite medical provider for a medical assessment.

156.    LPNs and LPCs are not trained, licensed or legally permitted to diagnose any medical condition. LPNs and LPCs cannot prescribe medication. LPNs cannot practice without the direct supervision of a physician or RN. Yet, under Turn Key and CCSO's medical delivery system, these providers are permitted to assess, evaluate and treat detainees with complex and serious medical and mental health conditions, without direct supervision by a physician or RN. This "system" violates Oklahoma law and, by design, creates excessive and unreasonable risks to inmates and detainees, like Ms. Hanchett, who have serious, complex and/or life-threatening conditions.

157.    Consistent with the dangerously deficient medical delivery system, Ms. Hanchett was never medically assessed by a physician, PA, NP, or even RN. And in fact, her medical intake was never completed in the two weeks she was at the Jail.

158.    Ms. Hanchett was also not provided with any medications to address her obviously serious medical conditions save for being prescribed one psychotropic medication less than 48 hours before her death. By that point, however, her deterioration was such that she was incapable of voluntarily accepting medication.

159.    Additionally, Turn Key has an established practice of failing to adequately assess inmates with complex and serious medical and mental health needs, including a failure to regularly take vital signs.

160.    Even on the rare occasions Turn Key staff takes vital signs from inmates with complex and serious medical and mental health needs, like Ms. Hanchett, Turn Key has an established practice of failing to train medical and mental health staff on what constitutes alarming vital signs; when to report alarming vital signs to a physician; and failing to send

inmates with complex and serious medical and mental health needs to an outside medical facility for an adequate assessment and treatment.

161.    Turn Key's inadequate or non-existent policies and customs were a moving force behind the constitutional violations and injuries alleged herein.

162.    Turn Key's corporate policies, practices, and customs, as described *supra*, have resulted in deaths or negative medical outcomes in numerous cases, in addition to Ms. Hanchett.

163.    In November 2014, while detained at the Cleveland County Jail, Robert Allen Autry developed a sinus infection. Both he and his mother informed Turn Key medical staff that a traumatic brain injury he suffered as a teenager made him particularly susceptible to sinus infections causing life threatening brain injections. Mr. Autry and his mother repeatedly asked medical staff to provide antibiotics, but none were provided.

164.    Approximately two weeks after she initially contacted medical staff about her son's condition and need for care, Turn Key staff called Mr. Autry's mother asking her to provide written consent for Mr. Autry to receive emergency surgery.

165.    He had been found unconscious in his cell and had been transported to the hospital. Later the same day, Mr. Autry was diagnosed with "a serious bacterial infection in his brain as a result of an untreated sinus infection." Mr. Autry underwent emergency brain surgery and subsequently a serious of other operations and procedures to place a feeding tube, insert a tracheal tube, and replace a cranial monitoring probe.

166.    Eventually, the treating physician determined Mr. Autry "was totally incapacitated from a brain injury resulting from a brain abscess and subdural empyema" and "would likely never return to an independent state."

167.    In June 2016, a nurse who worked for Turn Key at the Garfield County Jail allegedly did nothing to intervene while a hallucinating man was kept in a restraint chair for more than 48 hours. That man, Anthony Huff, ultimately died restrained in the chair.

168.    On September 24, 2017, a 25-year-old man named Caleb Lee died in the Tulsa County Jail after Turn Key medical staff, in deliberate indifference to Mr. Lee's serious medical needs, provided nearly nonexistent treatment to Mr. Lee over a period of 16 days. Mr. Lee was not seen by a physician in the final six (6) days of his life at the Tulsa County Jail (and only once by a psychologist during his entire stay at the jail), despite the fact that other Turn Key staff noted that he was suffering from: tachycardia, visible tremors, psychosis, symptoms of delirium, stage 2 hypertension, paranoia, and hallucinations. Turn Key staff failed to transfer Mr. Lee to an outside medical provider despite these obviously serious symptoms that worsened by the day until Mr. Lee's death on September 24, 2017.

169.    An El Reno man died in 2016 after being found naked, unconscious and covered in his own waste in a cell at the Canadian County Detention Center, while ostensibly under the care of Turn Key medical staff. The Office of the Chief Medical Examiner found the man had experienced a seizure in the days before his death.

170.    Another man, Michael Edwin Smith, encountered deliberate indifference to his serious medical needs at the Muskogee County Jail in the summer of 2016. Mr. Smith became permanently paralyzed when the jail staff failed to provide him medical treatment

after he repeatedly complained of severe pain in his back and chest, as well as numbness and tingling. Smith claims that cancer spread to his spine, causing a dangerous spinal compression, a condition that can cause permanent paralysis if left untreated. Smith asserts that he told the Turn Key-employed physician at the jail that he was paralyzed, but the physician laughed at Smith and told him he was faking. For a week before he was able to bond out of the jail, Smith was kept in an isolation cell on his back, paralyzed, unable to walk, bathe himself or use the bathroom on his own. He was forced to lay in his own urine and feces because staff told Smith he was faking paralysis and refused to help him.

171.    In November of 2016, Turn Key staff disregarded, for days, the complaints and medical history of James Douglas Buchanan while he was an inmate in the Muskogee County Jail. As noted by Clinton Baird, M.D., a spinal surgeon:

> [Mr. Buchanan] is a 54-year-old gentleman who had a very complicated history… [H]e was involved in being struck by a car while riding bicycle several weeks ago. … *He ended up finding himself in jail and it was during this time in jail that he had very significant clinical deterioration in his neurologic status. [I]t is obvious that he likely developed the beginnings of cervical epidural abscess infection* in result of his critical illness [and] hospitalization, but then *while in <u>jail</u>, he deteriorated significantly and his <u>clinical deterioration</u> <u>went</u> <u>unrecognized</u> <u>and</u> <u>untreated</u> until he was nearly completely quadriplegic.*

172.    On September 24, 2017, a 25-year-old man named Caleb Lee died in the Tulsa County Jail after Turn Key medical staff, in deliberate indifference to Mr. Lee's serious medical needs, provided nearly nonexistent treatment to Mr. Lee over a period of 16 days. Mr. Lee was not seen by a physician in the final six (6) days of his life at the Tulsa County Jail (and only once by a psychologist during his entire stay at the jail), despite the fact that other Turn Key staff noted that he was suffering from: tachycardia, visible tremors,

psychosis, symptoms of delirium, stage 2 hypertension, paranoia, and hallucinations. Turn Key staff failed to transfer Mr. Lee to an outside medical provider despite these obviously serious symptoms that worsened by the day until Mr. Lee's death on September 24, 2017.

173.    Like Ms. Hanchett, Mr. Lee was largely assessed and treated by LPNs during his nearly three-week incarceration at the Jail before his death.

