## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

(1) DANIEL HANCHETT, as Personal
 representative of the Estate of Shannon
Hanchett, Deceased,

      Plaintiff,

vs.

(1) SHERIFF OF CLEVELAND COUNTY,
   IN HIS OFFICIAL CAPACITY, et al.,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO.: 24-CV-87-G

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT JEWEL JOHNSON, LPN'S MOTION TO DISMISS AMENDED COMPAINT

Robert M. Blakemore, OBA #18656
bobblakemore@ssrok.com
Daniel E. Smolen, OBA #19943
danielsmolen@ssrok.com
Bryon D. Helm, OBA #33003
bryonhelm@ssrok.com
SMOLEN & ROYTMAN
701 South Cincinnati Avenue
Tulsa, Oklahoma 74119
Telephone: (918) 585-2667
Facsimile: (918) 585-2669
*Attorneys for Plaintiff*

November 13, 2024

# TABLE OF CONTENTS

*Page*

Table of Contents ............................................................ *i*

Table of Authorities ........................................................ *ii*

Introductory Statement ..................................................... *1*

Summary of Allegations Concerning Ms. Hanchett ............. *2*

Standard of Review ......................................................... *13*

Discussion ..................................................................... *14*

Proposition:  Plaintiff has alleged Sufficient Facts to State Claims for Relief that are "Plausible" on their Face ...... *14*

      ■   Plaintiff Has Plausibly Alleged LPN Johnson Was Deliberately Indifferent to Ms. Hanchett's Serious Medical Needs) ...... *15*

Certificate of Service ...................................................... *22*

## TABLE OF AUTHORITIES

*Case*                                                                      *Page(s)*

*Archuleta v. Wagner*, 523 F.3d 1278 (10th Cir. 2008)                          *13*

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)                                       *14*

*Barrios v. Haskell Cty. Pub. Facilities Auth.*, 432 P.3d 233 (Okla. 2018)     *21*

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)                          *14*

*Bell v. Wolfish*, 441 U.S. 520, 545 (1979)                                    *15*

*Burke v. Regalado*, No. 18-CV-231-GKF-FHM, 2019 WL 1371144, at                *14*
*2 (N.D. Okla. Mar. 26, 2019)

*Burke v. Regalado*, 935 F.3d 960, 991 (10th Cir. 2019)                     *14, 15,
                                                                            16, 19, 21*

*DeSpain v. Uphoff*, 264 F.3d 965 (10th Cir. 2001).                            *17*

*Estelle v. Gamble*, 429 U.S. 97 (1976)                                      *2, 15*

*Estate of Jensen by Jensen v. Clyde*, 989 F.3d 848 (10th Cir. 2021)           *3*

*Farmer v. Brennan*, 511 U.S. 825 (1994)                                     *15, 16,
                                                                            17, 19*

*Graham v. Garfield County Criminal Justice Authority*, Case No. 17-CV-634     *22*
(W.D. Okla. Mar. 7, 2019)

*InterGen N.V. v. Grina*, 344 F.3d 134 (1st Cir. 2003)                         *19*

*Johnson v. Doughty*, 433 F.3d 1001 (7th Cir.2006)                             *19*

*Kelley v. Crosfield Catalysts*, 135 F.3d 1202 (7th Cir. 1998)                 *19*

*Lance v. Morris*, 985 F.3d 787 (10th Cir. 2021)                               *15*

*Lopez v. LeMaster*, 172 F.3d 756 (10th Cir.1999)                              *15*

*Lucas v. Turn Key Health Clinics, LLC*, 58 F. 4th 1127                      *16, 17, 22*

*Mata v. Saiz,* 427 F.3d 745 (10th Cir. 2005)                                   *16, 17,*
                                                                                 *19, 21*

*New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.*, 101 F.3d    *19*
1492 (3d Cir. 1996)

*Prince v. Sheriff of Carter Cnty.,* 28 F.4th 1033 (10th Cir. 2022).             *15, 16*

*Paugh v. Uintah County,* 47 F.4th 1139 (10th Cir. 2022)                            *17*

*Rife v. Oklahoma Dep't of Pub. Safety,* 854 F.3d 637 (10th Cir. 2017)              *17*

*Robbins v. Oklahoma,* 519 F.3d 1242 (10th Cir. 2008)                               *14*

*Sawyers v. Norton,* 962 F.3d 1270 (10th Cir. 2020)                                 *16*

*Sealock v. Colorado,* 218 F.3d 1205 (10th Cir. 2000)                            *15, 17*

*Spruill v. Gillis,* 372 F.3d 218 (3d Cir.2004)                                     *19*

*Tafoya v. Salazar,* 516 F.3d 912 (10th Cir. 2008)                               *16, 21*

*W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank,* 712 F.3d 165          *19*
(3d Cir. 2013)


*Internet Source*

American College Health Association Guidelines February 2023,                       *3*
https://www.acha.org/documents/resources/guidelines/ACHA_Sco
pe_of_Practice_for_College_Health_LPNs_Feb2023.pdf

## Introductory Statement

On June 14, 2024, well after the initial Complaint was filed in this case and while motions to dismiss the original Complaint were still pending, Defendant Sheriff of Cleveland County, in his official capacity, provided Plaintiff with a production of documents and materials. Included in this production of documents and materials was surveillance video consisting of over *250 hours* of footage. *See* Hanchett Jail Video (Dkt. #75-1) (Filed Conventionally) (Filed Under Seal). The surveillance video footage captures nearly every minute of Ms. Hanchett's detention at the Cleveland County Jail ("Jail"). *Id.* The video is stunning exposé of an unconstitutional medical delivery system. The prolonged and continual mistreatment of Ms. Hanchett, as depicted in the video, is truly shocking in its cruelty and depravity. *Id.*

