## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) DANIEL HANCHETT, as Personal representative of the Estate of Shannon Hanchett, Deceased, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | CASE NO.: 24-CV-87-J |
| (1) SHERIFF OF CLEVELAND COUNTY, IN HIS OFFICIAL CAPACITY, (2) TURN KEY HEALTH CLINICS, LLC, (3) DIANA MYLES-HENDERSON, LPC, (4) TARA DOTO, LPN, (5) NATASHA KARIUKI, LPN, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT
## TARA DOTO, LPN'S MOTION TO DISMISS

Robert M. Blakemore, OBA #18656
bobblakemore@ssrok.com
Daniel E. Smolen, OBA #19943
danielsmolen@ssrok.com
Bryon D. Helm, OBA #33003
bryonhelm@ssrok.com
SMOLEN & ROYTMAN
701 South Cincinnati Avenue
Tulsa, Oklahoma 74119
Telephone: (918) 585-2667
Facsimile: (918) 585-2669
*Attorneys for Plaintiff*

January 16, 2025

# TABLE OF CONTENTS

|  | *Page* |
|---|---|
| Table of Contents | *i* |
| Table of Authorities | *ii* |
| Introductory Statement | *1* |
| Summary of Allegations Concerning Ms. Hanchett | *2* |
| Standard of Review | *12* |
| Discussion | *13* |
| PROPOSITION I: Plaintiff's Amended Complaint Should Not be Dismissed for Failure to Timely Serve Nurse Doto | *13* |
| PROPOSITION II: Plaintiff Has Alleged Sufficent Facts to State Claims for Relief that are "Plausible" on Their Face | *15* |
| Certificate of Service | *27* |

# TABLE OF AUTHORITIES

| *Case* | *Page(s)* |
|---|---|
| *Archuleta v. Wagner,* 523 F.3d 1278 (10th Cir. 2008) | *12* |
| *Ashcroft v. Iqbal,* 556 U.S. 662 (2009) | *12* |
| *Barrios v. Haskell Cty. Pub. Facilities Auth.,* 432 P.3d 233 (Okla. 2018) | *26* |
| *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007) | *12, 13* |
| *Bell v. Wolfish,* 441 U.S. 520 (1979) | *16* |
| *Burke v. Regalado,* No. 18-CV-231-GKF-FHM, 2019 WL 1371144 (N.D. Okla. Mar. 26, 2019) | *13* |
| *Burke v. Regalado,* 935 F.3d 960 (10th Cir. 2019) | *15, 16, 17, 25* |
| *Clinton v. Sec. Benefit Life Ins. Co.,* 63 F.4th 1264 (10th Cir. 2023) | *13* |
| *DatRec, LLC v. AllegianceMD Software, Inc.,* 2022 WL 2758527, at \*2 (N.D. Okla. 2022) | *15* |
| *DeSpain v. Uphoff,* 264 F.3d 965 (10th Cir. 2001) | *17* |
| *Dias v. City & Cnty. Of Denver,* 567 F.3d 1169 (10th Cir. 2009) | *13* |
| *Espinoza v. U.S.,* 52 F.3d 838 (10th Cir. 1995) | *14* |
| *Estate of Jensen by Jensen v. Clyde,* 989 F.3d 848 (10th Cir. 2021) | *23* |
| *Estelle v. Gamble,* 429 U.S. 97, 103 (1976) | *1, 15* |
| *Farmer v. Brennan,* 511 U.S. 825, 832-33 (1994) | *15, 16, 17, 18* |
| *Graham v. Garfield County Criminal Justice Authority,* Case No. 17-CV-634 (W.D. Okla. Mar. 7, 2019) | *26* |
| *Hunt v. Uphoff,* 199 F.3d 1220 (10th Cir. 1999) | *23* |

*InterGen N.V. v. Grina,* 344 F.3d 134 (1st Cir. 2003) _24_

*Kelley v. Crosfield Catalysts,* 135 F.3d 1202 (7th Cir. 1998) _24_

*Lance v. Morris,* 985 F.3d 787 (10th Cir. 2021) _16_

*Lopez v. LeMaster,* 172 F.3d 756, 759 (10th Cir. 1999) _15_

*Lucas v. Turn Key Health Clinics, LLC,* 58 F.4th 1127 (10th Cir. 2023) _17, 23, 26_

*Martin v. Bd. of County Com'rs of County of Pueblo,* 909 F.2d 402 (10th Cir. 1990 _12_

*Mata v. Saiz,* 427 F.3d 745 (10th Cir. 2005) _17, 18, 25_

*Moya v. Schollenbarger,* 465 F.3d 444 (10th Cir. 2006) _10_

*NCMIC Insurance Company v. Brown,* 2018 WL 1508550, at *2 (D.N.M., 2018) _14, 15_

*New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.,* 101 F.3d 1492, 1504 (3d Cir. 1996) _24_

*Oxendine v. Kaplan,* 241 F.3d 1272 (10th Cir. 2001) _23_

*Paugh v. Uintah County,* 47 F.4th 1139 (10th Cir. 2022) _18_

*Prince v. Sheriff of Carter Cty.,* 28 F.4th 1033 (10th Cir. 2022) _16_

*Quintana v. Santa Fe Cnty. Bd. of Comm'rs,* 973 F.3d 1022 (10th Cir. 2020) _13_

*Rife v. Oklahoma Dep't of Pub. Safety,* 854 F.3d 637, 641 (10th Cir. 2017) _18_

*Robbins v. Oklahoma,* 519 F.3d 1242 (10th Cir. 2008) _13_

*Sawyers v. Norton,* 962 F.3d 1270 (10th Cir. 2020) _17, 25_

*Sealock v. Colorado,* 218 F.3d 1205 (10th Cir. 2000) _16, 18_

*Smith v. Allbaugh,* 987 F.3d 905 (10th Cir. 2021) _23_

*Tafoya v. Salazar*, 516 F.3d 912 (10th Cir. 2008)       _17_

*W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank,*       _24_
712 F.3d 165 (3d Cir. 2013)

## Introductory Statement

On June 14, 2024, well after the initial Complaint was filed in this case and while motions to dismiss the original Complaint were still pending, Defendant Sheriff of Cleveland County, in his official capacity, provided Plaintiff with a production of documents and materials. Included in this production of documents and materials was surveillance video consisting of over *250 hours* of footage. *See* Hanchett Jail Video (Dkt. #75-1) (Filed Conventionally) (Filed Under Seal). The surveillance video footage captures nearly every minute of Ms. Hanchett's detention at the Cleveland County Jail ("Jail"). *Id.* The video is stunning exposé of an unconstitutional medical delivery system. The prolonged and continual mistreatment of Ms. Hanchett, as depicted in the video, is truly shocking in its cruelty and depravity. *Id.*

The video shows that, for approximately 11 days, Ms. Hanchett was kept in a tiny "padded" cell with the lights on 24 hours a day, depriving her of any sleep, driving her deeper into madness. The cell was infested with cockroaches. It had no toilet or sink, forcing Ms. Hanchett to urinate on the floor. For days upon days, Ms. Hanchett laid in her own urine. She was deprived of hydration for ten (10) days. She went stretches of three (3) and five (5) days without anyone at the Jail opening her cell door. Suffering from severe dehydration, Ms. Hanchett's physical condition declined to the point that she could no longer walk, stand or even sit up on her own power. Still, Turn Key medical staff, including Defendant Tara Doto, LPN, and Cleveland County Sheriff's Office ("CCSO") detention staff alike, provided her with no assistance. By midnight on December 8, 2022, Ms. Hanchett was dead. Her heart had given out. Days of severe dehydration and reckless neglect had taken their toll. She

was just 38 years old.