174.    Indeed, a physician never once saw Mr. Lee for a week before his death, despite the fact that his symptoms and conditions, including hypertension, bipolar disorder, and hallucinations, continued to deteriorate.

175.    In January 2018, Marconia Kessee died of drug toxicity in the Cleveland County Jail after Turn Key wholly failed to take any actions – including performing a medical intake evaluation – in response to profuse sweating, inability to walk, incoherent speech, and seizure-like convulsions of Mr. Kessee and instead put him in a cell where he died within hours. Cleveland County Jail detention staff were aware of the same symptoms and performed wholly inadequate, less than one second long sight checks of Mr. Kessee throughout the last hours of his life. Turn Key staff did not even perform a single sight check of Mr. Kessee during the time he lay dying, until he was found completely unresponsive.

176.    On September 6, 2019, Dunniven Phelps was booked in to the Tulsa County Jail.

177.    During the book-in process, on September 6 at approximately 7:35 p.m., Turn Key employee/agent Richard Dutra filled out an Intake Screening form.  Pertinently, the Intake Screening form indicates that Mr. Phelps was being treated for hypertension

(high blood pressure) at the time and had been prescribed medication by his physician to treat the condition. During the intake screening process, Mr. Dutra further documented that Mr. Phelps was diabetic and had previously been diagnosed with mental health conditions.

178. During the medical intake process, Mr. Phelps complained that he had a severe headache, neck pain, and burry vision, which are common symptoms of a stroke.

179. Despite the fact that Mr. Phelps told Mr. Dutra about his current symptoms and history of hypertension, Mr. Dutra recommended that Mr. Phelps be placed in general population and that he did not need a referral for a continuity of care plan.

180. Throughout the night of September 6, 2019, Mr. Phelps' symptoms significantly worsened, as he was obviously suffering from a stroke.

181. By the morning of September 7, Mr. Phelps was experiencing severe weakness on the entire left side of his body, leaving him barely able to walk, as his left leg was almost completely numb.

182. At approximately 9:37 a.m. on September 7, Turn Key Nurse Patty Buchanan "assessed" Mr. Phelps, who told her that he could hardly feel or move the left side of his body and his other symptoms, such as dizziness and blurred vision, were worsening. Nurse Buchanan recorded Mr. Phelps' blood pressure as 163/103, which the American Heart Association classifies as Stage 2 hypertension.

183. Nurse Buchanan failed to inform a physician or even an RN or Nurse Practitioner about Mr. Phelps' alarming symptoms and worsening condition, in deliberate indifference to his serious medical needs.

184.    Further, while Nurse Buchanan allegedly counseled Mr. Phelps on the importance of taking his medications, there is no evidence that she, or anyone else at TCSO/Turn Key, ***ever gave Mr. Phelps any medications during his time at the Jail.***

185.    On one occasion, when Mr. Phelps could not get off of the ground because he could not use his left leg or left arm, a DO threatened to "Taze" Mr. Phelps if he didn't get off the ground.

186.    Mercifully, an inmate who was an amputee let Mr. Phelps use his wheelchair so that he could try to get an actual medical assessment and treatment at the medical unit of the Jail.

187.    At approximately 2:19 p.m. on September 7, a DO finally agreed to wheel Mr. Phelps to the medical unit, where he was seen by Nurse Gann.

188.    Shockingly, Nurse Gann thought Mr. Phelps was faking his emergent condition. Jail surveillance video shows Mr. Phelps lying on the ground in the medical unit, unable to walk, stand, or effectively use his arms, while Nurse Gann drops a piece of paper onto his face, presumably because she thought Mr. Phelps would move out of the way if he was capable of moving. Nurse Gann and other Turn Key personnel left Mr. Phelps lying on the floor, helpless and in immeasurable pain.

189.    At 4:05 p.m. on September 7, Mr. Phelps was finally seen by Elizabeth Martin, Advanced Practical Registered Nurse ("APRN").

190.    APRN Martin noted that Plaintiff had a ***"3 day history of evolving stroke like symptoms."*** She also noted that Plaintiff's "speech [was] slurred" and that

he had "left side facial droop" and weakness on his left side. By this time, Plaintiff's blood pressure was 183/114, which is considered a ***hypertensive crisis that requires immediate consultation and assessment by a physician.***

191.    Mr. Phelps was finally sent to Hillcrest Medical Center at approximately 6:15 p.m. on September 7, 2019.

192.    Once at Hillcrest, Mr. Phelps was transferred to the Intensive Care Unit ("ICU") where physicians provided emergent, live-saving treatment.

193.    Unfortunately, the delay in treating Mr. Phelps, due to Turn Key and Jail staff's deliberate indifference, resulted in Mr. Phelps suffering permanent damage.

194.    Mr. Phelps is now permanently paralyzed on the entire left side of his body and will require significant medical treatment for the rest of his life.

195.    From June to October 2019, Bryan Davenport, an inmate at the Cleveland County Jail, was denied adequate medical care by Turn Key personnel. Mr. Davenport informed Turn Key staff that he had hypertension and HIV, yet he was not seen by a physician, physician's assistant, or nurse practitioner for nearly a month after his arrival at the jail. Davenport provided Turn Key staff with the names of his providers, his need for HIV medications, and the names of those medications. When a Turn Key nurse finally saw Davenport, she told him that she did not want to start treatment pertaining to his HIV and left him without vital medications for several months. Turn Key also refused to treat Davenport under their "chronic care" protocol, instead requiring him to submit multiple sick calls just to attempt to get his medications so that Turn Key and Cleveland County could charge Davenport $15/visit.

196.    In October-November 2020, an inmate at the Cleveland County Jail slowly died of his known congestive heart failure as Turn Key and its employees ignored the obvious and severe worsening of his condition, including extreme edema and swelling, fluid leaking from his legs, urinary incontinence, and clear sings of infection. Turn Key staff failed to properly assess, evaluate, or treat the inmate and failed to refer him to a more highly trained provider or an outside medical provider.

197.    In July 2021, an inmate named Perish White died of COVID-19, which he contracted in the Creek County Jail.

198.    Mr. White began feeling ill on or about July 5, 2021, and reported his symptoms to Turn Key staff at the Creek County Jail.

199.    By July 8, 2021, at the latest, Mr. White began experiencing shortness of breath and coughing. On information and belief, Mr. White also stopped eating and was refusing meal trays. These drastic changes in Parish's condition, particularly in light of the ongoing COVID-19 pandemic, made it obvious, even to a layperson, that Perish needed emergent evaluation and treatment from a physician.

200.    ***From July 5 to July 16, 2021, Turn Key staff never once took Mr. White's vital signs,*** despite his repeated complaints that he was seriously ill, his obvious symptoms, and the fact that COVID-19 was raging through the Creek County Jail.