The video shows that, for approximately 11 days, Ms. Hanchett was kept in a tiny "padded" cell with the lights on 24 hours a day, depriving her of any sleep, driving her deeper into madness. The cell was infested with cockroaches. It had no toilet or sink, forcing Ms. Hanchett to urinate on the floor. For days upon days, Ms. Hanchett laid in her own urine. She was deprived of hydration for ten (10) days. She went stretches of three (3) and five (5) days without anyone at the Jail opening her cell door. Suffering from severe dehydration, Ms. Hanchett's physical condition declined to the point that she could no longer walk, stand or even sit up on her own power. Still, Turn Key medical staff, including Defendant Jewel Johnson, LPN ("LPN Johnson", "Nurse Johnson" or "Johnson"), and Cleveland County Sheriff's Office ("CCSO") detention staff alike, provided her with no assistance. By midnight on December 8, 2022, Ms. Hanchett was dead. Her heart had

1

given out. Days of severe dehydration and reckless neglect had taken their toll. She was just 38 years old.

> As the Supreme Court stated in the seminal case of *Estelle v. Gamble*:

> An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical torture or a lingering death…, the evils of most immediate concern to the drafters of the [Eighth] Amendment….

429 U.S. 97, 103 (1976). The is one of those "worst cases" as described by the Court in *Estelle*. As graphically depicted by the surveillance video, the persistent disregard of Ms. Hanchett's emergent, obvious and basic medical and mental health needs produced "physical torture" and a "lingering death". *See* Hanchett Jail Video (Dkt. #75-1) (Filed Conventionally) (Filed Under Seal). The evidence of deliberate indifference in this case is overwhelming. The Amended Complaint reflects this overwhelming evidence. *See, e.g.,* Dkt. #57, ¶¶ 30-138. LPN Johnson's Motion to Dismiss (Dkt. #82) should be denied.

## Summary of Allegations Concerning Ms. Hanchett

In order to assist the Court with its analysis of LPN Johnson's Motion to Dismiss, Plaintiff provides the following summary of allegations concerning Ms. Hanchett's treatment at the Cleveland County Jail. To wit, Plaintiff has alleged, *inter alia*:

- Shannon Hanchett was a mother of two boys and a pillar of the local community. She was the owner of Norman's Cookie Cottage, a well-known and popular bakery in Norman, OK.

- In October of 2022, Ms. Hanchett went to the hospital for severe headaches, but a CT scan found no abnormalities. A few weeks later, she began to exhibit signs of mental illness consistent with bipolar disorder and/or schizophrenia. She had no prior history of illness.

2

- The following month, Ms. Hanchett began to hallucinate and became convinced that her husband of 17 years, Daniel, had tapped the cell phone he had recently bought for her.

- On the evening of November 26, 2022, Ms. Hanchett entered an AT&T Wireless store in Norman, hoping to buy a new cell phone. While in the store, she exhibited obvious signs of psychosis.

- Clearly confused, distressed, and suffering from delusions, Ms. Hanchett asked a store employee to call 911, and a Norman Police Department ("NPD") Officer responded to the scene.

- The Officer acknowledged that Ms. Hanchett appeared to be exhibiting behavior consistent with a mental health disorder. Nevertheless, he arrested Ms. Hanchett for misdemeanor obstruction and transported her to the Cleveland County Jail ("Jail"). Video from the officer's body-worn camera shows that Ms. Hanchett is disoriented and terrified at the prospect of being arrested.

- Ms. Hanchett had no criminal history. This was her first time in a detention facility. She was a pretrial detainee.

- Jail surveillance video shows Ms. Hanchett's mental health status, which could conservatively be described as acute psychosis, continued to deteriorate after arriving at the Jail.

- Turn Key nurse Danille Hay, LPN[1], began the medical intake process with Ms. Hanchett but later claimed she was unable to complete it due to Ms. Hanchett's ongoing and severe mental health crisis.

---

[1]    "Licensed practical nursing" means "the practice of nursing *under the supervision or direction of a registered nurse, licensed physician* or dentist." 59 Okla. Stat. § 567.3a(4). LPNs have about a year of nursing education, often culminating in a certificate. The role of an LPN is, as the name suggests, practical. Typical duties for which an LPN is qualified are: record a patient's health history; administer medications (under the supervision of an RN or physician); perform wound care; measure and record vital signs; observe a patient's condition. "LPNs cannot diagnose any medical condition or prescribe any medication." *See* www.acha.org/documents/resources/guidelines/ACHA_Scope_of_Practice_for_College _Health_LPNs_Feb2023.pdf. LPNs are expected to report even minor changes in patient care to a registered nurse or other medical professional. *See also, Estate of Jensen by Jensen v. Clyde*, 989 F.3d 848, 852 (10th Cir. 2021) ("An LPN designation does not require an associate's or bachelor's degree … [LPNs are] prohibited from prescribing medications, conducting health assessments, and diagnosing medical conditions.").

3

■ Nurse Hay *was* able to chart, however, that Ms. Hanchett suffered from lupus and bipolar disorder.

■ Nurse Hay also took Ms. Hanchett's vital signs. Her blood pressure (143/89) and pulse (120 BPM) were both elevated. Nurse Hay did not, however, take any steps to address these concerning vital signs.

■ Nurse Hay later charted that Ms. Hanchett had been "uncooperative" during processing and that she'd been unable "to complete [intake] at this time." However, in a written report, Officer David Owen notes that Ms. Hanchett "appears to cooperate with officers while being processed as a new inmate."