As the Supreme Court stated in the seminal case of *Estelle v. Gamble*:

> An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical torture or a lingering death..., the evils of most immediate concern to the drafters of the [Eighth] Amendment....

429 U.S. 97, 103 (1976). The is one of those "worst cases" as described by the Court in *Estelle*. As graphically depicted by the surveillance video, the persistent disregard of Ms. Hanchett's emergent, obvious and basic medical and mental health needs produced "physical torture" and a "lingering death". And this surveillance video is the gravamen of Plaintiff's Amended Complaint. *See, e.g.,* Dkt. #57, ¶¶ 30-138. The evidence of deliberate indifference in this case is overwhelming. The Amended Complaint reflects this overwhelming evidence. Nurse Doto's Motion to Dismiss (Dkt. #101) should be denied.

## Summary of Allegations Concerning Ms. Hanchett

In order to assist the Court with its analysis of Nurse Doto's Motion to Dismiss, Plaintiff provides the following summary of allegations concerning Ms. Hanchett's treatment at the Cleveland County Jail. To wit, Plaintiff has alleged, *inter alia*:

- Shannon Hanchett was a mother of two boys and a pillar of the local community. She was the owner of Norman's Cookie Cottage, a well-known and popular bakery in Norman, OK.

- In October of 2022, Ms. Hanchett went to the hospital for severe headaches, but a CT scan found no abnormalities. A few weeks later, she began to exhibit signs of mental illness consistent with bipolar disorder and/or schizophrenia. She had no prior history of illness.

- The following month, Ms. Hanchett began to hallucinate and became convinced that her husband of 17 years, Daniel, had tapped the cell phone he had recently bought for her.

- On the evening of November 26, 2022, Ms. Hanchett entered an AT&T Wireless store in Norman, hoping to buy a new cell phone. While in the store, she exhibited obvious signs of psychosis.

- Clearly confused, distressed, and suffering from delusions, Ms. Hanchett asked a store employee to call 911, and a Norman Police Department ("NPD") Officer responded to the scene.

- The Officer acknowledged that Ms. Hanchett appeared to be exhibiting behavior consistent with a mental health disorder. Nevertheless, he arrested Ms. Hanchett for misdemeanor obstruction and transported her to the Cleveland County Jail ("Jail"). Video from the officer's body-worn camera shows that Ms. Hanchett is disoriented and terrified at the prospect of being arrested.

- Ms. Hanchett had no criminal history. This was her first time in a detention facility. She was a pretrial detainee.

- Jail surveillance video shows Ms. Hanchett's mental health status, which could conservatively be described as acute psychosis, continued to deteriorate after arriving at the Jail.

- Turn Key nurse Danille Hay, LPN[1], began the medical intake process with Ms. Hanchett but later claimed she was unable to complete it due to Ms. Hanchett's ongoing and severe mental health crisis.

- Nurse Hay *was* able to chart, however, that Ms. Hanchett suffered from lupus and bipolar disorder.

---

[1] "Licensed practical nursing" means "the practice of nursing *under the supervision or direction of a registered nurse, licensed physician* or dentist." 59 Okla. Stat. § 567.3a(4). LPNs have about a year of nursing education, often culminating in a certificate. The role of an LPN is, as the name suggests, practical. Typical duties for which an LPN is qualified are: record a patient's health history; administer medications (under the supervision of an RN or physician); perform wound care; measure and record vital signs; observe a patient's condition. "LPNs cannot diagnose any medical condition or prescribe any medication." *See* www.acha.org/documents/resources/guidelines/ACHA_Scope_of_Practice_for_College_Health_LPNs_Feb2023.pdf. LPNs are expected to report even minor changes in patient care to a registered nurse or other medical professional. *See also, Estate of Jensen by Jensen v. Clyde,* 989 F.3d 848, 852 (10th Cir. 2021) ("An LPN designation does not require an associate's or bachelor's degree ... [LPNs are] prohibited from prescribing medications, conducting health assessments, and diagnosing medical conditions.").

- Nurse Hay also took Ms. Hanchett's vital signs. Her blood pressure (143/89) and pulse (120 BPM) were both elevated. Nurse Hay did not, however, take any steps to address these concerning vital signs.

- Nurse Hay later charted that Ms. Hanchett had been "uncooperative" during processing and that she'd been unable "to complete [intake] at this time." However, in a written report, Officer David Owen notes that Ms. Hanchett "appears to cooperate with officers while being processed as a new inmate."

- After failing to complete the intake process, Jail staff locked Ms. Hanchett in processing cell B130 – a tiny, cockroach-infested cell that had no sink, no toilet and no bed. For the next 11 days, she was confined in these conditions and deprived of virtually all human contact. The lights were left on at all times, day and night, depriving her of any sleep.

- For periods of up to 5 days at a time, no one at the Jail even opened the door of Ms. Hanchett's cell. Denied access to a toilet, she was forced to urinate on the floor and then lie in her own waste.

- Despite the absence of a sink in her cell, no one at the Jail provided her with water or other hydration, day after day after day.

- Throughout this time, the Jail and Turn Key staff were fully aware of Ms. Hanchett's dreadful conditions of confinement and her escalating mental health crisis.

- Ms. Hanchett's cell was video monitored, allowing Jail staff to clearly see her extreme distress, her erratic behavior, and the rotting food, trash, and human waste on the floor of her cell. Despite observing that Ms. Hanchett had not been adequately eating and had been given nothing to drink for days, they failed to address these dangerous health risks or report them to a physician. This constitutes deliberate indifference, reckless neglect and inhumane mistreatment across the board. Indeed, as painstakingly summarized herein, Ms. Hanchett was shown *nothing but* indifference during her time at the Jail.

- At 12:18 AM [on December 8, 2022], DO McKenney approaches Ms. Hanchett's medical cell and looks in with his flashlight. He kicks the door to try to get her attention, but she does not respond.

- At 12:36 AM, members of the fire department arrive. They declare Ms. Hanchett deceased. Her body is wrapped in a bag and wheeled out on a gurney.