201.    On July 19, 2021, Mr. White was finally taken to OSU Medical Center in Tulsa for COVID-19 and respiratory failure. At the time, his oxygen saturation level was in the 70's. He was diagnosed with acute kidney failure. He was placed on life support, including a ventilator and dialysis.

45

202.    Mr. White died on July 30, 2022.

203.    April 13, 2021, Christa Sullivan died at the Oklahoma County Jail ("OCJ"), which also uses Turn Key as its jail medical provider.

204.    Ms. Sullivan had a history of severe mental illness, including depression, bipolar disorder, schizophrenia, and several previous suicide attempts.

205.    Ms. Sullivan was housed at the OCJ for nearly a year prior to her death. Throughout her time at OCJ, she exhibited extremely serious symptoms, including multiple instances of self-harm, suicidal ideation, a refusal to eat or drink, rapid weight loss, and catatonia.

206.    Approximately two months before Ms. Sullivan's death, numerous Turn Key providers, including nurses and two physicians, acknowledged Ms. Sullivan's emergent conditions and the fact that it was impossible for Ms. Sullivan to receive the life-saving care she needed in a jail setting.

207.    In fact, one Turn Key physician noted, with respect to Ms. Sullivan:

*DEPRESSED AFFECT, SEVERE ADULT FAILURE TO THRIVE. SEEMS AT HIGH RISK FOR POOR OUTCOME. I HAVE DISCUSSED HER CASE WITH PSYCHE, NURSING, AND WOUND CARE AND DO NOT SEE ANY LIKELY TO SUCCEED INTERVENTIONS IN THIS SETTING. SHE DOES NOT SEEM COMPETENT BY ANY BEHAVIORAL PARAMETER THAT I CAN SEE. WILL REDISCUSS OPTIONS WITH DR. CUKA AND DR. COOPER.*

208.    Yet, Turn Key providers allowed Ms. Sullivan to languish in her cell for months, cationic and barely eating, until her eventual death.

209.    After Ms. Sullivan's death, Kevin Wagner, a Captain at OCJ told an investigator, "[Ms. Sullivan] went from 148 when she got here to … *she looks like a skeleton."* Captain Wagner also told the investigator he helped get Ms. Sullivan to a local hospital for a week at one point "because I felt that *medical (in the Jail) wasn't providing her care enough."*

210.    Another staff member told an investigator that Ms. Sullivan deteriorated *"to a bag of bones."*

211.    On June 12, 2021, Joseph Stewart was booked into the Cleveland County Jail.

212.    On June 13, 2021, Mr. Stewart advised a Jail detention officer and Turn Key Nurse Angela Albertson, LPN, that he needed to go to the hospital because his arm had been hurting since the day of his arrest and because he had an L1 (lumbar vertebrae) fracture that was hurting.

213.    Responsible Jail and Jail medical staff did nothing other than instruct Mr. Stewart to "not lay on his right side and rest arm."

214.    Two hours later, Mr. Stewart advised Turn Key Nurse Sarah Garcia, LVN, of his arm and back pain.

215.    In response, Mr. Stewart was moved to a bottom bunk. Nurse Garcia did not alert any other medical provider of Mr. Stewart's condition, complaints, or her decision making.

216.    On June 17, 2021, Nurse Albertson responded to a sick call placed by Mr. Stewart. Nurse Albertson noted that Mr. Stewart had increased pain and reduced range of motion in his left arm and a belief that it might be associated with his back.

217.    On June 19, 2021, Turn Key LPN Amanda Stehr observed Mr. Stewart "laying on the …floor" in distress with a pain rating of 10/10. She charted that Mr. Stewart asked "multiple times" to be transported to the hospital, that he was experiencing the worst pain he had ever been in and he could not handle it."

218.    In response, Nurse Stehr called a Turn Key NP, ***whose only action was to prescribe an 800 mg ibuprofen, despite Mr. Stewart's obviously serious – and steadily worsening – symptoms and condition***.

219.    On June 21, 2021, Turn Key CRNP Becky Pata was informed that Mr. Stewart had fractured his L1 approximately three months previous, that he had experienced right shoulder pain since booking, and that he had a history of herniated discs.

220.    Pata observed Mr. Stewart limping and "obviously in a great deal of pain" before charting that she would "send to ER out of abundance of caution."

221.    After being transported to Norman Regional Hospital ("NRH"), Mr. Stewart's L1 compression fracture was confirmed.

222.    Mr. Stewart was returned to the Jail after his short visit to the NRH ER.

223.    On June 30, 2021, Mr. Stewart reported to Pata that he didn't feel well. He was taken back to NRH to be evaluated for pneumonia. Mr. Stewart reported symptoms including shortness of breath and unilateral leg swelling for the past month. After treating and discharging Mr. Stewart, NRH provided discharge instructions to the Jail and Turn

Key that Mr. Stewart needed to return to the hospital in the event of "worsening symptoms or any symptoms of concern," "trouble breathing," or any "new symptoms or other concerns."

224.    On July 4, 2021, Mr. Stewart reported the following worsening or new conditions to Defendant Nurse Kariuki: 1) chest pain of 10/10; and 2) spitting up blood. Nurse Kariuki observed that Mr. Stewart appeared to be in distress with "reddish-green mucous…in the toilet."

225.    In response to these alarming (and new) symptoms, Kariuki did nothing other than click a preformatted box suggesting that she instructed him to "increase fluids, medication use, follow-up sick call if no improvement."

226.    Upon information and belief, Nurse Kariuki failed to report these symptoms to a physician, NP, PA, or RN, despite being aware of NRH's discharge instructions.

227.    On July 5, 2021, Mr. Stewart reported to Nurse Albertson additional worsening or new conditions, including difficulty breathing and persistent coughing.

228.    In response to these new symptoms/worsening condition, Nurse Albertson did nothing other than instruct Mr. Stewart to "take good deep breaths so as not to get pneumonia."

229.    On July 7, 2021, Mr. Stewart reported to CRNP Pata that he now was coughing up blood streaked sputum and had heartburn.

230.    Pata, despite having knowledge of the NRH discharge instructions, did not contact a physician or the hospital and merely ordered omeprazole and prednisone for Mr. Stewart.

231.    On July 14, 2021, Mr. Stewart reported the following worsening or new conditions to Turn Key LPN Christina Meza: 1) "woke up with blood dripping down the side of my face"; 2) pale-looking appearance; 3) persistent coughing; and 4) "leaning forward to breathe with hands on knees."

232.    Meza did nothing other than order Guaifenesin, a generic cough medicine. She did not report Mr. Stewart's condition to a physician or the hospital despite knowing of NRH's discharge instructions.