■ After failing to complete the intake process, Jail staff locked Ms. Hanchett in processing cell B130 – a tiny, cockroach-infested cell that had no sink, no toilet and no bed. For the next 11 days, she was confined in these conditions and deprived of virtually all human contact. The lights were left on at all times, day and night, depriving her of any sleep.

■ For periods of up to 5 days at a time, no one at the Jail even opened the door of Ms. Hanchett's cell. Denied access to a toilet, she was forced to urinate on the floor and then lie in her own waste.

■ Despite the absence of a sink in her cell, no one at the Jail provided her with water or other hydration, day after day after day.

■ Throughout this time, the Jail and Turn Key staff were fully aware of Ms. Hanchett's dreadful conditions of confinement and her escalating mental health crisis.

■ Ms. Hanchett's cell was video monitored, allowing Jail staff to clearly see her extreme distress, her erratic behavior, and the rotting food, trash, and human waste on the floor of her cell. Despite observing that Ms. Hanchett had not been adequately eating and had been given nothing to drink for days, they failed to address these dangerous health risks or report them to a physician. This constitutes deliberate indifference, reckless neglect and inhumane mistreatment across the board. Indeed, as painstakingly summarized herein, Ms. Hanchett was shown *nothing but* indifference during her time at the Jail.

■ At 12:18 AM [on December 8, 2022], DO McKenney approaches Ms. Hanchett's medical cell and looks in with his flashlight. He kicks the door to try to get her attention, but she does not respond.

■ At 12:36 AM, members of the fire department arrive. They declare Ms. Hanchett deceased. Her body is wrapped in a bag and wheeled out on a gurney.

■ The Medical Examiner's office determined Ms. Hanchett died of heart failure. Other significant conditions contributing to her death were psychosis with auditory and visual hallucinations and severe dehydration.

■ On information and belief, Ms. Hanchett's death was would not have occurred in the absence of her prolonged catatonia and severe dehydration.

■ Ms. Hanchett was just 38 years old when she died.

*See* Amended Complaint (Dkt. #57) at ¶¶ 13, 15-30, 133, 140-142.

As briefly summarized above, Ms. Hanchett was left to languish in a tiny, cockroach-infested processing cell, Cell B130, for nearly 11 days as her physical and mental condition deteriorated. *See, e.g.,* Dkt. #57 at ¶¶ 31-142. At 7:57 PM on Saturday, November 26, 2022, Jail staff locked Ms. Hanchett in B130. *Id.* at ¶ 31. Since B130 is a processing cell, not meant to hold inmates for more than a few hours, it has no bed – or any furnishings at all – no sink, and no toilet. The tiny room consists of nothing more than bare walls and a bare floor with a drain in its center. A light blares down from the ceiling. In the 11 days Ms. Hanchett spent in B130, the light remained on at all times. This made it virtually impossible for Ms. Hanchett to sleep, driving her deeper into madness. *Id.* After locking Ms. Hanchett into this "processing cell" on Saturday night, Jail staff leave her there – without access to water, a sink, a toilet, or even a mat to lie on – for more than 3 days without letting her out. Video from the cell's overhead camera shows that, from the moment Ms. Hanchett enters cell B130, she was suffering an obvious and severe psychotic episode. She talked to herself virtually nonstop for more than 10 hours – sometimes staring directly into the camera, sometimes standing in the corner and talking to the wall. She paced around the cell and at times appeared to dance. Eventually she fixated on the intercom and spoke into it for

hours.  She did not sleep. *Id.* at ¶ 32.

By 4:57 PM on November 27, 2022, Ms. Hanchett had been locked in B130, which, again, had no toilet or sink, for 21 hours. Left with no choice, Ms. Hanchett pulled her pants down and *urinated on the floor* of her cell, which was already covered with food and trash.  In her psychotic state, she stripped naked, only to put her urine-soaked clothes back on a few minutes later.  She sat in the corner, with her legs in the urine. Dkt. #57 at ¶ 38. At 6:23 PM, two DOs passed by her cell holding jugs of water, but *they did not give any* to Ms. Hanchett.  One returned a moment later, the jug still in his hands.  He looked into Ms. Hanchett's cell.  Instead of giving her water, he closed the panel and walked away. *Id.* at ¶ 40.

By Monday, November 28, Ms. Hanchett – who was already severely psychotic when she arrived at the jail – had had no meaningful sleep for days.  She continued to throw her meals onto the floor, so the rotting food was piling up.  **The door of her cell had not even been opened since Saturday**.  She had *still* been given no water, no mat to sleep on, and no opportunity to bathe.  She had not seen a physician. Dkt. #57 at ¶ 41. Ms. Hanchett continued to speak on the intercom, but help did not arrive.  She was forced to urinate on the floor again. *Id.* at ¶ 42. Ms. Hanchett was severely psychotic, confined in squalid conditions, not eating, and given no access to water. Yet not one person on the Jail or Turn Key staff displayed even the slightest concern for her well-being. *Id.* at ¶ 44.

Just past midnight on November 29, a DO opened the window panel on the door of B130 and looked in, seeing Ms. Hanchett lying on the floor of her filthy cell, naked from the waist down. Dkt. #57 at ¶ 45. The DO was carrying a jug of water, but did not offer

any to Ms. Hanchett, who had been in the cell with no access to water for over two days. *Id.* Occasionally, Jail staff would put sack lunches through the bean hole in Hanchett's cell door, but she would throw it on the floor. *Id.* at ¶ 46. LPN Kariuki would later document ""PT HAD NOT BEEN EATING" but took no action to address Ms. Hanchett's obviously serious medical and mental health conditions. *Id.* Ms. Hanchett continued to descend deeper into her psychosis, exacerbated by her acute dehydration, as Jail staff and Turn Key staff observed her without doing a single thing to help. *Id.* at ¶¶ 47-51.