- The Medical Examiner's office determined Ms. Hanchett died of heart failure. Other significant conditions contributing to her death were psychosis with auditory and visual hallucinations and severe dehydration.

- On information and belief, Ms. Hanchett's death was would not have occurred in the absence of her prolonged catatonia and severe dehydration.

- Ms. Hanchett was just 38 years old when she died.

*See* Amended Complaint (Dkt. #57) at ¶¶ 13, 15-30, 133, 140-142.

As briefly summarized above, Ms. Hanchett was left to languish in a tiny, cockroach-infested processing cell, Cell B130, for nearly 11 days as her physical and mental condition deteriorated. *See, e.g.,* Dkt. #57 at ¶¶ 31-142. At 7:57 PM on Saturday, November 26, 2022, Jail staff locked Ms. Hanchett in B130. *Id.* at ¶ 31. Since B130 is a processing cell, not meant to hold inmates for more than a few hours, it has no bed – or any furnishings at all – no sink, and no toilet. The tiny room consists of nothing more than bare walls and a bare floor with a drain in its center. A light blares down from the ceiling. In the 11 days Ms. Hanchett spent in B130, the light remained on at all times. This made it virtually impossible for Ms. Hanchett to sleep, driving her deeper into madness. *Id.* After locking Ms. Hanchett into this "processing cell" on Saturday night, Jail staff leave her there – without access to water, a sink, a toilet, or even a mat to lie on – for more than 3 days without letting her out. Video from the cell's overhead camera shows that, from the moment Ms. Hanchett enters cell B130, she was suffering an obvious and severe psychotic episode. *Id.* at ¶ 32.

By 4:57 PM on November 27, 2022, Ms. Hanchett had been locked in B130, which, again, had no toilet or sink, for 21 hours. Left with no choice, Ms. Hanchett pulled her pants down and *urinated on the floor* of her cell, which was already covered with food and trash. In her psychotic state, she stripped naked, only to put her urine-soaked clothes back on a few minutes later. She sat in the corner, with her legs in the urine. Dkt. #57 at ¶ 38. At 6:23

PM, two DOs passed by her cell holding jugs of water, but *they did not give any* to Ms. Hanchett. One returned a moment later, the jug still in his hands. He looked into Ms. Hanchett's cell. Instead of giving her water, he closed the panel and walked away. *Id.* at ¶ 40.

By Monday, November 28, Ms. Hanchett – who was already severely psychotic when she arrived at the jail – had had no meaningful sleep for days. She continued to throw her meals onto the floor, so the rotting food was piling up. ***The door of her cell had not even been opened since Saturday.*** She had *still* been given no water, no mat to sleep on, and no opportunity to bathe. She had not seen a physician. Dkt. #57 at ¶ 41. Ms. Hanchett continued to speak on the intercom, but help did not arrive. She was forced to urinate on the floor again. *Id.* at ¶ 42.

Just past midnight on November 29, a DO opened the window panel on the door of B130 and looked in, seeing Ms. Hanchett lying on the floor of her filthy cell, naked from the waist down. Dkt. #57 at ¶ 45. The DO was carrying a jug of water, but did not offer any to Ms. Hanchett, who had been in the cell with no access to water for over two days. *Id.* Occasionally, Jail staff would put sack lunches through the bean hole in Hanchett's cell door, but she would throw it on the floor. *Id.* at ¶ 46. LPN Kariuki would later document ""PT HAD NOT BEEN EATING" but took no action to address Ms. Hanchett's obviously serious medical and mental health conditions. *Id.* Ms. Hanchett continued to descend deeper into her psychosis, exacerbated by her acute dehydration, as Jail staff and Turn Key staff observed her without doing a single thing to help. *Id.* at ¶¶ 47-51.

Jail staff briefly removed Ms. Hanchett from B130 at around 9:31 PM on November

29 only so that they could house another inmate there during his processing. Dkt. #57 at ¶ 52. Ms. Hanchett had been in the Jail for over four days, but still had not been seen by a physician. *Id.* at ¶ 53. Instead of transferring Ms. Hanchett to a psychiatric facility, Jail staff returned Ms. Hanchett to "processing cell" B130 once the male inmate had been processed. After marching her back into that cell, Jail staff ordered her to strip naked. Ms. Hanchett took off her pants but either could or would not take off her shirt. Jail staff grabbed Hanchett and took off her shirt. *Id.* at ¶ 54. Jail staff left Ms. Hanchett naked in B130 with only a suicide blanket. Although she was identified as a suicide risk, she had been provided no medical or mental health evaluation, treatment or care. *Id.* at ¶ 55. Jail staff did not open the door again for five days. *Id.* at ¶ 56.

Once returned to B130, Ms. Hanchett spent most of her time lying on the floor. Dkt. #57 at ¶ 57. Dangerously dehydrated, floridly psychotic, and completely untreated, Ms. Hanchett writhed around naked on the filthy floor of her video-monitored cell. What appears to be a cockroach periodically crawled across the lens of the camera. *Id.* at ¶ 58.

On December 2, Ms. Hanchett was in the same dire condition, rolling around on the floor of her dirty cell, covered with trash and rotting food, in deep psychosis and dehydration while Jail staff and medical staff observed her but doing nothing. Dkt. #57 at ¶¶ 61-69. Ms. Hanchett had been in B130 for an entire week. *Id.* Just before midnight on December 3, Nurse Doto opened the panel on the door of Ms. Hanchett's cell. She saw Ms. Hanchett lying on the floor, surrounded by trash and human waste. When she saw Nurse Doto, Ms. Hanchett raised her head off the floor and spoke urgently to her, waving both hands. Nurse Doto did nothing to help Ms. Hanchett. She watches Ms. Hanchett for a few seconds, then

closes the panel and walks away. *Id.* at ¶ 72.

At 2:29 AM on December 4, Nurse Doto opened the panel on the door of Ms. Hanchett's cell.  As before, she saw Ms. Hanchett lying on the floor, surrounded by trash and human waste.  As before, she did nothing to help Ms. Hanchett.  She closed the panel and walked away. Dkt. #57 at ¶ 74. At 2:44 AM, a DO walked past Ms. Hanchett's cell with a jug of water.  He did not give her any.  At that time, Ms. Hanchett was lying on the floor and sticking her face into the drain. Twenty (20) minutes later, Hanchett held an empty cup and showed it to the camera.  She held it to her mouth for hours.  A DO opened the door panel and saw Hanchett lying on the floor, facing the cell door, and holding an empty cup. He did nothing to help her. *Id.* at ¶ 75. *See also, id.* at ¶¶ 76-78.