233.    Within an hour of Mr. Stewart's complaint to Meza, Turn Key and Jail staff allowed Mr. Stewart's release without disclosing the extent of his medical condition. Mr. Stewart was released to the custody of a deputy from Kingfisher county at approximately 7:59 p.m.

234.    No one informed the Kingfisher deputy of Mr. Stewart's emergent condition or NRH's orders to bring Mr. Stewart back to the hospital if he had new or worsening symptoms.

235.    Upon arrival at the Kingfisher Jail, approximately 60 miles from Norman, the medical staff at the Kingfisher Jail refused to admit Mr. Stewart based on his dire medical condition.

236.    The transporting deputy then took Mr. Stewart to a local hospital before he was transferred to a hospital in Enid where he died the following day, July 15, 2021.

237.    Mr. Stewart died due to acute bacterial endocarditis, acute respiratory failure, congestive heart failure, and hyponatremia.

238.    On August 3, 2021, Gregory Neil Davis was arrested by Oklahoma City Police Department ("OCPD") Officers and transported to the OCJ.

239.    Mr. Davis was charged with indecent exposure, and was observed by officers to be in the midst of an obvious mental health crisis.

240.    Upon arriving at the OCJ, Mr. Davis was not evaluated by Turn Key personnel, nor was he tested for COVID-19 or have his vital signs taken.

241.    Mr. Davis was finally seen by a Turn Key provider, Sanaria Okongor, LPC, on August 6, 2021. Ms. Okongo noted that Mr. Davis suffered from signs of psychosis, but she made no treatment recommendations or took any actions other than to recommend follow-up a few days later.

242.    Ms. Okongor saw Mr. Davis again on August 9, 2021 and again noted he appeared to be suffering from psychosis. Ms. Okongor again failed to make any treatment recommendations or take any actions, including taking vital signs or referring Mr. Davis to a higher-level provider.

243.    For at least the final few days of Mr. Davis's life – from August 9-12, 2021 – inmates in nearby cells heard Mr. Davis beating at his cell door, crying, and begging for medical help but no one came to assist him, provide him medical care, or refer him to a physician or outside medical provider.

244.    On the morning of August 12, 2021, at approximately 6:45 a.m., Mr. Davis was observed in his cell in need of emergency medical attention by Lt. Morris and Ronald Anderson, employees and/or agents of the Oklahoma County Criminal Justice Authority ("OCCJA").

245.    Upon information and belief, EMSA was not called until approximately 9:17 a.m. When EMSA arrived, paramedics transported Mr. Davis to a nearby hospital, where he was pronounced dead.

246.    Mr. Davis died of a perforated duodenal ulcer, a condition that does not normally result in death unless left untreated for a substantial period of time, often more than 24 hours.

247.    From August 3-12, 2021, the only Turn Key personnel who saw, evaluated, assessed, or "treated" Mr. Davis was an LPC, who saw Mr. Davis on two occasions.

248.    Mr. Davis was never seen by a Turn Key physician nor was he referred to an outside medical provider other than the day of his death, when it was far too late.

249.    In August 2021, Larry Price, an intellectually disabled, 55-year-old inmate at the Sebastian County (Arkansas) Adult Detention Center, starved to death after responsible jail and Turn Key personnel failed to properly treat his medical and mental health conditions, including schizophrenia, for a year.

250.    The six foot, two inch Mr. Price entered the jail weighing approximately 185 pounds. By the time he was found unresponsive in his cell 366 days later, he weighed 90 pounds according to EMS reports. He had also been ingesting his own urine and feces according to reports.

251.    The medical examiner's report noted that Mr. Price was COVID-19 positive when he died, but the official cause of death was listed as ***"acute dehydration and malnutrition."***

252.    Similar to Ms. Hanchett, Mr. Price encountered Dr. Lewis, but Dr. Lewis did nothing to ensure that Mr. Price was cared for.

253.    For over a year, Turn Key personnel watched as Mr. Price deteriorated both physically and mentally, doing nothing to assess, evaluate, or treat his conditions. Nor did Turn Key personnel refer Mr. Price to an outside medical provider.

254.    On December 24, 2021, Dean Stith, a 55-year-old Black man, was booked into the Tulsa County Jail after being arrested for the non-violent misdemeanor of false reporting of a crime.

255.    Mr. Stith suffered from numerous pre-existing medical and mental health conditions, including hypertension, bipolar disorder and/or schizophrenia, and serious dementia, which was obvious even to a layperson. Indeed, upon information and belief, the charges Mr. Stith faced – false reporting of a crime – were the result of symptoms of his dementia.

256.    During the book-in process, on December 25, 2021 at approximately 12:14 a.m., Turn Key employee/agent James Flora, LPN filled out an Intake Screening form. Pertinently, the Intake Screening form indicates that Mr. Stith: was being treated for hypertension; had an unstable gait; had open sores and wounds on both of his hands; was disheveled, disorderly, and insensible.

257.    Mr. Stith's condition continued to deteriorate throughout his stay at the Jail.

258.    On January 5, 2022, at approximately 4:29 p.m., Turn Key Nurse Practitioner Megan Rasor saw Mr. Stith for the purported purpose of "[hypertension] and wounds to BLE." NP Rasor charted that Mr. Stith was unable to recall his medication

regimen and was "A&O [alert and oriented] to person and place only. Patient **has 2+ pitting edema to BLE with multiple open areas...[3]** Patient to wear compression hose but is noncompliant."

259.    On January 7, 2022, Mr. Stith's blood pressure was measured at 101/68, his pulse was 60, which is in the low range. Inexplicably, his oxygen saturation was not taken.

260.    Also on January 7, Judy Wagga, a Turn Key Psychiatric Nurse Practitioner, saw Mr. Stith and noted that he "appeared to be responding to internal stimuli." This was a sign that Mr. Stith was suffering from acute psychosis, an emergent situation.

261.    On January 8, 2022, Mr. Stith's pulse rose to 98 and his blood pressure rose to 124/97. Yet, despite these fluctuations, Mr. Stith was not put on any blood pressure medicine or given additional treatment.

262.    On January 9, 2022, Alicia Irvin, Turn Key psychologist, noted Mr. Stith's dementia and wrote that he had slurred speech, a new alarming symptom, and was not responding appropriately to questions. Dr. Irvin described Mr. Stith as having a "Major Neurocognitive Disorder." But Mr. Stith was not sent to an outside medical provider nor referred to a physician.

263.    Mr. Stith's pulse had also plummeted to 56, which is considered bradycardia. Bradycardia can be a serious problem if heart can't pump enough oxygen-rich blood to the

---

[3]     Pitting edema is when a swollen part of your body has a dimple (or pit) after you press it for a few seconds. It can be a sign of a serious health issue, such as a blood clot, congestive heart failure, kidney disease, liver disease or *lung disease*. Nurse Lewis' note indicates that Mr. Stith had pitting edema in both legs.

body. Symptoms of bradycardia include confusion, such as the confusion repeatedly displayed by Mr. Stith.