Jail staff briefly removed Ms. Hanchett from B130 at around 9:31 PM on November 29 only so that they could house another inmate there during his processing. Dkt. #57 at ¶ 52. Ms. Hanchett had been in the Jail for over four days, but still had not been seen by a physician. *Id.* at ¶ 53. Instead of transferring Ms. Hanchett to a psychiatric facility, Jail staff returned Ms. Hanchett to "processing cell" B130 once the male inmate had been processed. After marching her back into that cell, Jail staff ordered her to strip naked. Ms. Hanchett took off her pants but either could or would not take off her shirt.  Jail staff grabbed Hanchett and took off her shirt. *Id.* at ¶ 54. Jail staff left Ms. Hanchett naked in B130 with only a suicide blanket. Although she was identified as a suicide risk, she had been provided no medical or mental health evaluation, treatment or care. *Id.* at ¶ 55. Jail staff did not open the door again for five days. *Id.* at ¶ 56.

Once returned to B130, Ms. Hanchett spent most of her time lying on the floor. Dkt. #57 at ¶ 57. Dangerously dehydrated, floridly psychotic, and completely untreated, Ms. Hanchett writhed around naked on the filthy floor of her video-monitored cell. What appears to be a cockroach periodically crawled across the lens of the camera. *Id.* at ¶ 58. At

10:38 AM on December 1, Nurse Kariuki opened the panel on Ms. Hanchett's cell. She saw Ms. Hanchett lying naked on her back on the bare concrete floor. Her face was next to the drain. She was making strange, agitated movements with her fingers, which she raised to her mouth. Nurse Kariuki observed this for approximately 1 second. Instead of aiding Ms. Hanchett in any way, she simply closed the panel and walked away. *Id.* at ¶ 60.

The next day, December 2, Ms. Hanchett was in the same dire condition, rolling around on the floor of her dirty cell, covered with trash and rotting food, in deep psychosis and dehydration while Jail staff and medical staff observed her but doing nothing. Dkt. #57 at ¶¶ 61-69. Ms. Hanchett had been in B130 for an entire week. *Id.* Just before midnight on December 3, Turn Key Nurse Tara Doto opened the panel on the door of Ms. Hanchett's cell. She saw Ms. Hanchett lying on the floor, surrounded by trash and human waste. When she saw Nurse Doto, Ms. Hanchett raised her head off the floor and spoke urgently to her, waving both hands. Nurse Doto did nothing to help Ms. Hanchett. She watches Ms. Hanchett for a few seconds, then closes the panel and walks away. *Id.* at ¶ 72.

At 2:29 AM on December 4, Nurse Doto opened the panel on the door of Ms. Hanchett's cell. As before, she saw Ms. Hanchett lying on the floor, surrounded by trash and human waste. As before, she did nothing to help Ms. Hanchett. She closed the panel and walked away. Dkt. #57 at ¶ 74. At 2:44 AM, a DO walked past Ms. Hanchett's cell with a jug of water. He did not give her any. At that time, Ms. Hanchett was lying on the floor and sticking her face into the drain. Twenty (20) minutes later, Hanchett held an empty cup and showed it to the camera. She held it to her mouth for hours. A DO opened the door panel and saw Hanchett lying on the floor, facing the cell door, and holding an

empty cup.  He did nothing to help her. *Id.* at ¶ 75. *See also, id.* at ¶¶ 76-78.

Just past midnight on December 5, 2022, a DO opened the door to B130 and entered. Dkt. #57 at ¶ 82. **This is the first time her cell door had opened since Wednesday, November 30.**  Although Ms. Hanchett had entered the Jail in good physical condition – and had spent the first several days in custody on her feet and pacing her cell – Jail staff find she is now unable to even stand on her own. *Id.* A DO tried to give Hanchett clothes to put on, but she struggled to even sit up and could not dress herself. *Id.* at ¶ 83. Ms. Hanchett collapsed to the floor, but the three DOs who witnessed the fall did nothing. *Id.* at ¶ 84. Nurse Doto smiled as she watched the DOs put Hanchett on the floor in the West Corner area, just down the hall from cell B130.  One **DO demonstrated for Nurse Doto how Hanchett collapsed just moments before.**  Nurse Doto walked over to cell B130, where Ms. Hanchett has spent the past five (5) straight days – without a toilet, without a shower, and with human waste and rotting food piled on the floor.  Nurse Doto covered her nose with her sweater and glanced inside.  Then she walked away. *Id.* at ¶¶ 85-86. Too weak to move, Ms. Hanchett was left sitting on the floor for hours, with her back propped against the wall.  Multiple DOs walk around without paying any attention to her. Although she has recently collapsed, at times she was completely unattended. *Id.* at ¶¶ 87-88. At 2:29 AM on December 5, Jail staff pulled Ms. Hanchett to her feet and marched her back to cell B130. *Id.* at ¶ 90. *See also id.* at ¶¶ 91-101.