Just past midnight on December 5, 2022, a DO opened the door to B130 and entered. Dkt. #57 at ¶ 82. **This is the first time her cell door had opened since Wednesday, November 30.**  Although Ms. Hanchett had entered the Jail in good physical condition – and had spent the first several days in custody on her feet and pacing her cell – Jail staff find she is now unable to even stand on her own. *Id.* A DO tried to give Hanchett clothes to put on, but she struggled to even sit up and could not dress herself. *Id.* at ¶ 83. Ms. Hanchett collapsed to the floor, but the three DOs who witnessed the fall did nothing. *Id.* at ¶ 84. Nurse Doto smiled as she watched the DOs put Hanchett on the floor in the West Corner area, just down the hall from cell B130.   One **DO demonstrated for Nurse Doto how Hanchett collapsed just moments before.**  Nurse Doto walked over to cell B130, where Ms. Hanchett has spent the past five (5) straight days – without a toilet, without a shower, and with human waste and rotting food piled on the floor.  Nurse Doto covered her nose with

her sweater and glanced inside. Then she walked away. *Id.* at ¶¶ 85-86. Although Ms. Hanchett is in the midst of an obvious medical emergency, Nurse Doto does nothing to help her. *Id.* at ¶ 86. After learning that Hanchett had just collapsed and could not stand without assistance, she does not even take Ms. Hanchett's vital signs. *Id.* She merely stands near where Ms. Hanchett is propped up on the floor. *Id.* After standing around and chatting with the DOs for five minutes, she simply walks away. *Id.* Nurse Doto knew, as it was patently obvious, that Ms. Hanchett, was in medical distress. Nurse Doto disregarded the known and excessive risks to Ms. Hanchett's health and safety. This was deliberate indifference. *Id.*

Too weak to move, Ms. Hanchett was left sitting on the floor for hours, with her back propped against the wall. Multiple DOs walk around without paying any attention to her. Dkt. #57 at ¶ 87. Although she has recently collapsed, at times she was completely unattended. *Id.* at ¶¶ 87-88. At 2:29 AM on December 5, Jail staff pulled Ms. Hanchett to her feet and marched her back to cell B130. *Id.* at ¶ 90. At 8:08 PM, a DO opens the panel on Ms. Hanchett's cell and Nurse Doto briefly peers in. She sees Ms. Hanchett lying naked on the bare concrete floor, amidst trash and rotting food. She knows Ms. Hanchett is too weak to stand and has collapsed earlier that day. She knows Hanchett's cell has no sink in it. Yet Nurse Doto provides no care to Ms. Hanchett. Instead, she walks away to the nearby desk and chats with DOs there. There is a jug of water in front of her. She does not provide any care to Ms. Hanchett. *Id.* at ¶ 97.

On December 7, numerous Jail and Turn Key staff observed Ms. Hanchett's condition and did nothing to help her as she slowly dies. Dkt. #57 at ¶ 112. At 9:19 AM, Cpt. Hammonds, accompanied by two other jailers, opened Ms. Hanchett's cell door. *Id.* at

¶ 113. The staff found Ms. Hanchett lying naked on the floor, rolling in the filth. She did not even respond to the door opening. A DO entered the cell and lifted Hanchett up to get her dressed, but she collapsed back onto the floor. Another DO entered the cell to assist and the two stood Hanchett up and tried to walk her out the door, but she **could not walk even with two people helping her. She collapsed and fell into the hallway.** This is, yet again, an obviously emergent situation requiring immediate transfer to a hospital. *Id.* at ¶ 114. Still, with Ms. Hanchett on death's door in front of them, the Jail staff did not call an ambulance. Rather, Shaw grabbed the suicide blanket from her cell and placed it over Hanchett's body. Then Hammonds grabbed Hanchett by her arms and **dragged her limp, naked body on the concrete floor, down the entire length of the hall.** *Id.* at ¶ 115. Hammonds and Shaw deposited Ms. Hanchett in Cell B124, another processing cell. *Id.* at ¶ 116.

Two hours later, Hammonds and Carter approached the door of cell B124, along with another DO. When Carter opened the cell door, Ms. Hanchett's bare legs *flop out into the hall.* Carter stepped over Hanchett's legs, pulled her up into a seated position and put her shirt on. Ms. Hanchett could not even sit up under her own power. Hammonds and Carter reclined her back and moved her limp body around on the hallway floor so they could get her pants on. Dkt. #57 at ¶ 120. When Hammonds and Carter failed to get Hanchett to her feet or even into a wheelchair, they decided to place her onto a suicide blanket and drag her body down the hall by her arms. *Id.* at ¶ 122. Eventually, Hammonds and Carter lifted Ms. Hanchett's limp body off the floor and into a wheelchair and wheeled her down the hall to the medical unit. *Id.* at ¶ 123-124. **Nurse Kariuki and Nurse Jewel Johnson appeared to share a joke and laugh as she passed by them.** They wheeled Ms. Hanchett to the shower in

the medical unit, pulled off her pants, and *dumped her body* from the wheelchair onto the shower floor. Nurse Kariuki was sitting behind the desk – just a few feet from the shower – and watched this with an amused expression. While Ms. Hanchett was lying on the shower floor, a DO approached Nurse Kariuki and tells her a joke. She laughed and pushed him away. *Id.* at ¶ 124-125. After showring Ms. Hanchett, Cpt. Hammonds and Nurse Johnson tried to stand her up, but she could not stand and collapsed to the floor again. *Id.* at ¶ 127. Instead of calling an ambulance, the Turn Key nurses continued to laugh. *Id.* Hammonds and Johnson then dragged Ms. Hanchett's naked body across the floor while Nurse Kariuki hysterically laughed. *Id.* at ¶ 128.

Nurse Doto reports to the Jail at 7:09 PM. At no time during her shift that night does she provide Ms. Hanchett anything to drink. She does, however, repeatedly sip on her own drinks during this time, and hands a DO a cold beverage, in full view of Hanchett's cell. And after Ms. Hanchett's death, Nurse Doto submits to the Sheriff's Office a *falsified*, handwritten statement claiming she had given Ms. Hanchett water twice that night. Dkt. #57 at ¶ 130. Contradicting her own statement to law enforcement that she had given Ms. Hanchett water on the night of her death, in another medical record *Nurse Doto falsely claims Ms. Hanchett "refused fluids"* at 9:17 PM that night. Jail surveillance video shows she did not offer Ms. Hanchett water at that time or any other time that night. Nor was Ms. Hanchett remotely competent to "refuse" water at this point – if she was even conscious at all. She was just three hours from dying from dehydration. She needed to be transported emergently to the hospital. Yet instead of providing her any care at all, Nurse Doto falsely claims Ms. Hanchett simply chose not to drink water that was offered to her. This was, once

again, deliberate indifference. *Id.* at ¶ 131.

At 12:18 AM on December 8, 2022, DO McKenney approached Ms. Hanchett's medical cell and looked in with his flashlight. By this time, Ms. Hanchett's ***"feet were pale and blue."*** *Id.* at ¶ 135. Her "eyes were red and her lips were purple." *Id.* Yet Nurse Doto moved without any sense of urgency. *Id.* At 12:36 AM, members of the fire department arrived and declared Ms. Hanchett deceased. *Id.* at ¶ 138.