264.    By this point it was abundantly clear that Mr. Stith was suffering from a condition that could not be adequately treated in a correctional setting. With negligence and deliberate indifference, Dr. Irvin, who is not a physician, failed to call for an ambulance or otherwise ensure that Stith was urgently evaluated by a physician.

265.    At approximately 2:46 p.m. on January 9, Turn Key Nurse Sarah Lewis, LPN, observed Mr. Stith *"**drooling, tangential thought, not responding appropriately to questions, diminished skin turgor,[4] 2+ pitting edema to BLEs, and full body weakness.**"* Nurse Lewis also noted that Mr. Stith was **unable to urinate**.

266.    Particularly when coupled with his worsening condition over a period of days, Nurse Lewis' note clearly reflects that Mr. Stith was in a dire condition and in obvious need of emergent care that could not be provided in a correctional setting. Nonetheless, with negligence and deliberate indifference, Nurse Lewis failed to call for an ambulance or even contact a physician.

267.    On January 10, 2022, at approximately 4:05 a.m., Mr. Stith was found wedged between his bunk and the wall in his cell. TCSO Detention Officer Davis notified Turn Key Nurses Nikki Copeland and Sarah Schumacher, who found that Mr. Stith was "cool to the touch and arms contracted to chest."

---

[4]     A decrease in skin turgor is a late sign of dehydration.

268.    EMSA was called and paramedics arrived at approximately 4:39 a.m., finding Mr. Stith unresponsive. The EMSA paramedics documented that Jail **"*health care staff are poor historians* and are unsure of timeline."**

269.    The paramedics noted that Mr. Stith was displaying decorticate posturing, which is a pose in which someone has rigid, extended legs, arms bent toward the center of their body, pointed and turned in toes, curled wrists, and balled hands. Decorticate posturing is caused by abnormal brain conditions such as a stroke, concussion, traumatic brain injury, brain bleed, brain tumor, or infection. Mr. Stith was transferred to St. John Medical Center where he presented in cardiac arrest.

270.    Providers at St. John were unable to resuscitate Mr. Stith, who passed away shortly after his arrival.

271.    The Office of the Chief Medical Examiner of Oklahoma determined that Mr. Stith died due to: 1) acute bronchopneumonia[5] due to complications of COVID-19; and 2) hypertensive atherosclerotic cardiovascular disease.

272.    On December 20, 2022, less than two weeks after Ms. Hanchett died, another inmate at the Cleveland County Jail, Kathryn Milano, passed away.

273.    In February 2023, Joe Allen Sims, Jr., a mentally ill inmate who was supposed to be under "critical watch," died by suicide at the Cleveland County Jail.

274.    Mr. Sims was discovered by Jail staff 77 minutes after he hanged himself, despite the fact that he was supposed to be closely monitored due to his mental state.

---

[5]    Symptoms of bronchopneumonia include muscle aches, confusion or delirium.

275.    Upon information and belief, Ms. Milano had an extensive history of medical and mental health issues that were poorly controlled while she was housed at the Jail, consistent with the Jail's and Turn Key's policies and practices as discussed, *supra*.

276.    In each of these instances, there was an utter lack of physician supervision over the clinical care provided to the inmates.  And each of these inmates, with obvious, serious and emergent medical and mental health conditions, was kept at the jail when they clearly should have been transported to a hospital or other off-site provider capable of assessing and treating the conditions.

277.    By its design, the Turn Key medical system was destined to fail.

278.    At all pertinent times, Dr. William Cooper, D.O., was the "Medical Director" for Turn Key.  In an effort to cut costs, Turn Key and Dr. Cooper spread the few physicians and mid-level providers they employ far too thin, making it impossible for them to medically supervise, let alone provide appropriate on-site medical care, at any of the county jails under contract with Turn Key.

279.    In essence, Turn Key employs a small number of mid-level providers, such as physician's assistants or nurse practitioners, and physicians who travel all over the State (and sometimes to other states, such as Arkansas and Kansas) to the dozens of jails staffed by Turn Key for short blocks of time each week.  This constitutes plainly insufficient medical staffing, particularly for a larger institution like the Cleveland County Jail.

280.    With no physician reasonably available to medically supervise the care provided to the inmates, undertrained personnel were left to practice outside the scope of their training and licensure.

281.    In other words, Turn Key had a policy, practice or custom of inadequately staffing county jails, including the Cleveland County Jail, with undertrained and underqualified medical personnel who are ill-equipped to evaluate, assess, supervise, monitor or treat inmates, like Ms. Hanchett, with complex and serious medical and mental health needs, including heart disease, bipolar disorder, schizophrenia, catatonia, dehydration, and malnutrition.

282.    With wholly inadequate physician oversight of the clinical care, the non-physician staff was improperly, and dangerously, expected to act in the role of a physician, with the understanding that off-site care was to be avoided.

283.    This system, designed to minimize costs at the expense of inmate care, obviously placed inmates with complex, serious and life-threatening medical and mental health conditions, like Ms. Hanchett, at substantial risk of harm.

284.    This system, which Turn Key implemented company-wide, was substantially certain to, and did, result in constitutional deprivations.

285.    CCSO and the County were on notice that the medical care and supervision provided by Turn Key and the detention staff was wholly inadequate and placed inmates like Ms. Hanchett at excessive risk of harm.  However, CCSO and the County failed to alleviate the known and obvious risks in deliberate indifference to the rights of inmates like Ms. Hanchett.

286.    Moreover, Dr. Cooper, Turn Key's Medical Director, has maintained a policy, at the corporate level, of intentionally omitting information about inmates' negative

health outcomes from written documentation, and has ordered Turn Key personnel to keep such bad news out of written communications.

287.    This policy, in and of itself, constitutes deliberate indifference to the health and safety of Turn Key's patients.

288.    Turn Key has maintained a custom of inadequate medical care and staffing at a corporate level which poses excessive risks to the health and safety of inmates like Ms. Hanchett.

289.    There is an affirmative link between the aforementioned unconstitutional acts and/or omissions Turn Key staff, including of Nurse Doto, Nurse Kariuki, Nurse Johnson, and LPC Myles-Henderson, and policies, practices and/or customs which Turn Key promulgated, created, implemented and/or possessed responsibility for.