At 7:05 AM on December 6, **LPN Johnson noted that Hanchett was "talking to herself" and "not responding to verbal stimuli when asked if she is okay." Yet she took no action to help Ms. Hanchett.** Dkt. #57 at ¶ 103. At 11:27 AM, a

Turn Key nurse rolled a cart with a laptop on it down the hall outside Ms. Hanchett's cell. A DO opened the door and the nurse entered Hanchett's cell. Hanchett could not even sit up on her own, let alone stand, but she tried to roll to the door. The ***DO attempted to lift her up, but she fell. She was slowly dying of dehydration.*** Again, this was an obviously emergent situation requiring immediate transfer to a hospital. Instead of calling for an ambulance, the nurse dragged Ms. Hanchett's naked body over to the door. *Id.* at ¶ 104. The nurse put a headset on Ms. Hanchett, who was lying naked on the concrete floor. Too weak to even sit up on her own, or dress herself, Hanchett then had a brief video call with Dr. Jawaun Lewis, a psychiatrist. ***<u>This is what passes as "medical care" at the Jail.</u>*** *Id.* at ¶ 106. After ten (10) days at the Jail, no member of Turn Key's staff had even taken Ms. Hanchett's vital signs since she first entered the facility. She had received no treatment at all, nor even an examination. The video call with Dr. Lewis, while lying naked on the floor, was her first -- and last -- "encounter" with a doctor at the Jail. During the call, Ms. Hanchett was in an obvious state of emergent distress, naked and weakened to the point that she could not even sit up. Instead of ordering that Ms. Hanchett be sent to the hospital, Dr. Lewis terminated the call after a few minutes. *Id.* at ¶ 107-108. That evening, Nurse Kariuki filled out a "Restrictive Housing Clearance" form. In it, she states that on December 6, Ms. Hanchett "refused medical attention" and that she was "noncompliant for intake." But Jail video surveillance does not show that Nurse Kariuki had seen Ms. Hanchett at any time on December 6 – or at any other time in the past five (5) days. Although Ms. Hanchett arrived at the Jail ten (10) days ago experiencing a psychotic episode – and although her mental health has steadily declined in the interim – Nurse

Kariuki states on this form that it is "unknown" whether Ms. Hanchett is a mental health patient. She concluded the "Restrictive Housing Clearance" form by stating *"Pt should stay housed in processing until she has been cooperative during the intake process." Id.* at ¶ 109.

On December 7, numerous Jail and Turn Key staff observed her condition and did nothing to help her as she slowly dies. Dkt. #57 at ¶ 112. At 9:19 AM, Cpt. Hammonds, accompanied by two other jailers, opened Ms. Hanchett's cell door. *Id.* at ¶ 113. The staff found Ms. Hanchett lying naked on the floor, rolling in the filth. She did not even respond to the door opening. A DO entered the cell and lifted Hanchett up to get her dressed, but she collapsed back onto the floor. Another DO entered the cell to assist and the two stood Hanchett up and tried to walk her out the door, but she ***could not walk even with two people helping her. She collapsed and fell into the hallway.*** This is, yet again, an obviously emergent situation requiring immediate transfer to a hospital. *Id.* at ¶ 114. Still, with Ms. Hanchett on death's door in front of them, the Jail staff did not call an ambulance. Rather, Shaw grabbed the suicide blanket from her cell and placed it over Hanchett's body. Then Hammonds grabbed Hanchett by her arms and ***dragged her limp, naked body on the concrete floor, down the entire length of the hall.*** *Id.* at ¶ 115. Hammonds and Shaw deposited Ms. Hanchett in Cell B124, another processing cell. *Id.* at ¶ 116.

Nurse Kariuki then arrived at Cell B124. Dkt. #57 at ¶ 117. For the first time since Ms. Hanchett's admission to the Jail on November 27, Ms. Hanchett's vitals were taken. *Id.* By this point, Ms. Hanchett had been suffering from severe psychosis for nearly two weeks. *Id.* Her physical condition had markedly worsened to the point that she could not walk, stand or even sit up on her own power. She had been in an obvious state of medical

distress for well over a week, yet Turn Key provided her no treatment whatsoever. Her blood pressure has dropped from 143/89 on November 26 to just 88/52. She was faint, confused, and just hours away from dying from extreme dehydration. Yet Kariuki advised that Hanchett **"did not need to be transported to the hospital per the Physician's Assistant (PA) Becky Pata." Becky Pata had never examined Ms. Hanchett.** *Id.*

Two hours later, Hammonds and Carter approached the door of cell B124, along with another DO. When Carter opened the cell door, Ms. Hanchett's bare legs *flop out into the hall.* Carter stepped over Hanchett's legs, pulled her up into a seated position and put her shirt on. Ms. Hanchett could not even sit up under her own power. Hammonds and Carter reclined her back and moved her limp body around on the hallway floor so they could get her pants on. Dkt. #57 at ¶ 120. Nurse Kariuki walked by during this scene and did **nothing**. *Id.* at ¶ 121. When Hammonds and Carter failed to get Hanchett to her feet or even into a wheelchair, they decided to place her onto a suicide blanket and drag her body down the hall by her arms. *Id.* at ¶ 122. Eventually, Hammonds and Carter lifted Ms. Hanchett's limp body off the floor and into a wheelchair and wheeled her down the hall to the medical unit. *Id.* at ¶ 123-124. **Nurse Kariuki and LPN Johnson appeared to share a joke and laugh as she passed by them.** Even a nearby inmate joined in the laughter. *Id.* They wheeled Ms. Hanchett to the shower in the medical unit, pulled off her pants, and **dumped her body** from the wheelchair onto the shower floor. Nurse Kariuki was sitting behind the desk – just a few feet from the shower – and watched this with an amused expression. While Ms. Hanchett was lying on the shower floor, a DO approached Nurse Kariuki and tells her a joke. She laughed and pushed him away. **Nurse Kariuki**

*put her head down on the desk because she was bent over laughing while Ms.* *Hanchett was dying of dehydration just a few feet away*. *Id*. at ¶ 125-126. After showring Ms. Hanchett, Cpt. Hammonds and **LPN Johnson tried to stand her up,** **but she could not stand and collapsed to the floor again.** *Id*. at ¶ 127. Instead of calling an ambulance, the Turn Key nurses continued to laugh. *Id*. Hammonds and *Johnson then dragged Ms. Hanchett's naked body across the floor while Nurse* *Kariuki hysterically laughed.* *Id*. at ¶ 128. After dumping Ms. Hanchett's body on the floor of the medical cell, **LPN Johnson performed a curtsey for Nurse Kariuki and** **the DOs watching from behind the desk.  All of them laughed.**  Ms. Hanchett was just twelve hours away from her death. *Id*. at ¶ 129.