<u>Standard of Review</u>

When deciding a Rule 12(b) motion to dismiss, courts are "'limited to assessing the legal sufficiency of the allegations contained within the four corners of the complaint ....'" *Archuleta v. Wagner,* 523 F.3d 1278, 1281 (10th Cir. 2008) (cleaned up). In conducting this assessment, courts must "'accept as true all well-pleaded facts, as distinguished from conclusory allegations, and view those facts in the light most favorable to the nonmoving party.'" *Archuleta,* 523 F.3d at 1283 (cleaned up).

In *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007), the United States Supreme Court held that the complaint must contain "enough facts to state a claim to relief that is *plausible* on its face" (emphasis added). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009). "The plausibility requirement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of the conduct necessary to make out the claim." *Burke v. Regalado,* No. 18-CV-231-GKF-FHM, 2019 WL 1371144, at *2 (N.D. Okla. Mar. 26, 2019) (cleaned up). The Tenth Circuit has observed that the *Twombly* "opinion seeks to find a middle ground

between 'heightened fact pleading,' . . . and allowing complaints that are no more than 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action,' which the Court stated 'will not do.'" *Robbins v. Oklahoma,* 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly,* 550 U.S. at 547 and 555).

The Tenth Circuit has emphasized that "[g]ranting [a] motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Clinton v. Sec. Benefit Life Ins. Co.,* 63 F.4th 1264, 1276 (10th Cir. 2023) (cleaned up). The Circuit imposes a "low bar for surviving a motion to dismiss." *Quintana v. Santa Fe Cnty. Bd. of Comm'rs,* 973 F.3d 1022, 1034 (10th Cir. 2020). A "well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id.* (quoting *Dias v. City & Cnty. Of Denver,* 567 F.3d 1169, 1178 (10th Cir. 2009)).

Applying this standard of review, Plaintiff's allegations against Nurse Doto easily survive the Motion to Dismiss.

## Discussion

## PROPOSITION I: PLAINTIFF'S AMENDED COMPLAINT SHOULD NOT BE DISMISSED FOR FAILURE TO TIMELY SERVE NURSE DOTO

Plaintiff named Nurse Doto in his initial Complaint, but was unable to timely serve her. Plaintiff subsequently learned that Nurse Doto was married in 2024, now goes by the name Tara Brandon, and has moved to Tennessee with her husband. *See, e.g.,* Dkt. #99 at 2. A process server hired by Plaintiff's counsel served Nurse Doto on December 4, 2024, 86

days after the September 9, 2024 filing of the Amended Complaint. *Id.* While Plaintiff was unable to timely serve Nurse Doto with the initial Complaint, Plaintiff respectfully requests the Court not to dismiss Nurse Doto for failure to timely serve in the interests of justice and judicial economy.

Rule 4(m) provides that if the plaintiff "shows good cause for the failure [to serve], the court must extend the time for service for an appropriate period." Fed.R.Civ.P. 4(m). District Courts have discretion to grant an extension of time to serve a defendant, even in the absence of a showing of good cause. *See, e.g., Espinoza v. U.S.,* 52 F.3d 838, 841 (10th Cir. 1995). "If the plaintiff fails to show good cause, the district court must still consider whether a permissive extension of time may be warranted. At that point the district court may in its discretion either dismiss the case without prejudice or extend the time for service." *Id.* "Factors that the Court should consider in determining whether to grant a permissive extension of time for service include (1) whether the applicable statute of limitations would bar the action if it had to be refiled, (2) whether the plaintiff has tried, but failed, to effect service upon the United States, especially if proceeding *pro se,* and (3) whether the failure of a *pro se* plaintiff to effect timely service was a consequence of confusion or delay attending the resolution of an *in forma pauperis* petition." *NCMIC Insurance Company v. Brown,* 2018 WL 1508550, at *2 (D.N.M., 2018) (citing *Espinoza,* 52 F.3d at 842). "Additional factors include whether the defendant had notice of the lawsuit or would be prejudiced by an extension." *NCMIC,* 2018 WL 1508550, at *2 (internal citations omitted).

As Nurse Doto has now been served with the Amended Complaint[2] and Summons, Plaintiff asserts that Defendants have suffered no prejudice. Further it is in the interests of judicial economy to not dismiss Defendant Doto for untimely service. *See, e.g., DatRec, LLC v. AllegianceMD Software, Inc.,* 2022 WL 2758527, at *2 (N.D. Okla. 2022) ("Dismissing this case now that Defendant is served and presumably ready to address the merits would do nothing to advance the efficient litigation of cases that Rule 4(m) is intended to promote – to the contrary, it would be inefficiency of the highest magnitude to dismiss the case and require the parties and the Court administrative staff to start anew on under a different caption."). Were the Court to dismiss Nurse Doto for failure to timely serve, Plaintiff would be forced to refile his claims against Nurse Doto pursuant to Oklahoma's Savings Statute, 12 O.S. § 100. Then, Plaintiff would move to join Doto as a Defendant in the case-at-bar. This would create unnecessary delay and disruption. On the other hand, as Defendants' Motions to Dismiss are pending, there would not be any unnecessary delay in the proceedings if the Court grants Plaintiff's requested extension of time to serve Nurse Doto.

## PROPOSITION II: PLAINTIFF HAS ALLEGED SUFFICIENT FACTS TO STATE CLAIMS FOR RELIEF THAT ARE "PLAUSIBLE" ON THEIR FACE

■ **Plaintiff Has Plausibly Alleged Nurse Doto Was Deliberately Indifferent to Ms. Hanchett's Serious Medical Needs**

Although "neither prison officials nor municipalities can absolutely guarantee the safety of their prisoners, [t]hey are ... responsible for taking reasonable measures to [e]nsure

---

[2] Notably, Plaintiff filed his Amended Complaint prior to the expiration of the two-year statute of limitations against Defendants, including Nurse Doto.

the safety of inmates." *Lopez v. LeMaster,* 172 F.3d 756, 759 (10th Cir.1999) (internal citation omitted). "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan,* 511 U.S. 825, 828 (1994). *See also Estelle v. Gamble,* 429 U.S. 97, 104 (1976). "The constitutional protection against deliberate indifference to a pretrial detainee's serious medical condition springs from the Fourteenth Amendment's Due Process Clause." *Burke v. Regalado,* 935 F.3d 960, 991 (10th Cir. 2019). "The Fourteenth Amendment's Due Process Clause entitles pretrial detainees" like Buchanan "to the same standard of medical care that the Eighth Amendment requires for convicted inmates." *Lance v. Morris,* 985 F.3d 787, 793 (10th Cir. 2021) (citation omitted). *See also Bell v. Wolfish,* 441 U.S. 520, 545 (1979); *Burke,* 935 F.3d at 991.