290.    Ms. Hanchett displayed alarming symptoms for the entirety of the two weeks she was housed at the Jail, including bipolar disorder, schizophrenia, catatonia, dehydration, malnutrition, and heart disease.  In deliberate indifference to these serious medical needs, neither Nurse Doto, Nurse Kariuki, Nurse Johnson, LPC Myles-Henderson, nor any other Turn Key employee/agent adequately treated Ms. Hanchett's symptoms and conditions. When her health deteriorated to the point that she was completely incoherent, was not eating or drinking, could not stand or sit up under her own power, and spent hours every day lying on the floor of her cell naked, she was kept at the Jail for an extended period of time, when it was obvious she needed a higher level of care. This was callous and reckless indifference. Indeed, the only time Ms. Hanchett's vital signs

were taken while she was at the Jail were the during the initial attempted book-in process and the day before she ultimately passed away.

291.    It was obvious that Ms. Hanchett's conditions could not be effectively treated in a correctional setting.  Yet, despite the obvious and excessive risks to her health and safety, Nurse Doto, Nurse Kariuki, Nurse Johnson, LPC Myles-Henderson, and the other Turn Key employees/agents referenced above, refused to send her to the hospital or other facility with a higher level of care.

292.    Even if no single Turn Key employee/agent had violated Ms. Hanchett's constitutional rights, Turn Key would still be liable under a theory of a systemic failure of its policies and procedures as described herein.  There were such gross deficiencies in the medical delivery system at the Jail that Ms. Hanchett was effectively denied constitutional medical care.

■  **Sheriff/CCSO/ County's Custom of Inadequate Medical Care**

293.    Counties may be held liable for the maintenance of an unconstitutional health care delivery system. In *Burke v. Regalado*, 935 F.3d 960 (10th Cir. 2019), the Tenth Circuit upheld a jury verdict against the Tulsa County Sheriff for his failure to supervise based on evidence that he maintained a policy or custom of insufficient medical resources and training, chronic delays in care and indifference toward medical needs at the Tulsa County Jail. *See Burke*, 935 F.3d at 999-1001.[6]

---

[6]    *See also v. Crowson v. Washington Cty. Utah*, 983 F.3d 1166, 1192 (10th Cir. 2020) (finding that a county may face liability based on "theory [of] systemic failure of medical policies and procedures"); *Burke v. Glanz*, No. 11-CV-720-JED-PJC, 2016 WL 3951364, at *23 (N.D. Okla. July 20, 2016) ("[B]ased on the record evidence construed in plaintiff's

294.    As evidenced, *supra*, the Jail/CCSO/the County have maintained an unconstitutional health care delivery system.

295.    Indeed, by simply retaining Turn Key as the medical provider at the Jail in light of the obviously substandard care that Turn Key has provided – and continues to provide – to inmates at the Cleveland County Jail and county jails all over Oklahoma, Arkansas, and Kansas, CCSO/the County are deliberately indifferent to inmates' serious medical needs.

296.    CCSO/the County are aware, or should be aware[7], of Turn Key's repeated failures to provide constitutionally adequate medical care for inmates, yet CCSO/the County have made the conscious decision to retain Turn Key as the Cleveland County Jail's medical provider.

297.    In addition, CCSO has utterly failed to train its detention staff in how to properly monitor, supervise, or care for inmates, like Ms. Hanchett, with complex or serious medical and mental health needs, with deliberate indifference to the health and safety of those inmates.

---

favor, a reasonable jury could find that, in the years prior to Mr. Williams's death in 2011, then-Sheriff Glanz was responsible for knowingly continuing the operation of a ***policy or established practice of providing constitutionally deficient medical care*** in deliberate indifference to the serious medical needs of Jail inmates like Mr. Williams.").

[7]    The negative medical outcomes discussed, *supra*, at jails in which Turn Key is the medical provider, have garnered substantial media attention. Further, upon information and belief, when Turn Key submits a request for proposal ("RFP") to a county when it is vying to become the jail's medical provider, Turn Key discloses a list of the current and previous lawsuits against it in which inmates, or an inmate's estate, has alleged constitutionally inadequate medical care.

298.    During Ms. Hanchett's 11 days at the Cleveland County Jail, dozens of Jail staff members watched her die a slow, grueling death. They knew she was housed in a temporary processing cell with no sink, no toilet, and no bed or mat for days at a time. They knew she was not eating. They knew she had not bathed and could not bathe. They knew her cell was filthy, covered with trash and rotting food. They knew that she entered the Jail physically healthy, and they watched her decline to the point that she could not even sit up. Throughout these 11 days, they saw and demonstrated deliberate indifference continually. Not one of them called an ambulance. Not one of them showed any indication that they saw any problem with how she was treated. It is clear from the Jail surveillance video that this was just like any another day at the Cleveland County Jail. The Jail has a deeply entrenched custom and practice of deliberate indifference.

299.    An inspection conducted by the Oklahoma State Department of Health's Jail Inspection Division ("JID") in March 2023 revealed that jailers had missed numerous cite checks on inmates, including inmates who were supposed to be under critical watch, in December 2022 and January 2023. One of those inmates who jailers failed to adequately monitor was Ms. Hanchett. Logs revealed that detainees who were supposed to be closely monitored were left alone and unsupervised for up to 45 minutes at a time on December 5 and 6, 2022.

300.    An inspection in May of 2022 revealed that detention officers missed dozens of 15-minute checks required for detainees under suicide watch at the Jail.

301.    In one case, the report shows that jailers missed 50 of 73 checks needed over 18 hours for a detainee deemed a suicide risk.

302.    The report also revealed that jailers missed dozens of other checks on inmates who were not on a heightened monitoring schedule.

303.    Yet, upon information and belief, CCSO/the County failed to ensure that the Jail was properly staffed, jailers were adequately trained, and that jailers conducted their required checks, especially on inmates, like Ms. Hanchett, who had serious medical/mental health needs and/or required close monitoring.

304.    In March 2023, the Board of County Commissioners of Cleveland County approved a plan to increase medical and mental health staff at the Jail following the deaths of Ms. Hanchett, Ms. Milano, and Mr. Sims.

305.    County Commissioner Rod Cleveland said that the move **was not a response to the deaths of Hanchett, Milano, and Sims, but rather to the Jail's growing population**.

306.    In 2022, the Jail's average daily population was 541 detainees compared to 367 three years earlier, according to reports from Turn Key.

307.    Medical staff reported that there were twice as many sick calls and twice as many mental health needs in 2022 compared to 2019, but during that time period, the County took no steps to increase detention or medical staffing at the Jail.

308.    On information and belief, CCSO also had a custom and practice of keeping detainees in the "temporary" processing cells, that are not equipped with sinks, toilets or bunks, well beyond the intended time period, sometimes for days. On information and belief, the detainees housed in the processing cells often have severe mental health problems, including suicidal ideation, and are labeled by CCSO and Turn Key as

uncooperative or noncompliant. The extended housing of inmates in the "temporary" processing cells is a result of overcrowding at the Jail and CCSO and Turn Key's refusal to care for inmates deemed to be difficult. Housing inmates or detainees in the "temporary" processing cells for a period of days creates obvious and substantial risks of harm to that inmate/detainee population.