At 12:18 AM on December 8, 2022, DO McKenney approached Ms. Hanchett's medical cell and looked in with his flashlight. By this time, Ms. Hanchett's **"feet were** **pale and blue."** *Id*. at ¶ 135. Her "eyes were red and her lips were purple." *Id*. Yet Nurse Doto moved without any sense of urgency. *Id*. At 12:36 AM, members of the fire department arrived and declared Ms. Hanchett deceased. *Id*. at ¶ 138.

## Standard of Review

When deciding a Rule 12(b) motion to dismiss, courts are "'limited to assessing the legal sufficiency of the allegations contained within the four corners of the complaint ....'" *Archuleta v. Wagner,* 523 F.3d 1278, 1281 (10th Cir. 2008) (cleaned up). In conducting this assessment, courts must "'accept as true all well-pleaded facts, as distinguished from conclusory allegations, and view those facts in the light most favorable to the nonmoving party.'"  *Archuleta,* 523 F.3d at 1283 (cleaned up).

13

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), the United States Supreme Court held that the complaint must contain "enough facts to state a claim to relief that is *plausible* on its face" (emphasis added). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "The plausibility requirement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of the conduct necessary to make out the claim." *Burke v. Regalado*, No. 18-CV-231-GKF-FHM, 2019 WL 1371144, at *2 (N.D. Okla. Mar. 26, 2019) (cleaned up). The Tenth Circuit has observed that the *Twombly* "opinion seeks to find a middle ground between 'heightened fact pleading,' . . . and allowing complaints that are no more than 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action,' which the Court stated 'will not do.'" *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 547 and 555). As the *Robbins* Court reasoned:

> "[P]lausible" cannot mean 'likely to be true.' Rather, "plausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." [*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)]. The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

*Robbins*, 519 F.3d at 1247.

Applying this standard of review, Plaintiff's allegations against LPN Johnson easily survive the Motion to Dismiss.

## Discussion

**PROPOSITION: PLAINTIFF HAS ALLEGED SUFFICIENT FACTS TO**

STATE CLAIMS FOR RELIEF THAT ARE "PLAUSIBLE" ON THEIR FACE

- ■ **Plaintiff Has Plausibly Alleged LPN Johnson Was Deliberately Indifferent to Ms. Hanchett's Serious Medical Needs**

Although "neither prison officials nor municipalities can absolutely guarantee the safety of their prisoners, [t]hey are ... responsible for taking reasonable measures to [e]nsure the safety of inmates." *Lopez v. LeMaster,* 172 F.3d 756, 759 (10th Cir.1999) (internal citation omitted). "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan,* 511 U.S. 825, 828 (1994). *See also Estelle v. Gamble,* 429 U.S. 97, 104 (1976). "The constitutional protection against deliberate indifference to a pretrial detainee's serious medical condition springs from the Fourteenth Amendment's Due Process Clause." *Burke v. Regalado,* 935 F.3d 960, 991 (10th Cir. 2019). "The Fourteenth Amendment's Due Process Clause entitles pretrial detainees" like Buchanan "to the same standard of medical care that the Eighth Amendment requires for convicted inmates." *Lance v. Morris,* 985 F.3d 787, 793 (10th Cir. 2021) (citation omitted). *See also Bell v. Wolfish*, 441 U.S. 520, 545 (1979); *Burke,* 935 F.3d at 991.

It is believed that Ms. Hanchett was a pretrial detainee at the time of her death. Nevertheless, whether the Eighth or Fourteenth Amendment applies, the deliberate indifference standard is the same.

Deliberate indifference involves both an objective and subjective component. *See, e.g., Sealock v. Colorado,* 218 F.3d 1205, 1209 (10th Cir. 2000); *Prince v. Sheriff of Carter Cnty.,* 28 F.4th 1033, 1043-44 (10th Cir. 2022). LPN Johnson does not assert that Plaintiff has failed to satisfy the objective component. Thus, the objective component is not at issue for

the purposes of the Motion to Dismiss.

Rather, LPN Johnson argues that, in order to satisfy the subjective component of deliberate indifference, Plaintiff was required to "show Defendant had knowledge of the specific risk faced by Ms. Hanchett – i.e. the risk of imminent death facing Ms. Hanchett from heart failure – and knowingly and willingly disregarded that risk to the level of sufficiently serious deprivation[.]" Dkt. #82 at 11.[2] However, knowledge of the "risk of imminent death facing Ms. Hanchett from heart failure" is not the appliable standard. Plaintiff is not required to plead this level of specificity. "[T]he complaint need not show [Defendant] was consciously aware [Ms. Hanchett] had a specific ailment … but rather that [s]he was aware [Ms. Hanchett] *faced a substantial risk of harm to her health and safety." Lucas v. Turn Key Health Clinics, LLC,* 58 F.4th 1127, 1141 (10th Cir. 2023). *See also Prince,* 28 F.4th at 1045 ("[B]ecause we conclude that Bowker's earlier symptoms should prompt a layperson to seek immediate medical attention, ***the risk of death was an incorrect inquiry***"). "To satisfy the subjective component, the plaintiff must show the official 'knows of and disregards an excessive risk to inmate health or safety.'" *Burke,* 935 F.3d at 992 (quoting *Farmer,* 511 U.S. at 837); *See also Sawyers v. Norton,* 962 F.3d 1270, 1283 (10th Cir. 2020); *Mata v. Saiz,* 427 F.3d 745, 753 (10th Cir. 2005). Put another way, a civil rights defendant is deliberately indifferent where she "has knowledge of a substantial risk of serious harm to inmates . . . [and] fails to take reasonable steps to alleviate that risk." *Tafoya v. Salazar,* 516 F.3d 912, 916 (10th Cir. 2008). Plaintiff has plausibly alleged that LPN

---

[2]    Citations to the pleadings refer to the CM/ECF pagination.