It is believed that Ms. Hanchett was a pretrial detainee at the time of her death. Nevertheless, whether the Eighth or Fourteenth Amendment applies, the deliberate indifference standard is the same.

Deliberate indifference involves both an objective and subjective component. *See, e.g., Sealock v. Colorado,* 218 F.3d 1205, 1209 (10th Cir. 2000); *Prince v. Sheriff of Carter Cnty.,* 28 F.4th 1033, 1043-44 (10th Cir. 2022). Nurse Doto does not assert that Plaintiff has failed to satisfy the objective component. Thus, the objective component is not at issue for the purposes of the Motion to Dismiss.

Rather, Nurse Doto argues that, in order to satisfy the subjective component of deliberate indifference, Plaintiff was required to "show Defendant had knowledge of the specific risk faced by Ms. Hanchett – i.e. the risk of imminent death facing Ms. Hanchett from heart failure – and knowingly and willingly disregarded that risk to the level of

sufficiently serious deprivation[.]" Dkt. #101 at 18.[3] However, knowledge of the "risk of imminent death facing Ms. Hanchett from heart failure" is not the appliable standard. Plaintiff is not required to plead this level of specificity. "[T]he complaint need not show [Defendant] was consciously aware [Ms. Hanchett] had a specific ailment ... but rather that [s]he was aware [Ms. Hanchett] *faced a substantial risk of harm to her health and safety."* *Lucas v. Turn Key Health Clinics, LLC,* 58 F.4th 1127, 1141 (10th Cir. 2023). *See also Prince,* 28 F.4th at 1045 ("[B]ecause we conclude that Bowker's earlier symptoms should prompt a layperson to seek immediate medical attention, *the risk of death was an incorrect inquiry*"). "To satisfy the subjective component, the plaintiff must show the official 'knows of and disregards an excessive risk to inmate health or safety.'" *Burke,* 935 F.3d at 992 (quoting *Farmer,* 511 U.S. at 837); *See also Sawyers v. Norton,* 962 F.3d 1270, 1283 (10th Cir. 2020); *Mata v. Saiz,* 427 F.3d 745, 753 (10th Cir. 2005). Put another way, a civil rights defendant is deliberately indifferent where she "has knowledge of a substantial risk of serious harm to inmates . . . [and] fails to take reasonable steps to alleviate that risk." *Tafoya v. Salazar,* 516 F.3d 912, 916 (10th Cir. 2008). Plaintiff has plausibly alleged that LPN Doto was aware that Ms. Hanchett "faced a substantial risk of harm to her health and safety." *Lucas,* 58 F.4th at 1141. Nothing more is necessary.

"Because it is difficult, if not impossible, to prove another person's actual state of mind, whether an official had knowledge may be inferred from circumstantial evidence." *DeSpain v. Uphoff,* 264 F.3d 965, 975 (10th Cir. 2001). For instance, "the existence of an

---

[3]     Citations to the pleadings refer to the CM/ECF pagination.

obvious risk to health or safety may indicate awareness of the risk." *Rife v. Oklahoma Dep't of Pub. Safety,* 854 F.3d 637, 647 (10th Cir. 2017) (citing *Farmer,* 511 U.S. at 842).

The Tenth Circuit recognizes two types of conduct constituting deliberate indifference in the jail/prison medical context. *See Sealock,* 218 F.3d at 1211. "First, a medical professional may fail to treat a serious medical condition properly.... The second type of deliberate indifference occurs when prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment." *Sealock,* 218 F.3d at 1211. A medical professional who serves "solely ... as a gatekeeper for other medical personnel capable of treating the condition" may be held liable under the deliberate indifference standard if she "delays or refuses to fulfill that gatekeeper role." *Id.*

Additionally, "[a] prisoner may satisfy the subjective component by showing that defendants' delay in providing medical treatment caused either unnecessary pain or a worsening of [his] condition. Even a brief delay may be unconstitutional." *Mata,* 427 F.3d at 755. Further, when an inmate's condition is worsening, a reasonable jury could find that the need for medical assistance was obvious. *See Paugh v. Uintah County,* 47 F.4th 1139, 1159 (10th Cir. 2022).

Applying these legal standards, Plaintiff has alleged numerous facts which tend to show that Nurse Doto was deliberately indifferent to Ms. Hanchett's serious medical needs. Indeed, Nurse Doto both "fail[ed] to treat [Ms. Hanchett's] serious medical condition properly[,]" and also "delay[ed] or refuse[d] to fulfill [her] gatekeeper role." *See* Summary of Allegations Concerning Ms. Hanchett, *supra.*

Defendant claims that Plaintiff's allegations against Nurse Doto "are limited to less than a handful of interactions that, in total, do not rise to the level of deliberate indifference." Dkt. #101 at 18. Defendant's argument is completely devoid of merit. Nurse Doto showed Ms. Hanchett nothing but deliberate indifference, bordering on pure contempt. For example, Plaintiff has alleged that Nurse Doto encountered Ms. Hanchett on December 3, 2022 at approximately 11:59 p.m., when she found her lying on the floor, surrounded by trash and human waste. Dkt. #57 at ¶ 72. As alleged, when Ms. Hanchett saw Nurse Doto, she raised her head off the floor, tried to speak to her, and waved both hands at her. *Id.* Nurse Doto observed Ms. Hanchett and did nothing to help. *Id.* She did not enter the cell, did not take vital signs, and did not call 911 or a doctor. *Id.* This was deliberate indifference.

Nurse Doto returned to Ms. Hanchett's cell a few hours later, at around 2:29 a.m. on December 4, 2022. Dkt. #57 at ¶ 74. Again, she did not enter the cell, but rather observed Ms. Hanchett through the panel of the cell door, seeing her lying on the floor surrounded by trash and human waste. *Id.* As before, she did nothing to help Ms. Hanchett, closing the panel and walking away. *Id.* Again, this was deliberate indifference.