309.    The County/BOCC/CCSO have had abundant opportunity to increase funding, supervision and training which would allow it to properly staff and address the systemic deficiencies, including severe deficiencies in its medical delivery system, that have plagued the Jail in recent years. Its failure to do so has resulted in injury to multiple detainees, including Ms. Hanchett. Its failure to take reasonable measures to alleviate known and substantial risks to inmates like Ms. Hanchett constitutes deliberate indifference at the municipal level.

## CAUSES OF ACTION

### VIOLATION OF THE EIGHTH AND/OR FOURTEETH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES (42 U.S.C. § 1983)

310.    All preceding paragraphs are incorporated herein by reference.

### A.    Individual Liability and Underlying Violation of Constitutional Rights

- **Unconstitutional Living Conditions**

311.    During the 11 days Ms. Hanchett was in custody at the Cleveland County Jail, she was housed in a cell with no sink, no toilet, and no bed or mat, with the lights on at all times.  For periods as long as 5 days at a time, the door to her cell was never opened.

Within processing cell B130, she had no access to water.  With no access to a toilet, she was forced to relieve herself onto the floor of her cell and then live amidst her own waste.  In addition to her waste, the floor was strewn with rotting food and trash, which in turn attracted insects.  She was deprived of the opportunity to bathe.  The stench of her cell was overwhelming.

312.    In violation of Ms. Hanchett's rights under the Eighth and Fourteenth Amendments, Jail staff and Turn Key staff, including Defendants Doto, Kariuki, Johnson, and Myles-Henderson, failed to provide humane conditions of confinement by ensuring that Ms. Hanchett received the basic necessities of adequate food, water, and personal hygiene.

313.    These conditions resulted in unquestioned and serious deprivations of basic human needs and posed a substantial risk of serious harm to Ms. Hanchett's health and safety.

314.    Jail staff and Turn Key staff, including Defendants Doto, Kariuki, Johnson, and Myles-Henderson,  knew of the excessive risks to Ms. Hanchett's health and safety.

315.    Indeed, the risk was so obvious that no reasonable correctional officer or nurse could have concluded that it was constitutionally permissible to house Ms. Hanchett in such deplorably dangerous and unsanitary conditions for such an extended period.

316.    Despite their knowledge of these serious deprivations of Ms. Hanchett's basic human needs, and the substantial risk of serious harm these deprivations posed to Ms. Hanchett's health and safety, Jail staff and Turn Key staff, including Defendants Doto, Kariuki, Johnson, and Myles-Henderson,  disregarded these risks.

317.    As a direct proximate result of the unlawful conduct of Jail and Turn Key staff, including Defendants Doto, Kariuki, Johnson, and Myles-Henderson, Ms. Hanchett suffered actual and severe physical injuries, physical pain and suffering, emotional and mental distress, loss of familial relationships and death.

- **Failure to Provide Adequate Medical Care**

318.    Ms. Hanchett had obvious, severe, and emergent medical and mental health needs made known to CCSO/the County and Turn Key, including Defendants Lewis, Doto, Kariuki, Johnson, and Myles-Henderson, prior to her death.

319.    Nonetheless, CCSO/the County and Turn Key, including Defendants Lewis, Doto, Kariuki, Myles-Henderson, and Johnson, disregarded the known and obvious risks to Ms. Hanchett's health and safety.

320.    As described *supra*, Ms. Hanchett had serious and emergent medical and mental health conditions that were known and obvious to the Turn Key/CCSO employees/agents. It was obvious that Ms. Hanchett needed immediate and emergent evaluation and treatment from a physician, but such services were denied, delayed, and obstructed. Jail staff and Turn Key staff, including Defendants Lewis, Doto, Kariuki, Johnson, and Myles-Henderson, disregarded the known, obvious, and substantial risks to Ms. Hanchett's health and safety.

321.    In deliberate indifference to her serious medical needs, health, and safety, Jail staff and Turn Key staff, including Defendants Lewis, Doto, Kariuki, Johnson, and Myles-Henderson,  failed to provide Ms. Hanchett with, *inter alia*, timely or adequate medical or mental health treatment; proper monitoring and supervision; or reasonable access to

outside medical providers who were qualified and capable of evaluating and treating her while she was placed under their care.

322.    In deliberate indifference to her health and safety, Jail detention staff repeatedly failed to conduct required 15-minute checks on Ms. Hanchett when they knew Ms. Hanchett was suffering from obviously serious medical and mental health conditions. And even when repeatedly observing Ms. Hanchett in a state of obvious and emergent medical distress, detention staff provided no assistance whatsoever.

323.    As a direct proximate result of the unlawful conduct of Jail and Turn Key staff, including Defendants Lewis, Doto, Kariuki, Johnson, and Myles-Henderson, Ms. Hanchett suffered actual and severe physical injuries, physical pain and suffering, emotional and mental distress, loss of familial relationships and death.

### B. Municipal Liability (Against Turn Key)

324.     All preceding paragraphs are incorporated herein by reference.

325.    Turn Key is a "person" for purposes of 42 U.S.C. § 1983.

326.    At all times pertinent hereto, Turn Key was acting under color of State law.

327.    Turn Key has been endowed by Cleveland County with powers or functions governmental in nature, such that Turn Key became an instrumentality of the State and subject to its constitutional limitations.

328.    Turn Key is charged with implementing and assisting in developing the policies of CCSO with respect to the medical and mental health care of inmates at the Cleveland County Jail and has shared responsibility to adequately train and supervise its employees.

329.    In addition, Turn Key implements, maintains and imposes its own corporate policies, practices, protocols and customs at the Jail.

330.    There is an affirmative causal link between the aforementioned acts and/or omissions of Turn Key medical staff, as described above, in being deliberately indifferent to Ms. Hanchett's serious medical needs, health, and safety, and the above-described customs, policies, and/or practices carried out by Turn Key.

331.    These customs, policies, and/or practices are summarized, *inter alia*, in paragraphs 143-292, 308, *supra.*

332.    Turn Key has maintained a healthcare delivery system at a corporate level, including at the Cleveland County Jail, that has "such gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care." *Garcia v. Salt Lake County,* 768 F.2d 303, 308 (10th Cir. 1985).

333.    Turn Key maintained a policy or custom of insufficient medical staffing, resources and training, chronic delays and indifference toward medical needs of detainees and inmates. *See, e.g., Burke v. Regalado,* 935 F.3d 960, 999-1001 (10th Cir. 2019).