Johnson was aware that Ms. Hanchett "faced a substantial risk of harm to her health and safety." *Lucas*, 58 F.4th at 1141. Nothing more is necessary.

"Because it is difficult, if not impossible, to prove another person's actual state of mind, whether an official had knowledge may be inferred from circumstantial evidence." *DeSpain v. Uphoff*, 264 F.3d 965, 975 (10th Cir. 2001). For instance, "the existence of an obvious risk to health or safety may indicate awareness of the risk." *Rife v. Oklahoma Dep't of Pub. Safety*, 854 F.3d 637, 647 (10th Cir. 2017) (citing *Farmer*, 511 U.S. at 842).

The Tenth Circuit recognizes two types of conduct constituting deliberate indifference in the jail/prison medical context. *See Sealock*, 218 F.3d at 1211. "First, a medical professional may fail to treat a serious medical condition properly.... The second type of deliberate indifference occurs when prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment." *Sealock*, 218 F.3d at 1211. A medical professional who serves "solely ... as a gatekeeper for other medical personnel capable of treating the condition" may be held liable under the deliberate indifference standard if she "delays or refuses to fulfill that gatekeeper role." *Id.*

Additionally, "[a] prisoner may satisfy the subjective component by showing that defendants' delay in providing medical treatment caused either unnecessary pain or a worsening of [his] condition. Even a brief delay may be unconstitutional." *Mata*, 427 F.3d at 755. Further, when an inmate's condition is worsening, a reasonable jury could find that the need for medical assistance was obvious. *See Paugh v. Uintah County*, 47 F.4th 1139, 1159 (10th Cir. 2022).

17

Applying these legal standards, Plaintiff has alleged numerous facts which tend to show that LPN Johnson was deliberately indifferent to Ms. Hanchett's serious medical needs. As alleged, LPN Johnson disregarded obvious and substantial risks to Ms. Hanchett's health and safety. LPN Johnson both "fail[ed] to treat [Ms. Hanchett's] serious medical condition properly[,]" and also "delay[ed] or refuse[d] to fulfill [her] gatekeeper role." *See* Summary of Allegations Concerning Ms. Hanchett, *supra*.

In fact, the allegations against LPN Johnson go beyond deliberate indifference. LPN Johnson treated Ms. Hanchett with utter contempt by laughing at her and mocking her in her time of utmost and emergent medical need. For instance, Plaintiff alleges:

■　At 7:05 AM on December 6, **LPN Johnson noted that Hanchett was "talking to herself" and "not responding to verbal stimuli when asked if she is okay." Yet she took no action to help Ms. Hanchett.** Dkt. #57 at ¶ 103.

■　On December 7, Hammonds and Carter lifted Ms. Hanchett's limp body off the floor and into a wheelchair and wheeled her down the hall to the medical unit. *Id.* at ¶ 123-124. **Nurse Kariuki and LPN Johnson appeared to share a joke and laugh as she passed by them.** Even a nearby inmate joined in the laughter. *Id.* They wheeled Ms. Hanchett to the shower in the medical unit, pulled off her pants, and **dumped her body** from the wheelchair onto the shower floor. *Id.*

■　After showring Ms. Hanchett, Cpt. Hammonds and **LPN Johnson tried to stand her up, but she could not stand and <u>collapsed</u> to the floor again.** *Id.* at ¶ 127. Instead of calling an ambulance, the Turn Key nurses continued to laugh. *Id.* Hammonds and **Johnson then dragged Ms. Hanchett's naked body across the floor while Nurse Kariuki hysterically laughed.** *Id.* at ¶ 128.

■　After dumping Ms. Hanchett's body on the floor of the medical cell, **LPN Johnson performed a curtsey for Nurse Kariuki and the DOs watching from behind the desk. All of them laughed.** Ms. Hanchett was just twelve hours away from her death. *Id.* at ¶ 129.

Accepting these allegations as true, LPN Johnson exhibited utter and depraved indifference toward Ms. Hanchett. Ms. Hatchett was in obvious medical distress. Yet, LPN

Johnson completely abdicated her duties to care for Mr. Hanchett. She did nothing to assist Ms. Hanchett. Even worse, Johnson's acts and omissions were callous, cruel and inhumane. At a minimum, this was deliberate indifference to Ms. Hanchett's serious medical and mental health needs. *See, e.g., Burke,* 935 F.3d at 992; *Farmer,* 511 U.S. at 837; *Mata,* 427 F.3d at 753. LPN Johnson's contrary arguments are frivolous.

LPN Johnson argues that, in the Amended Complaint, Plaintiff "conveniently omits several facts previously alleged by Plaintiff in his Complaint which support a finding that Plaintiff cannot state a claim for deliberate indifference against Defendant, and upon which this Court has already considered and come to the same conclusion." Dkt. #82 at 6. Contrary to Defendant's assertion, the Court should not take judicial notice of Plaintiff's initial Complaint (Dkt. #1), as the Amended Complaint "supersedes the original and renders it of no legal effect, unless the amended complaint specifically refers to or adopts the earlier pleading," which is not the case here. *New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.,* 101 F.3d 1492, 1504 (3d Cir. 1996) (cleaned up). *See also, W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank,* 712 F.3d 165, 171-72 (3d Cir. 2013); *InterGen N.V. v. Grina,* 344 F.3d 134, 145 (1st Cir. 2003) ("…the mere retraction of statements made in an original complaint does not justify the invocation of judicial estoppel."); *Kelley v. Crosfield Catalysts,* 135 F.3d 1202, 1204-5 (7th Cir. 1998) ("It is well-established that an amended pleading supersedes the original pleading; facts not incorporated into the amended complaint are considered functus officio… If certain facts or admissions from the original complaint become *functus officio,* they cannot be considered by the court on a motion to dismiss the amended complaint. A court cannot resuscitate these facts when assessing

19

whether the amended complaint states a viable claim.").