Shortly after midnight on December 5, a DO entered Ms. Hanchett's cell. This was the first time since November 30 that her cell door was opened. Dkt. #57 at ¶ 82-83. The DO tried to give Ms. Hanchett clothes to put on, but she was unable to dress herself. *Id.* While the DO was trying to dress Ms. Hanchett, she collapsed on the floor. *Id.* Nurse Doto stood and watched, smiling, as three DOs stood Ms. Hanchett up and walked her down the hall to the West Corner area of the Jail. *Id.* at ¶ 84-85. Nurse Doto walked over to cell B130, where Ms. Hanchett had spent the past five (5) straight days – without a toilet,  without a

shower, and with human waste and rotting food piled on the floor. Reacting to the stench of the cell, Nurse Doto covered her nose with her sweater and glanced inside. Then she walked away. *Id.* Although Ms. Hanchett was in the midst of an obvious medical emergency, and had just collapsed, Nurse Doto did nothing to help her. *Id.* at ¶ 86. Nurse Doto disregarded the known and excessive risks to Ms. Hanchett's health and safety. This was deliberate indifference. *Id.*

At 8:08 p.m. on December 5, a DO opened the panel on Ms. Hanchett's cell and Nurse Doto briefly peered in. Dkt. #57 at ¶ 97. She saw Ms. Hanchett lying naked on the bare concrete floor, amidst trash and rotting food. *Id.* She knew Ms. Hanchett was too weak to stand and had collapsed earlier that day. *Id.* She knew Hanchett's cell has no sink in it. *Id.* Yet Nurse Doto provided no care to Ms. Hanchett. *Id.* Instead, she walked away to the nearby desk and chatted with DOs there. *Id.* There was a jug of water in front of her, but she did not provide any to Ms. Hanchett. *Id.*

Although Nurse Doto did nothing to help Ms. Hanchett despite her serious medical needs, she did take the time to complete a "Waiver of Treatment/Evaluation" Form. Dkt. #57 at ¶ 98. In it, she claims that at 9:39 PM on December 5, Ms. Hanchett "refused to let me take vitals." *Id.* The document – which is supposed to be signed by the patient – states:

- *"I certify that I am refusing to consent . . . at my own insistence and against the advice of the health care provider..."*

- "I have been informed of by a qualified healthcare professional of the risks attendant to my refusal."

- "During the clinical interview with included counseling and education, the qualified healthcare professional has given me the opportunity to ask questions and has answered my questions."

20

- *"I assume full responsibility for any results caused by my decision and I hereby release the institution, its employees, officers, and the provider from all legal responsibility and liability."*

- *"I certify that I am of sound mind* and have read, or had read to me, and fully understand the above information concerning my refusal to accept treatment/evaluation..."

Dkt. #57 at ¶ 98. On the signature line, Nurse Doto wrote "refused." *Id.* at ¶ 99. Nurse Doto falsified this form. Jail surveillance video shows Nurse Doto did not ask to take Ms. Hanchett's vitals, conduct a "clinical interview," or provide Ms. Hanchett "counseling and education." Nor did Ms. Hanchett refuse Nurse Doto's help. *Id.* at ¶ 100.[4] **Clearly, Ms. Hanchett was not even close to being coherent enough to consent, or not consent, to anything.** Nurse Doto did not even enter Ms. Hanchett's cell.

Lastly, Nurse Doto reported to the Jail at 7:09 p.m. on December 7, 2022. *See* Dkt. #57 at ¶ 130. At no time during her shift that night did she provide Ms. Hanchett anything to drink. *Id.* Contradicting her own statement to law enforcement that she had given Ms. Hanchett water on the night of her death, in another medical record **Nurse Doto falsely claims Ms. Hanchett "refused fluids"** at 9:17 PM that night. *Id.* at ¶ 131. Jail surveillance video shows she did not offer Ms. Hanchett water at that time or any other time that night. *Id.* Nor was Ms. Hanchett remotely competent to "refuse" water at this point – if she was

---

[4] In Defendant's Motion to Dismiss, she criticizes Plaintiff for having "discrepancies" between her Complaint and Amended Complaint. *See, e.g.,* Dkt. #101 at 18-19. For example, Defendant points out that in the original Complaint, "Plaintiff asserted that Nurse Doto did in fact conduct" a clinical interview of Ms. Hanchett on December 5. *Id.* at 19. Defendant fails to mention the reason that Plaintiff removed her original allegations that Nurse Doto attempted to assess Ms. Hanchett on the evening of December 5 is the surveillance video proved that Nurse Doto falsified the waiver of treatment form and, in fact, never even entered Ms. Hanchett's cell.

even conscious at all.[5] *Id.* She was just three hours from dying from dehydration. *Id.* She needed to be transported emergently to the hospital. *Id.* Yet instead of providing her any care at all, Nurse Doto falsely claims Ms. Hanchett simply chose not to drink water that was offered to her. This was, once again, deliberate indifference. *Id.*

Nurse Doto observed Ms. Hanchett's mental and physical condition – which was objectively and obviously serious on November 26 – steadily decline over a full week, but she still failed to act during any of her "encounters" with Ms. Hanchett. To the contrary, Nurse Doto showing nothing but deliberate indifference towards Ms. Hanchett, smiling and laughing at her with colleagues while she lay dying. Each failure to provide any treatment or secure an urgent evaluation from a higher-level provider constitutes deliberate indifference.

A recent civil rights case against Turn Key is instructive here. In *Lucas v. Turn Key*, the district court granted a motion to dismiss a claim of deliberate indifference to a serious medical need. On appeal, the plaintiff argued that the district court applied a "more stringent subjective standard" for deliberate indifference by requiring her to allege that the decedent, "Ms. Caddell", received no medical treatment at all. *Lucas,* 58 F.4th at 1137-38. The defendants in *Lucas* argued that the district court properly held that a "complete denial of care" is required to state a claim. *Id.* at 1138. In rejecting this argument, the *Lucas* Court

---

[5] Defendant argues that the surveillance video shows Nurse Doto "check[ing] on Ms. Hanchett on a number of occasions" on December 7 and that by virtue of Nurse Doto standing outside of Hanchett's cell for a few seconds periodically, it is not "an unreasonable inference that when Nurse Doto was standing at the glass checking on Ms. Hanchett, she offered her fluids." Dkt. #101 at 21-22. First, Plaintiff has plausibly alleged that Nurse Doto did not offer Ms. Hanchett fluids, and Plaintiff's allegations must be taken as true. Second, the video undisputedly shows that Nurse Doto did not bring any fluids with her on the occasions that she briefly stood at Ms. Hanchett's cell on December 7, when Ms. Hanchett was nearly unresponsive and just hours from death. Third, Nurse Doto's viewing the dying Ms. Hanchett in no way constitutes constitutionally adequate care.

cited to several other Tenth Circuit decisions that stand for the proposition that a medical professional's failure to treat an inmate's condition *properly* may rise to the level of deliberate indifference. *Id.* at 1138-41 (citing *Oxendine v. Kaplan,* 241 F.3d 1272, 1277-79 (10th Cir. 2001), *Hunt v. Uphoff,* 199 F.3d 1220, 1224 (10th Cir. 1999); *Smith v. Allbaugh,* 987 F.3d 905, 911 (10th Cir. 2021); and *Estate of Jensen by Jensen v. Clyde,* 989 F.3d 848, 860 (10th Cir. 2021)).