334.    The patently deficient medical delivery system, as designed by Turn Key, resulted in a "systemic failure of medical policies and procedures". *Crowson v. Washington Cty. Utah,* 983 F.3d 1166, 1192 (10th Cir. 2020).

335.    On information and belief, CCSO also had a custom and practice of keeping detainees in the "temporary" processing cells, that are not equipped with sinks, toilets or bunks, well beyond the intended time period, sometimes for days. On information and belief, the detainees housed in these processing cells often have severe mental health

problems, including suicidal ideation, and are labeled by CCSO and Turn Key as uncooperative or noncompliant. The extended housing of inmates in the "temporary" processing cells is a result of overcrowding at the Jail and CCSO and Turn Key's refusal to care for inmates deemed to be difficult. Housing inmates or detainees in the "temporary" processing cells for a period of days creates obvious and substantial risks of harm to that inmate/detainee population.

336.    To the extent that no single officer or professional violated Ms. Hanchett's constitutional rights, Turn Key is still liable under a theory of a systemic failure of policies and procedures as described herein. Again, there were such gross deficiencies in medical procedures, staffing and facilities and procedures that Ms. Hanchett was effectively denied constitutional conditions of confinement.

337.    Turn Key knew, must have known, or should have known, either through actual or constructive knowledge, because it was obvious, that these policies, practices and/or customs posed substantial risks to the health and safety of inmates like Ms. Hanchett.  Nevertheless, Turn Key failed to take reasonable steps to alleviate those risks, in deliberate indifference to inmates', including Ms. Hanchett's, serious medical needs.

338.    Turn Key tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein.

339.    There is an affirmative causal link between the aforementioned customs, policies, and/or practices and Ms. Hanchett's injuries and damages as alleged herein.

### C. Official Capacity Liability (Against Defendant Sheriff)

340.    All preceding paragraphs are incorporated herein by reference.

341.    The aforementioned acts and/or omissions of CCSO and/or Turn Key staff in being deliberately indifferent to Ms. Hanchett's health and safety and violating Ms. Hanchett's civil rights are causally connected with customs, practices, and policies which the Sheriff/County/CCSO promulgated, created, implemented and/or possessed responsibility for.

342.    Such policies, customs and/or practices are specifically set forth in paragraphs 144-309, *supra*.

343.    The Sheriff/County/CCSO, through its continued encouragement, ratification, approval and/or maintenance of the aforementioned policies, customs, and/or practices; in spite of their known and obvious inadequacies and dangers; has been deliberately indifferent to inmates', including Ms. Hanchett's, health and safety.

344.    The Sheriff/County/CCSO has maintained a healthcare delivery system at the Jail that has such "gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care." *Garcia v. Salt Lake County,* 768 F.2d 303, 308 (10th Cir. 1985).

345.    The Sheriff/County/CCSO maintained a policy or custom of insufficient medical staffing, resources and training, chronic delays and indifference toward medical needs of detainees and inmates. *See, e.g., Burke v. Regalado,* 935 F.3d 960, 999-1001 (10th Cir. 2019).

346.    The patently deficient medical delivery system, as provided at the Jail, resulted in a "systemic failure of medical policies and procedures". *Crowson v. Washington Cty. Utah,* 983 F.3d 1166, 1192 (10th Cir. 2020).

347.    To the extent that no single officer or professional violated Ms. Hanchett's constitutional rights, the County/CCSO/Sheriff is still liable under a theory of a systemic failure of policies and procedures as described herein. Again, there were such gross deficiencies in medical procedures, staffing and facilities and procedures that Ms. Hanchett was effectively denied constitutional conditions of confinement.

348.    On information and belief, CCSO also had a custom and practice of keeping detainees in the "temporary" processing cells, that are not equipped with sinks, toilets or bunks, well beyond the intended time period, sometimes for days. On information and belief, the detainees housed in these processing cells often have severe mental health problems, including suicidal ideation, and are labeled by CCSO and Turn Key as uncooperative or noncompliant. The extended housing of inmates in the "temporary" processing cells is a result of overcrowding at the Jail and CCSO and Turn Key's refusal to care for inmates deemed to be difficult. Housing inmates or detainees in the "temporary" processing cells for a period of days creates obvious and substantial risks of harm to that inmate/detainee population.

349.    The County/CCSO tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein.

350.    There is an affirmative causal link between the aforementioned customs, policies, and/or practices and Ms. Hanchett's injuries and damages as alleged herein.

## NEGLIGENCE
### (Against Turn Key)

351.    All preceding paragraphs are incorporated herein by reference.

352.    Turn Key is vicariously liable for the acts of its employees and/or agents under the doctrine of *respondeat superior*.

353.    Turn Key is not an "employee" of CCSO under the Oklahoma Governmental Tort Claims Act ("GTCA") and is not otherwise immune from liability under Oklahoma law.

354.    Turn Key, through its employees and/or agents at the Cleveland County Jail, including Defendants Lewis, Doto, Kariuki, Johnson, and Myles-Henderson, owed a duty to Ms. Hanchett, and all other inmates incarcerated at the Cleveland County Jail, to tender medical treatment with reasonable care, taking caution not to cause additional harm during the course of medical and/or mental health care and treatment.

355.    As described herein, Turn Key, through its employees and/or agents, including Defendants Lewis, Doto, Kariuki, Johnson, and Myles-Henderson, breached its duty to Ms. Hanchett, by failing to provide competent and timely medical and mental health care and treatment as required by applicable standards of care, custom and law.

356.    Turn Key staff, including Defendants Lewis, Doto, Kariuki, Johnson, and Myles-Henderson,  failed to provide adequate or timely evaluation and treatment, even as Ms. Hanchett's known medical and mental health conditions deteriorated. Agents and/or employees of Turn Key failed to reasonably or timely treat Ms. Hanchett's serious medical conditions, and prevented her timely transfer to a medical facility for emergent care.

357.    Turn Key's negligence is the direct and proximate cause of Ms. Hanchett's physical pain, severe emotional distress, mental anguish, death, loss of familial relationships, and the damages alleged herein.

358.    As a result of Turn Key's negligence, Plaintiff is entitled to damages.

## PRAYER FOR RELIEF

WHEREFORE, based on the foregoing, Plaintiff prays this Court grant him the relief sought, including but not limited to actual and compensatory in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, punitive damages for  Defendants Turn Key, Doto, Myles-Henderson, Johnson and Kariuki's reckless disregard of Ms. Hanchett's federally protected rights, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

/s/Daniel E. Smolen
Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
Bryon D. Helm, OBA #33003
**SMOLEN & ROYTMAN**
701 South Cincinnati Avenue
Tulsa, Oklahoma 74119
P: (918) 585-2667
F: (918) 585-2669

***Attorneys for Plaintiff***