Tellingly, LPN Johnson makes no mention, in her Motion, that the Amended Complaint contains pages and pages of *new* factual allegations based on the surveillance video footage. While the original Complaint contained 11 ½ pages of allegations concerning the "Facts Specific to Ms. Hanchett", the Amended Complaint includes ***30 pages*** of factual allegations specific to Ms. Hanchett's tragic plight at the Jail. *Compare* Dkt. 1 at 4-16 *with* Dkt. #57 at 4-34. And, clearly, these factual allegations are derived from the newly-produced surveillance video footage. *See, e.g.,* Dkt. #57 at ¶¶ 30-138; and Hanchett Jail Video (Dkt. #75-1) (Filed Conventionally and Filed Under Seal).

There is a simple explanation as to why portions of the initial Complaint have now been relegated to the cutting room floor. Once again, it comes back to the surveillance video. Review of the video footage shows that many of the entries in Ms. Hanchett's medical chart and Jail records are false, or otherwise inaccurate. For instance, LPN Kariuki filled out a "Restrictive Housing Clearance" form, stating that, on December 6, Ms. Hanchett "refused medical attention" and was "noncompliant for intake." Dkt. #57 at ¶ 109. However, as Plaintiff alleges, "Jail video surveillance does not show that Nurse Kariuki ha[d] seen Ms. Hanchett at any time on December 6 – or at any other time in the [preceding] five (5) days." *Id.* Additionally, Plaintiff's initial Complaint alleged that Nurse Kariuki took Ms. Hanchett to a holding cell on December 6, 2022, observed her condition, and charted her observations. *See* Dkt. #1 at ¶¶ 66, 68-69. The surveillance video shows that Nurse Kariuki's notes are false. *See, e.g.,* Dkt. #57 at ¶¶ 107-110.

Simply put, the pertinent records and documents, to the extent they note any

purported "care" provided to Ms. Hanchett, are belied by the video evidence. Turn Key's records and representations -- concerning the treatment of Ms. Hanchett – are simply not credible. More broadly, the surveillance video demonstrates that Turn Key and CCSO staff, including LPN Johnson, repeatedly *failed* to document Ms. Hanchett's obvious physical decline (including multiple falls and an inability to walk, sit up or stand on her own), deplorable living conditions and lack of hydration. The video footage has drastically changed and augmented Plaintiff's factual allegations in this case.

Plaintiff has not omitted facts that "support a finding that Plaintiff cannot state a claim for deliberate indifference against" LPN Johnson, as she avers. *See* Dkt. #82 at 6. On the contrary, the facts *added* to this case, as gleaned from the video evidence, make for a truly *overwhelming claim* that multiple employees or agents of Turn Key, including LPN Johnson, were deliberately indifferent to Ms. Hanchett's serious medical needs. In other words, reading the Amended Complaint in the light most favorable to Plaintiff, it is beyond plausible that numerous employees or agents of Turn Key, including LPN Johnson, disregarded obvious and excessive risks to Ms. Hanchett's health and safety. *See, e.g., Burke*, 935 F.3d at 992; *Sawyers*, 962 F.3d at 1283; *Mata*, 427 F.3d at 753; *Tafoya*, 516 F.3d at 916.

Plaintiff has alleged plausible violations of Ms. Hanchett's constitutional right to adequate medical care. LPN Johnson's Motion to Dismiss should be denied.[3]

---

[3]     Defendant additionally argues that to "the extent Plaintiff is bringing" a state-law negligence claim against LPN Johnson, "it must fail for the reasons set forth below." Dkt. #82 at 16. Plaintiff has not, however, brought a negligence claim against LPN Johnson. *See, generally*, Dkt. #57. As clearly identified in the Amended Complaint, Plaintiff has only brought a negligence claim against Turn Key. *Id.* at ¶¶ 352-358. Further, in contrast to Defendant's assertion, *Barrios v. Haskell Cty. Pub. Facilities Auth.*, 432 P.3d 233 (Okla. 2018)

WHEREFORE, premises considered, Plaintiff respectfully requests that the Court deny LPN Johnson's Motion to Dismiss (Dkt. #62).

Respectfully submitted,

/s/Robert M. Blakemore
Daniel E. Smolen, OBA#19943
Robert M. Blakemore, OBA #18656
Bryon D. Helm, OBA #33003
SMOLEN & ROYTMAN
701 S. Cincinnati Ave.
Tulsa, Oklahoma 74119
P: (918) 585-2667
F: (918) 585-2669

**_Attorneys for Plaintiff_**

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of November 2024, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to all ECF registrants who have appeared in this case.

/s/Robert M. Blakemore

---

"did not find that a healthcare contractor was an employee entitled to tort immunity under the OGTCA but simply assumed the healthcare contractor was an employee for purposes of answering the certified questions before it." *Lucas,* 58 F.4th at 1147-48 (quoting *Graham v. Garfield County Criminal Justice Authority,* Case No. 17-CV-634 (W.D. Okla. Mar. 7, 2019) at 3-4).