As observed by the *Lucas* Court, in *Oxendine*, the Circuit "held the alleged facts supported an inference that Dr. Kaplan knew about and disregarded a substantial risk due to his treatment — the 'ineffectiveness of [his] reattachment and subsequent care of [a] severed finger,' and his gatekeeping — 'the delay in seeking specialized treatment.'" *Lucas,* 58 F.4th at 1143 (quoting *Oxendine,* 241 F.3d at 1278). The *Lucas* Court further relied on the decision in *Smith v. Allbaugh,* where the Circuit "held that medical staff did not 'merely misdiagnose[ ]' when the plaintiff 'presented with severe symptoms' of abdominal pain, but rather that 'medical staff prescribed ***woefully inadequate treatment*** in the form of Pepto-Bismol, a laxative, Ibuprofen, and fibrous foods.'" *Id.* at 1141 (quoting, *Smith,* 987 F.3d at 911).

Here, Plaintiff has alleged that Nurse Doto ***provided no care at all*** to address Ms. Hanchett's bizarre behavior, confusion, disorientation, delirium, refusal to eat, severe dehydration, inability to stand or walk in her own, collapsing onto the floor, emergent physical decline and hallucinations. Nurse Doto witnessed Ms. Hanchett's concerning and deteriorating condition on numerous occasions, yet she failed to provide even a modicum of treatment or refer Ms. Hanchett to an outside medical provider or a higher-level provider.

Each time Nurse Doto observed Ms. Hanchett, her condition had gotten worse, but, with deliberate indifference, Nurse Doto failed to do anything to help. *See, e.g., Paugh,* 47 F.4th at 1159.

Nurse Doto argues that, in the Amended Complaint, Plaintiff "conveniently omitted multiple Paragraphs from his initial Complaint in which he alleged Nurse Doto *did attempt* to evaluate Ms. Hanchett." Dkt. #101 at 10. This is a frivolous argument. First, contrary to Defendant's assertion, the Court should not take judicial notice of Plaintiff's initial Complaint (Dkt. #1), as the Amended Complaint "supersedes the original and renders it of no legal effect, unless the amended complaint specifically refers to or adopts the earlier pleading," which is not the case here. *New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.,* 101 F.3d 1492, 1504 (3d Cir. 1996) (cleaned up). *See also, W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank,* 712 F.3d 165, 171-72 (3d Cir. 2013); *InterGen N.V. v. Grina,* 344 F.3d 134, 145 (1st Cir. 2003) ("...the mere retraction of statements made in an original complaint does not justify the invocation of judicial estoppel."); *Kelley v. Crosfield Catalysts,* 135 F.3d 1202, 1204-5 (7th Cir. 1998) ("It is well-established that an amended pleading supersedes the original pleading; facts not incorporated into the amended complaint are considered functus officio... If certain facts or admissions from the original complaint become *functus officio,* they cannot be considered by the court on a motion to dismiss the amended complaint. A court cannot resuscitate these facts when assessing whether the amended complaint states a viable claim.").

Tellingly, Nurse Doto makes no mention, in her Motion, that the Amended Complaint contains pages and pages of *new* factual allegations based on the surveillance

video footage. While the original Complaint contained 11 ½ pages of allegations concerning the "Facts Specific to Ms. Hanchett", the Amended Complaint includes *30 pages* of factual allegations specific to Ms. Hanchett's tragic plight at the Jail. *Compare* Dkt. 1 at 4-16 *with* Dkt. #57 at 4-34. And, clearly, these factual allegations are derived from the newly-produced surveillance video footage. *See, e.g.,* Dkt. #57 at ¶¶ 30-138; and Hanchett Jail Video (Dkt. #75-1) (Filed Conventionally and Filed Under Seal).

There is a simple explanation as to why portions of the initial Complaint have now been relegated to the cutting room floor. Once again, it comes back to the surveillance video. Review of the video footage shows that many of the entries in Ms. Hanchett's medical chart and Jail records are false, or otherwise inaccurate. *See, e.g.,* fn 4, *supra.*

Simply put, the pertinent records and documents, including those written by Nurse Doto, to the extent they note any purported "care" provided to Ms. Hanchett, are belied by the video evidence. Turn Key's records and representations -- concerning the treatment of Ms. Hanchett – are simply not credible. More broadly, the surveillance video demonstrates that Turn Key and CCSO staff, including Nurse Doto, repeatedly *failed* to document Ms. Hanchett's obvious physical decline (including multiple falls and an inability to walk, sit up or stand on her own), deplorable living conditions and lack of hydration. The video footage has drastically changed and augmented Plaintiff's factual allegations in this case. Plaintiff has not omitted facts that "support a finding that Plaintiff cannot state a claim for deliberate indifference against" Nurse Doto, as she avers. *See* Dkt. #101 at 12. On the contrary, the facts *added* to this case, as gleaned from the video evidence, make for a truly *overwhelming claim* that multiple employees or agents of Turn Key, including Nurse Doto, were

deliberately indifferent to Ms. Hanchett's serious medical needs. In other words, reading the Amended Complaint in the light most favorable to Plaintiff, it is beyond plausible that numerous employees or agents of Turn Key, including Nurse Doto, disregarded obvious and excessive risks to Ms. Hanchett's health and safety. *See, e.g., Burke,* 935 F.3d at 992; *Sawyers,* 962 F.3d at 1283; *Mata,* 427 F.3d at 753; *Tafoya,* 516 F.3d at 916.

Plaintiff has alleged plausible violations of Ms. Hanchett's constitutional right to adequate medical care. Nurse Doto's Motion to Dismiss should be denied.[6]

WHEREFORE, premises considered, Plaintiff respectfully requests that the Court deny Defendant Tara Doto's Motion to Dismiss (Dkt. #101).

Respectfully submitted,

/s/Robert M. Blakemore
Daniel E. Smolen, OBA#19943
Robert M. Blakemore, OBA #18656
Bryon D. Helm, OBA #33003
SMOLEN & ROYTMAN
701 S. Cincinnati Ave.
Tulsa, Oklahoma 74119
P: (918) 585-2667
F: (918) 585-2669

*Attorneys for Plaintiff*

---

[6] Defendant additionally argues that to "the extent Plaintiff is bringing" a state-law negligence claim against Nurse Doto, "it must fail for the reasons set forth below." Dkt. #101 at 24. Plaintiff has not, however, brought a negligence claim against Nurse Doto. *See, generally,* Dkt. #57. As clearly identified in the Amended Complaint, Plaintiff has only brought a negligence claim against Turn Key. *Id.* at ¶¶ 352-358. Further, in contrast to Defendant's assertion, *Barrios v. Haskell Cty. Pub. Facilities Auth.,* 432 P.3d 233 (Okla. 2018) "did not find that a healthcare contractor was an employee entitled to tort immunity under the OGTCA but simply assumed the healthcare contractor was an employee for purposes of answering the certified questions before it." *Lucas,* 58 F.4th at 1147-48 (quoting *Graham v. Garfield County Criminal Justice Authority,* Case No. 17-CV-634 (W.D. Okla. Mar. 7, 2019) at 3-4).

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of January 2025, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to all ECF registrants who have appeared in this case.


/s/Robert M. Blakemore